#92288

ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 JUL -6  PM 3: 10

DEPUTY CLERK_____

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

UNITED STATES OF AMERICA *ex rel.*
TINA HAIGHT,

　　　　　　　　*Plaintiffs,*

　　v.

RRSA (COMMERCIAL DIVISION), LLC;
ROOFING & RESTORATION SERVICES OF
AMERICA, LLC; RRSA COMMERCIAL
ROOFING, INC.; HAIGHT CONSTRUCTION
MANAGEMENT SERVICES, INC.; TURCO
CONSTRUCTION INC.; ANDREW'S
ROOFING & RESTORATION; CLARK
BUILDERS GROUP, LLC; CLARK
BUILDERS GROUP, LLC; HUNT
COMPANIES, INC.; LEND LEASE (US)
CONSTRUCTION, INC.; LEND LEASE (US)
PUBLIC PARTNERSHIPS HOLDINGS, LLC;
LINCOLN PROPERTY COMPANY; HARPER
CONSTRUCTION COMPANY, INC.; WALSH
CONSTRUCTION COMPANY; COREY S.
SANCHEZ; JON R. SEYMORE; JENNIFER N.
SEYMORE; RONALD SCOTT NICHOLS;
AND JOHN DOES #1-50, FICTITIOUS
NAMES,

　　　　　　　　*Defendants.*

Civil Action No. _____

**COMPLAINT FOR
FALSE CLAIMS ACT VIOLATIONS
UNDER 31 U.S.C. § 3729 *ET SEQ.***

**FILED UNDER SEAL PURSAUNT TO
31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

## 3-16CV1975-M

## SEALED

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    JURISDICTION AND VENUE ........................................................................5

III.   PARTIES ............................................................................................................6

       A.    Plaintiff/Relator .......................................................................................6

       B.    Prime Contractor Defendants ..................................................................6

             1.    Clark Builders Group, LLC ...........................................................6

             2.    Hunt Companies, Inc. ....................................................................7

             3.    Harper Construction Company, Inc. ..............................................7

             4.    Lend Lease (US) Construction, Inc./Lend Lease (US) Public
                   Partnerships, LLC ..........................................................................8

             5.    Lincoln Property Company ............................................................8

             6.    Walsh Construction Company ........................................................8

       C.    Subcontractor Defendants ........................................................................9

             1.    RRSA (Commercial), LLC ............................................................9

             2.    Roofing & Restoration Services of America, LLC........................9

             3.    RRSA Commercial Roofing, Inc. ..................................................9

             4.    Haight Construction Management Services, Inc. ..........................9

             5.    Turco Construction Inc. ...............................................................10

             6.    Andrew's Roofing & Restoration..................................................10

             7.    Corey S. Sanchez .........................................................................10

             8.    Jon R. Seymore .............................................................................10

             9.    Jennifer N. Seymore......................................................................11

             10.   Ronald Scott Nichols ...................................................................11

       D.    John Does Nos. 1-50, Fictitious Names.................................................11

IV.    BACKGROUND ..............................................................................................12

       A.    Federal Small Business Subcontracting..................................................12

       B.    The "Presumed Loss Rule" Under the Small Business Jobs Act of 2010 .............21

       C.    The Anti-Kickback Act of 1986 ("AKA")..............................................23

       D.    Liability And Remedies Under the False Claims Act............................25

V.      RRSA (COMMERCIAL DIVISION), LLC IS FORMED IN ORDER TO
        FRAUDULENTLY OBTAIN SMALL BUSINESS SUBCONTRACTING
        OPPORTUNITIES.................................................................................................27

VI.     RRSA COMMERCIAL IS NOT A SMALL BUSINESS BECAUSE IT IS
        AFFILIATED WITH THE OTHER RRSA ENTITIES....................................33

        A.      RRSA Commercial Shares Common Ownership with the RRSA Affiliated
                Defendants ..............................................................................................33

        B.      RRSA Commercial Shares Common Management with the RRSA
                Affiliated Defendants.............................................................................35

        C.      RRSA Commercial Shares an Identity of Interest with the RRSA
                Affiliated Defendants.............................................................................37

        D.      The Totality of the Circumstances Confirms RRSA Commercial Is
                Affiliated with the RRSA Affiliated Defendants....................................37

VII.    THE PRIME CONTRACTOR DEFENDANTS WERE FULLY AWARE THAT
        RRSA COMMERCIAL WAS NOT A LEGITIMATE SMALL BUSINESS
        WHEN AWARDING IT GOVERNMENT SUBCONTRACTS .......................41

        A.      Clark Builders Group, LLC ...................................................................41

        B.      Hunt Companies, Inc. .............................................................................45

        C.      Lincoln Property Company/Lincoln Military Housing...........................47

        D.      Harper Construction Company, Inc. .......................................................50

        E.      Lend Lease (US) Public Partnerships, LLC............................................53

        F.      Walsh Construction Company ................................................................57

VIII.   THE RRSA AFFILIATED DEFENDANTS PAID CLARK ILLEGAL BRIBES
        IN EXCHANGE FOR AWARDING OF SUBCONTRACTS...........................60

IX.     DEFENDANTS INTENTIONALLY MISREPRESENTED THEIR SIZE
        STATUS ............................................................................................................61

X.      DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO
        DEFRAUD THE UNITED STATES ................................................................63

XI.     DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO
        FEDERAL PROGRAMS ..................................................................................64

XII.    SYSTEMIC DAMAGES CAUSED BY SMALL BUSINESS
        MISREPRESENTATION FRAUD ..................................................................67

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) .......................68

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) .....................69

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))....................69

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ...................70

Filed Under Seal

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 *ET SEQ*.

This is an action brought on behalf of the United States of America by Tina Haight ("Relator"), by and through her attorneys, against Defendants Clark Builders Group, LLC, Hunt Companies, Inc., Harper Construction, Inc., Lincoln Property Company, Lend Lease (US) Public Partnership and Walsh Construction Company (collectively, the "Prime Contractor Defendants") and RRSA (Commercial Division), LLC, Roofing and Restoration Services of America, LLC, RRSA Commercial Roofing, Inc., Haight Construction Management Services, Inc., Andrew's Roofing & Restoration, Inc., Turco Construction, Inc., MH Consulting and Construction, Inc., (collectively, the "RRSA Affiliated Defendants"), Corey S. Sanchez, Jon R. Seymore, Jennifer N. Seymore, Ronald Scott Nichols, and John Does #1-50, Fictitious Names, pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA").

## I.    INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States (collectively, the "Government") arising from false statements and claims that Defendants knowingly presented to, or caused to be presented to, the Government in violation of the FCA and state law counterparts.

2.      At issue in this case are Government contracts and subcontracts in which Defendants concealed and/or intentionally misrepresented the true size status of the RRSA Affiliated Defendants in the implementation of subcontracting plans on large construction projects, including at military bases throughout the country. Defendants pursued their illegal scheme in order to reap bonus payments and additional work orders at the expense of the United States and federal taxpayers.

3.      Defendants are comprised of (1) the Prime Contractors Defendants, which were issued awards under various Government construction contracts; (2) the RRSA Affiliated Defendants, which received subcontracts from the Prime Contractor Defendants under these Government construction projects; and (3) members of the RRSA Affiliated Defendants' senior management, who conceived of—and conspired with the Prime Contractor Defendants in carrying out—the illegal scheme described herein.

4.      Specifically, Defendants made false representations to Government entities that RRSA (Commercial Division), LLC (hereinafter "RRSA Commercial") was eligible to receive small business subcontract awards when RRSA Commercial was, in fact, not a legitimate small business due to its affiliation with a number of commonly controlled companies. As part of its fraudulent scheme, the Prime Contractor Defendants knowingly offered (and RRSA Commercial knowingly accepted) subcontracting opportunities with the full understanding that RRSA Commercial was not an eligible small business.

5.      In addition, the RRSA Affiliated Defendants paid illegal kickbacks to Prime Contractor Defendant Clark Builders Group, LLC ("Clark") to ensure RRSA Commercial received subcontracts under the construction contracts that Clark held with Government entities. This was in violation of the terms of the Anti-Kickback Act, 41 U.S.C. § 51 *et seq.*, and each of the prime contracts (which were incorporated into the subcontracts' flow down provisions) by providing or offering to provide kickbacks, including cash, gratuities, and/or gifts in kind; soliciting or accepting kickbacks, including cash, gratuities, and gifts in kind; and/or including the amount of prohibited kickbacks in the price charged.

6.      As a result of the Prime Contractor Defendants' false and/or fraudulent representations and conduct, the Government was induced to (1) believe that the Prime

Contractor Defendants were in compliance with their small business subcontracting plans; (2) award subsequent task order extensions; and (3) pay the Prime Contractor Defendants millions of dollars in contractually-mandated monetary bonus award fees while also providing Prime Contractor Defendants with additional business volume resulting in higher revenues and profits.

7.     The Prime Contractor Defendants also violated the terms of their small business subcontracting plans ("Subcontracting Plans") they were required to submit to GSA as a condition of award and payment.  In these Subcontracting Plans, the Prime Contractor Defendants represented that portions of their subcontractor spending on Government task orders would go to small business subcontractors.  These representations were knowingly false when made because the purported small business that received the subcontracts (*i.e.*, RRSA Commercial) was in fact, controlled and/or owned by the RRSA Affiliated Defendants.

8.     The Prime Contractor Defendants made numerous material false statements and certifications to the Government. When submitting their Subcontracting Plans, the Prime Contractor Defendants falsely represented that they intended to comply in good faith with their Subcontracting Plans.  In addition, each of the monthly invoice requests that the Prime Contractor Defendants presented to the Government for work allegedly performed by small businesses were false claims.  Further, the Prime Contractor Defendants made materially false statements in mandatory reports to the Government regarding their utilization of small businesses in their subcontracts, which was in violation of their obligation to comply in good faith with their Subcontracting Plans.

9.     Meanwhile, RRSA made false representations that it was eligible for awards on small business subcontracts when it was, in fact, ineligible because RRSA was "affiliated" with the RRSA Affiliated Defendants under SBA rules and regulations.  Specifically, RRSA self-

certified that it was a small business in order to gain subcontract opportunities. However, affiliation under SBA rules and regulations made RRSA other than a small business, and thus ineligible to be claimed as small businesses by Prime Contractor Defendants on all relevant Federal and State government contracts.

10.     As a consequence of Defendants' willful misrepresentations, the Government paid the Prime Contractor Defendants, which then subcontracted work and diverted compensation to RRSA for services that the Government would not otherwise have paid had they been fully aware of the nature of the RRSA Affiliated Defendants and that RRSA did not constitute a small business concern under the applicable rules and regulations.

11.     Defendants' fraud denied the United States and the States the opportunity to channel tens of millions of dollars' worth of federal and state contracting dollars to legitimate small businesses through subcontracting.

12.     As detailed below, Defendants' fraudulent reporting to the Government have caused many years of improper and illegal billings to the United States and the States. As a direct, proximate and foreseeable result of Defendants' fraudulent course of conduct set forth herein and conducted on a national scale, from at least 2011 through the present, Defendants have knowingly made numerous false express and implied certifications and/or caused the submission of thousands of false or fraudulent statements and false claims to Government programs for payment for their services.

13.     Defendants agreed to a common scheme to present these false claims and statements to the United States and the States, and these false claims and statements were made in furtherance of a conspiracy to defraud the United States and the States. The purpose of the

scheme has, at all relevant times, been to receive payment under false pretenses for claims submitted to the United States Government.

14.     As a result of these false express and implied certifications, reports and claims, the Government was falsely and/or fraudulently induced to conduct hundreds of transactions with Defendants, in the form of greater transfers and dollars fraudulently paid.  Because the United States was falsely and/or fraudulently induced to complete these transactions with Defendants, each claim for payment under the contracts was a false claim.

15.     Among other misconduct, as detailed herein, Defendants conspired amongst themselves as well as with numerous co-conspirators in order to deceive the Government as to the small business status of the RRSA Affiliated Defendants.  This misconduct was based on collusion and among the Defendants to conceal the true size status from the Government.

16.     This conduct is continuing.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over claims brought on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732.

18.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

19.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendants own and operate businesses within this judicial district, and certain acts that form the basis of this Complaint occurred in this judicial district.

20.    The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal their wrongdoing.

## III.    PARTIES

### A.    PLAINTIFF/RELATOR

21.    Relator Tina Haight ("Relator") brings this action on behalf of herself and the United States of America and the *Qui Tam* States.

22.    Relator is an original source of the allegations in this Complaint, and the allegations are not based upon publicly disclosed information.  Relator has provided the government with information prior to the filing of the Complaint in accordance with 31 U.S.C. § 3730(b)(2).

23.    Relator voluntarily provided the non-public information alleged herein to the government prior to filing this action.  Accordingly, Relator is an "original source" of the non-public information alleged in this Complaint within the meaning of 31 U.S.C. §§ 3730(e)(4)(A) and 3730(e)(4)(B).

### B.    PRIME CONTRACTOR DEFENDANTS

#### 1.    Clark Builders Group, LLC

24.    Clark Builders Group, LLC ("Clark") is a Virginia limited liability company with its principal place of business at 4401 Wilson Boulevard, Arlington, VA 22203.  Founded in 1992, Clark Builders is a non-publicly traded entity and there are no parents, subsidiaries or affiliate entities of Clark Builders that have issued stock or debt securities to the public.  The owner of Clark Builders is Construction Capital LLC, which is also a non-publicly traded entity.

25.    Formerly known as Clark Realty Builders, Clark Builders is one of the nation's top multifamily housing builders and an active participant in the Defense Department's push to

construct and renovate military housing.   Clark Builders builds some 6,000 units a year, including apartments, condominiums, and senior housing, as well as military dwellings.   While it acts as owner, developer, and builder on some projects, the company primarily serves as third-party general contractor

### 2.   Hunt Companies, Inc.

26.   Hunt Companies, Inc. ("Hunt") is a full-service real estate company in the residential contractor industry headquartered in 4401 North Mesa St., El Paso, Texas, 79902.

27.   Founded in 1977, the company has 680 full time employees and generates an estimated $56.7 million in annual revenue with regional offices located across the country. Hunt is a national developer, investor, manager and financier of real assets providing a broad range of services to public and private sector clients.   Hunt is involved in multifamily housing, public infrastructure and commercial properties to the management of assets, investments and financing.

### 3.   Harper Construction Company, Inc.

28.   Harper Construction Company, Inc. ("Harper") is a design-build general contractor headquartered in 2241 Kettner Boulevard, San Diego, CA 92101.   Founded in 1974 by its chairman, Ron Harper, Harper Construction is currently run by Jeff Harper and is a mid-sized organization in the nonresidential contractor industry. Harper has 140 full time employees and generates an estimated $28.9 million in annual revenue.

29.   Harper Construction provides a range of services including pre-construction, program management, design development, construction, interior design management, inspection and quality control services. The company has held several contracts with the Department of the Navy since 2002 to 2016

     **4.**     **Lend Lease (US) Construction, Inc./Lend Lease (US) Public Partnerships, LLC**

30.     Lend Lease (US) Construction, Inc. is headquartered in 200 Park Avenue, 9th Floor, New York, NY 10166. The company provides international project management and construction services. Formerly known as Bovis Lend Lease, Inc., the company changed its name to Lend Lease (US) Construction, Inc. in April 2011. Founded in 1917 and based in New York, New York, Lend Lease operates as a subsidiary to the parent company Lend Lease Corporation Limited, an international construction company headquartered in Sydney, Australia.

31.     Lend Lease (US) Public Partnerships, LLC is a subsidiary of Lend Lease Corporation Limited that focuses on infrastructure development. The company was incorporated in 2002 and has branches operating throughout the United States. The company's agent is the Corporation Trust Company which is located in Wilmington, Delaware 19801.

     **5.**     **Lincoln Property Company**

32.     Lincoln Property Company ("Lincoln"), headquartered in Dallas, Texas, was founded in 1965 for the purpose of building and operating residential communities, primarily in Texas and the southwestern United States. As part of an effort to expand its business, in 2001 Lincoln Military Housing was formed and entered into a partnership with the U.S. Department of Defense to renovate and redevelop family housing at selected bases for the Navy, the Marine Corps, and the Army. Lincoln Military Housing is now one of the largest operators of military housing in the country.

     **6.**     **Walsh Construction Company**

33.     Walsh Construction Company ("Walsh") is a general contracting corporation with its principal place of business at 929 West Adams, Chicago, Illinois 60607. Walsh is a general

contracting, construction management, and design build firm. Incorporated in the State of Illinois in 1949, Walsh provides preconstruction and construction services throughout the United States and provides, among other things, general contracting services to both private and government developers. Walsh has served as a general contractor for many federally financed construction projects. Walsh Construction Company operates as a subsidiary of The Walsh Group, Ltd.

C.     SUBCONTRACTOR DEFENDANTS

1.     **RRSA (Commercial), LLC**

34.     RRSA (Commercial), LLC is a Texas limited liability company with its principal place of business at 310 W. Jefferson Street, Waxahachie, Texas 75165.  RRSA (Commercial Division), LLC was incorporated on June 28, 2011.

2.     **Roofing & Restoration Services of America, LLC**

35.     Roofing & Restoration Services of America, LLC is a Texas limited liability company with its principal place of business at 310 W. Jefferson Street, Waxahachie, Texas 75165.  Roofing & Restoration Services of America was incorporated on February 9, 2010.

3.     **RRSA Commercial Roofing, Inc.**

36.     RRSA Commercial Roofing, Inc. is a Texas corporation with its principal place of business at 105 W. Franklin Street, Waxahachie, Texas 75165.  RRSA Commercial Roofing Inc. was incorporated on March 27, 2013.

4.     **Haight Construction Management Services, Inc.**

37.     Haight Construction Management Services, Inc. is a Texas corporation with its principal place of business at: 105 W. Franklin Street, Waxahachie, Texas 75165.  Haight Construction Management Services was incorporated on October 13, 2006.

### 5.     Turco Construction Inc.

38.     Turco Construction Inc., is a Minnesota corporation with its registered office address at 100 South 5th Street, Suite 1075, Minneapolis, MN 55402 and its principal executive office at 105 W. Franklin Street, Waxahachie, Texas 75165. Its Chief Executive Officer is Defendant Corey Sanchez. Turco Construction Inc. was incorporated on July 25, 2001.

### 6.     Andrew's Roofing & Restoration

39.     Andrew's Roofing & Restoration is an Ohio corporation with its principal place of business in Columbus, Ohio. Andrew's Roofing & Restoration, Inc. was incorporated on October 11, 2006.

### 7.     Corey S. Sanchez

40.     Corey S. Sanchez is a natural person who resides in Ellis County, Texas; he may be served with process at his residence at 6802 FM 876, Waxahachie, Texas 75167, or wherever he may be found.  Prior to Marty's death, Sanchez served as an officer, manager, agent, or director, either officially or de facto, of the RRSA Affiliated Defendants.  Sanchez was involved in all aspects of the business, particularly the operations.

### 8.     Jon R. Seymore

41.     Jon Ryan Seymore is a natural person who resides in Ellis County, Texas; he may be served with process at his residence at 309 Magnolia Dr., Waxahachie, Texas 75165, or wherever he may be found.  Mr. Seymore also served as an officer, manager, agent, or director either officially or de facto, of the RRSA Affiliated Defendants.  Like Defendant Sanchez, Mr. Seymore was involved in all aspects of the business, particularly financial. Further, Mr. Seymore had a partial ownership interest in certain of the RRSA Affiliated Defendants in conjunction with his wife husband, Defendant Jennifer Seymore.

### 9.   Jennifer N. Seymore

42.   Jennifer Nicole Haight Seymore ("Ms. Seymore") is a natural person who resides in Ellis County, Texas; she may be served with process at her residence at 309 Magnolia Dr., Waxahachie, Texas 75165, or wherever she may be found.  Ms. Seymore served as an officer, manager, agent, or director either officially or de facto, of the RRSA Affiliated Defendants.  Like Defendant Sanchez, Ms. Seymore was involved in all aspects of the business, particularly financial.  Further, Ms. Seymore had a partial ownership interest in certain of the RRSA Affiliated Defendants in conjunction with her husband, Defendant Jon Seymore.

### 10.   Ronald Scott Nichols

43.   Ronald Scott Nichols is a natural person who resides in Ellis County, Texas. Nichols has served as the Vice President of RRSA (Commercial), LLC since at least 2012.

### D.   JOHN DOES NOS. 1-50, FICTITIOUS NAMES

44.   John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with the Defendants to perpetuate the scheme described herein.

45.   To the extent that any of the conduct or activities described in this Complaint was not performed by Defendants, but by the individuals or entities described herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme described herein.

46.     As a result of actions of John Does Nos. 1-50, Fictitious Names, the Government has suffered financial harm.

## IV.   BACKGROUND

### A.   FEDERAL SMALL BUSINESS SUBCONTRACTING

47.     Encouraging small business participation in federal contracting is not a new initiative.  Congress passed the Small Business Act in 1953 to declare government's commitment to the success of small businesses and to ensure that a "fair proportion" of government contracts go to small business entities.  15 U.S.C. § 631(a).  That commitment was re-affirmed in the Small Business Jobs Act of 2010.  Pub. L. No. 111-240 (2010).

48.     In the Small Business Act, Congress created a government-wide goal for contracting to small businesses, which is currently 23 percent of all federal procurements.  15 U.S.C. § 644(g).

49.     Each year, the Small Business Administration reports on each of the federal agencies' progress in reaching its goal of contracting with small businesses. Small Business Contracts: Examining How Oversight Failures and Regulatory Loopholes Allow Large Businesses to Get and Keep Small Business Contracts Before the Subcomm. on Contracting Oversight Senate Homeland Security and Governmental Affairs Committee, 112th Cong. (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration).

50.     The Small Business Act also encourages prime contractors to award subcontracts to small companies, including those with various special socioeconomic designations recognized by the SBA, so that they will have the "maximum practicable opportunity to participate in the performance" of Federal contracts. 15 U.S.C. § 637(d)(1) provides:

It is the policy of the United States that small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems.

51.     The Small Business Act also requires the above language be inserted into every federal prime contract (other than certain specified contracts not relevant here), and further requires that every federal prime contract include a clause stating that "The contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract." 15 U.S.C. § 637(d)(3).

52.     The Small Business Act further emphasizes the importance of ensuring that small and other disadvantaged contractors participate in the performance of subcontracts by requiring prime contractors to submit subcontracting plans to the procuring agencies showing "percentage goals for the utilization" of these companies in performing the contract, 15 U.S.C. § 637(d)(4), (d)(6).

53.     Additionally, in its subcontracting plan, a contractor must include a "statement of the total dollars planned to be subcontracted and a statement of the total dollars planned to be subcontracted to small business (including ANCs and Indian tribes), veteran-owned small business, service-disabled veteran-owned small business, HUBZone small business, small disadvantaged business (including ANCs and Indian tribes) and women-owned small business concerns." FAR 19.704(a).

54.     A subcontracting plan must also include a "description of the types of records that will be maintained concerning procedures adopted to comply with the requirements and goals in the plan." *Id.*

55.     Pursuant to FAR § 52.219-9(l), a contractor must submit semi-annual Individual Subcontract Reports ("ISRs") or Summary Subcontract Reports ("SSRs") disclosing the details of each of the subcontracts awarded to small businesses, as well as the extent of its compliance with its small business subcontracting plan.

56.     A contractor who fails to submit a subcontracting plan when the threshold dollar amount is met is ineligible to be awarded the contract. *See* 15 U.S.C. § 637(d)(4)(C); FAR § 19.702. Further, "[n]o contract shall be awarded to any offeror unless the procurement authority determines that the [small business subcontracting] plan . . . provides the maximum practicable opportunity for small business concerns . . . to participate in the performance of the contract." 15 U.S.C. § 637(d)(4)(D).

57.     Indeed, the Small Business Act provides: "The subcontracting plan shall be included in and made a material part of the contract." *Id.* § 637(d)(4)(B). Further, the subcontracting plan must contain assurances that each offeror or bidder will submit "periodic reports . . . in order to determine the extent of compliance by the offeror or bidder with the subcontracting plan." *Id.* § 637(d)(6)(E).

58.     The Small Business Act further states in 15 U.S.C. § 637(d)(4)(D) as follows:

> No contract shall be awarded to any offeror unless the procurement authority determines that the plan to be negotiated by the offeror pursuant to this paragraph provides the maximum practicable opportunity for small business concerns, qualified HUBZone small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, small business concerns owned and controlled by

socially and economically disadvantaged individuals, and small business concerns owned and controlled by women to participate in the performance of the contract.

59.     The Small Business Act mandates that all federal prime contracts (other than certain specified contracts not relevant here) "shall contain a clause for the payment of liquidated damages upon a finding that a prime contractor has failed to make a good faith effort to comply with the requirements imposed on such contractor by this subsection." *Id.* § 637(d)(4)(F)(i).

60.     Contracts may only be awarded to responsible prospective contractors. FAR § 9.103(a).  In making a responsibility determination, the contracting officer must determine, among other things, that the contractor has "a satisfactory record of integrity and business ethics." FAR § 9.104-1(d).  Further, the contractor must consider the contractor's compliance with the subcontracting plans submitted on previous contracts as a factor in determining contractor responsibility.   FAR § 19.705-5(a)(1).   In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer is to make a determination of nonresponsibility.  FAR § 9.103(b).

61.     Moreover, the Small Business Act makes a prime contractor's representation that it is in compliance, and will remain in compliance with its small business subcontracting plan, a material condition of award and continuing performance. 15 U.S.C. § 637(d)(4)(B), (D).

62.     The Small Business Act further provides that a prime contractor or subcontractor's failure to comply in good faith with a subcontracting plan and the policy encouraging the greatest possible participation in the performance of the contract by disadvantaged small businesses including WOSBs, SDBs and HUBZone businesses, constitutes a "material breach" of the contract or subcontract. *Id.* § 637(d)(9).

63.     In order to meet the small business contracting goals, each federal agency holding procurements may create opportunities called "set-asides" for either all small businesses or a subset of small businesses to compete against a pool of like-size contractors.  Devon E. Hewitt, Jonathan T. Williams & Isaias Alba, IV.  *Small Business Contracting Programs – Part I.* Briefing Papers No. 10-11, Oct. 2010, at 3.  This allows small businesses to gain opportunities they might not have had competing against larger, more resource-rich companies.

64.     There are a number of small businesses that qualify for additional special programs by virtue of their company's minority ownership and/or geographic location.  Each of these categories, such as small disadvantaged business or 8(a) contractors, has its own qualifications for certification by the Small Business Administration ("SBA") or self-certification and allows for additional opportunities to compete against similarly qualified small businesses (i.e., only those in their category).

65.     Qualifying for a small business contracting program allows businesses to more readily gain lucrative opportunities with the Federal Government.  In 2009, approximately $100 billion went to small businesses to procure goods and services.  Reginald M. Jones & Douglas P. Hibshman.  *Limitations on Teaming Arrangements in Small Business Set-Asides.*  Procurement Lawyer, at 1, Spring 2010.

66.     Given the potential of receiving a contract designed only for small businesses, and the amount of money available, it is not surprising that businesses explore all the possible avenues to qualify.

67.     However, misrepresenting a firm as "small" to avail itself of contracting opportunities is strictly prohibited.  15 U.S.C. § 645. The Small Business Act provides sanctions

for false certifications up to $500,000 and imprisonment. Any violation of the rules governing eligibility may result from a firm misrepresenting itself as a small business.

68.    The SBA defines small businesses as those "not dominant in [their] field," but the actual size standard varies by industry and the industry code described in the North American Industry Classification System ("NAICS"). SMALL BUS. ADMIN., WHAT ARE THE SMALL BUSINESS SIZE STANDARDS?, *available at* http://www.sba.gov/content/what-are-small-business-size-standards (last visited May 23, 2014). The SBA uses NAICS as a basis for its size standards, which are typically the average number of persons employed for each pay period over the latest twelve months, or the average annual receipts over a three-year period. *Id.* Those standards set the threshold to qualify as a small business for Federal procurement opportunities. *Id.*

69.    In determining the size of a business, the SBA rules count the number of employees or the contractor's three-year annual revenues, as well as those of any affiliates of the contractor. 13 C.F.R. § 121.103(a)(6).

70.    Each NAICS industry code has a corresponding size standard, and the table is published annually in the Federal Register. 13 C.F.R. § 121.101. For example, roofing contractor services are classified under NAICS code 238160. As previously discussed, the corresponding size standard for this NAICS code has changed over the course of the relevant time period. From the issuance of RRSA Commercial's first subcontract until 2013, the size standard for NAICS Code 238160 was $14 million in average annual receipts over the most recent three-year period. After January 7, 2013, the size standard was increased to its current $15 million limit.

71.     If a purported "small business" and its affiliates have average annual receipts in excess of the relevant NAICS Code, it is not a small business and may not bid on a contract with that NAICS code set-aside for small businesses, or represent itself as a small business for the purpose of obtaining subcontracts.

72.     Eligibility for small business opportunities is generally determined on a procurement by procurement basis.  Each procurement officer must classify the product or service being sought in a particular NAICS code, identify the size standard SBA has set for that code and specify the standard in the solicitation, so businesses can correctly determine if they qualify as small for that particular solicitation.  FAR § 19.102.

73.     Affiliation is determined when one business has the power to control another or a third entity has the power to control both, whether exercised or not.  *Id.* § 121.103(a)(1). The SBA uses a totality of the circumstances test and may find affiliation even when no single factor is sufficient. *Id.* § 121.103(a)(5).  The SBA publishes clear guidance illustrating the operation of the affiliation rules.  SMALL BUS. ADMIN., AN OVERVIEW ON AFFILIATION, *available at* http://www.sba.gov/sites/default/files/affiliation_discussion_0.pdf (last visited May 23, 2014).

74.     The SBA considers factors to determine affiliation including common ownership and management, previous relationships with or ties to another concern, substantially identical business interests, or contractual arrangements.  13 C.F.R. § 121.103(a)(2).

75.     Affiliation through common ownership and management can be found when a person or entity is a majority shareholder of a small business concern or where the officers, directors or managing members of one concern are able to control the board of directors and/or management of another concern. *Id.* § 121.103(e).  The positions of CEO, COO, and CFO are

commonly understood to be senior leadership positions that carry with them the ability to exercise substantive control or critical influence over the company's operations.

76.     Ultimately, a small business cannot be controlled by a large business or have the ability to be controlled by one, whether such control is exercised.

77.     Affiliation through identical business interests can be found either when two or more entities have substantially identical business or economic interests (either because of family ties, common investments or firms economically dependent on each other), or when former owners, managers, or key employees of one concern organize a new concern in the same or related field.  *Id.* § 121.103(f).

78.     An identity of interest through economic dependence may arise when one firm provides critical financial assistance to another firm, such as through loans or financial guarantees.  Economic dependence also occurs when one firm generates a significant percentage of its revenue on contracts awarded to it by a second firm.  Affiliation through economic dependency can be found when a business concern is unlikely to be able to survive on its own or is economically dependent upon another person.  The SBA's Office of Hearing and Appeals ("OHA") has held, in virtually all cases, that one firm is economically dependent upon another if it derives 70% of more of its revenues from that firm.  OHA has also found affiliation based on economic dependence where one concern is so dependent on another for contracts or business that its economic viability would be in jeopardy without that business

79.     Finally, affiliation through the "newly organized concern" rule arises when former officers, directors, principal stockholders or "key employees" of a large business attempt to evade the SBA size rules by spinning off a new company.  The newly organized concern rule consists of four required elements: (1) the former officers, directors, principal stockholders,

managing members, or key employees of one concern organize a new concern; (2) the new concern is in the same or related industry or field of operation; (3) the persons who organized the new concern serve as the new concern's officers, directors, principal stockholders, managing members, or key employees; and (4) the one concern is furnishing or will furnish the new concern with contracts, financial or technical assistance, indemnification on bid or performance bonds and/or other facilities, whether for a fee or otherwise. Under this rule, a "key employee" is defined as an individual with "critical influence or substantial control over the operations or management" of the company.

80.     Ascertaining an entity's size to determine eligibility to bid is not a difficult exercise. The SBA has extensive, layman-readable instructions that describe the process in plain English. *See, e.g.,* SMALL BUS. ADMIN., SMALL BUSINESS SIZE STANDARDS, *available at* http://www.sba.gov/category/navigation-structure/contracting/contracting-officials/eligibility-size-standards (last visited May 23, 2014). Through one of their lawyer executives, the Defendants could have easily consulted these resources and received confirmation that they were not small business concerns due to their affiliation.

81.     If consulting the SBA web site was too difficult, the Defendants could have, free of charge, placed a phone call to one of the many SBA Procurement Centers around the country. These centers are staffed with experienced personnel trained to provide guidance on size and status compliance questions. The directory is found at: http://www.sba.gov/content/procurement-center-representatives.

**B.      THE "PRESUMED LOSS RULE" UNDER THE SMALL BUSINESS JOBS ACT OF 2010**

82.      The Small Business Jobs Act of 2010 codified the calculation of damages for misrepresentation under the FCA, which significantly increases the ante for prosecutions both by the Government and *qui tam* relators.

83.      Section 1341 of the Jobs Act, also called the "Presumed Loss Rule," (Senate Report 111-343, Small Business Contracting Revitalization Act of 2010, *available at* http://www.gpo.gov/fdsys/pkg/CRPT-111srpt343/html/CRPT-111srpt343.htm (last visited on May 23, 2014), provides a presumption of loss to the Government equal to the total amount expended on the contract.  Small Business Jobs Act of 2010, Pub. L. No. 111-240, §§ 1311-1347 (2010); Albert B. Krachman, *Game Changer: The Presumed Loss Rule and Mis-Certification of Small Business Status*, Contract Management Magazine, May 2011, at 16, *available at* http://www.blankrome.com/siteFiles/Publications/4840855CA653AA3DF85D4F9307A84C4D.p df.  There is no allowance for discounting the damages amount to credit the value of services or goods provided to the Government under the contract.  Small Business Jobs Act of 2010,  Pub. L. No. 111-240, § 1341 (2010).

84.      Through this Act, Congress has clearly stated that the Government's damages calculation shall use an intended beneficiary analysis. S. Rep. No. 111-343 at 8 (2010).  That is, where the Government intended the contract to benefit an eligible small business, and an ineligible business received the benefit of that contract, the entire amount paid to the ineligible contractor becomes the loss to the Government.

85.      This codification is significant because contractors are liable for three times the total amount of money received under the contract plus the penalties and other fees.  31 U.S.C. § 3729.  Thus, an ineligible business that misrepresented its status as small with a $300,000 set-

aside contract may be liable for over $1 million in damages by operation of the Small Business Jobs Act.

86.    The new law also changes the certification process for small businesses. As part of a bid or proposal, small businesses have historically needed to self-certify that they are an eligible small business.   Under the Small Business Jobs Act, businesses must both initially register as a small business and annually update their status in the SAM database.  These self-certifications are based on the honor system enforced by significant legal exposure if not accurate.

87.    The Small Business Jobs Act also has a Deemed Certification provision, which deems a proposal or bid to include a certification that the bidder is an eligible small business for small business opportunities contracts by operation of law.

88.    Both submissions of bids set aside for small businesses and registrations in the SAM database for the purpose of being considered for an award as a small business concern will be deemed "affirmative, willful and intentional certifications of small business size and status." 15 U.S.C. § 632(w)(2).

89.    Each time a large business misrepresents in its self-certifications that it is a "small business" in order to win a contract bid, the large business has won bids that should have been awarded to legitimate small businesses instead.   Likewise, the large business that has misrepresented its size status has gained an unfair advantage on other honest large businesses that have not made such misrepresentations.

90.    The SBA has identified such firms as "bad actors," who are "taking intentional and often fraudulent advantage" of SBA programs.  Small Business Contracts: Examining How Oversight Failures and Regulatory Loopholes Allow Large Businesses to Get and Keep Small

Business Contracts Before the Subcomm. on Contracting Oversight Senate Homeland Security and Governmental Affairs Committee, 112th Cong. (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration). The SBA has made clear that it "has no tolerance for a firm found to be acting fraudulently," adding that, where appropriate, the agency "will act decisively to oust them from our programs and from doing business with the government generally." *Id.*

91.    Further, the SBA is continuing to take action and make referrals to the Department of Justice "against any firm attempting to 'game the system'" with SBA programs. *Id.* The SBA has stated that it "will come down hard on those who seek to take unfair advantage of our programs and services to the detriment of the many honest small businesses that depend on those programs and services." *Id.*

C.    THE ANTI-KICKBACK ACT OF 1986 ("AKA")

92.    The Anti-Kickback Act of 1986, 41 U.S.C. § 51 *et seq.*, modernized and closed the loopholes of previous statutes applying to government contractors. The AKA attempts to make the anti-kickback statute a more useful prosecutorial tool by expanding the definition of prohibited conduct and by making the statute applicable to a broader range of persons involved in government subcontracting. Prosecutions under these statutes must establish the following.

93.    The AKA prohibits attempted as well as completed "kickbacks," which include any money, fees, commission, credit, gift, gratuity, thing of value, or compensation of any kind. The Act also provides that the inclusion of kickback amounts in contract prices is prohibited conduct in itself.

94.    The AKA requires only that the purpose of the kickback was for improperly obtaining or rewarding favorable treatment. It is intended to embrace the full range of government contracting.

95.    The AKA prohibits the payment, solicitation and receipt of kickbacks by prime contractors, prime contractor employees, subcontractors, and subcontractor employees. These terms are defined in the Act.

96.    The AKA defines kickbacks to include payments under any government contract.

97.    The AKA requires one to knowingly and willfully engage in the prohibited conduct for the imposition of criminal sanctions.

98.    The AKA requires each contracting agency to include in each prime contract exceeding $100,000 for other than commercial items, a requirement that the prime contractor shall—

> (1) Have in place and follow reasonable procedures designed to prevent and detect violations of the Act in its own operations and direct business relationships (*e.g.,* company ethics rules prohibiting kickbacks by employees, agents, or subcontractors; education programs for new employees and subcontractors, explaining policies about kickbacks, related company procedures and the consequences of detection; procurement procedures to minimize the opportunity for kickbacks; audit procedures designed to detect kickbacks; periodic surveys of subcontractors to elicit information about kickbacks; procedures to report kickbacks to law enforcement officials; annual declarations by employees of gifts or gratuities received from subcontractors; annual employee declarations that they have violated no company ethics rules; personnel practices that document unethical or illegal behavior and make such information available to prospective employers); and

> (2) Cooperate fully with any Federal agency investigating a possible violation of the Act.

99.    Both prime contractors and subcontractors, either of Government-unique or commercial items are required to submit a written report to the Government in the event that they

have "reasonable grounds to believe that a violation of [the Act] may have occurred." 41 U.S.C. § 57(c).

100.    Moreover, FAR contract clause 52.203-7 ("Anti-Kickback Procedures"), one of the flow down provisions included in many government subcontractor contracts, requires that essentially all of the prohibitions and requirements applicable to the Prime Contractor Defendants must be flowed-down to subcontractors "in all subcontracts under this contract which exceed $100,000."

### D.    LIABILITY AND REMEDIES UNDER THE FALSE CLAIMS ACT

101.    Each time a small business files its annual SAM self-certification or submits its FAR certifications, it becomes subject to a stiff sanctions regime intended to deter small business contracting fraud.

102.    In addition to other laws that may be applicable, section 16(d) of the Small Business Act provides severe criminal penalties for knowingly misrepresenting the small business size status of a concern in connection with procurement programs. 15 U.S.C. § 645(d). Section 16(a) of the Act also provides, in part, for criminal penalties for knowingly making false statements or misrepresentations to SBA for influencing in any way the actions of the Agency. 13 C.F.R. § 121.108.

103.    The penalties for violating the Small Business Act could not be more clear than as stated in the self-certifications made by each business concern bidding under a small business set-aside: "any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and

debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act." 15 U.S.C. § 645(d).

104.    The False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, § 4(f), 123 Stat, 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States Government for three times the amount of damages the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Prior to the FERA amendments, the FCA provided that a person is liable to the United States Government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . [a] false or fraudulent claim for payment or approval." *Id.* § 3729(a)(1).

105.    The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Id.* § 3729(b)(2)(A).

106.    As amended by FERA, the FCA also makes a person liable to the United States Government for three times the amount of damages which the Government sustains because of

the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B). The FCA, prior to the FERA amendments, provided that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id.* § 3729(a)(2).

107.    The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). The FCA further provides that "no proof of specific intent to defraud is required." *Id.* §§ 3729(b), 3729(b)(1)(B).

## V.      RRSA (COMMERCIAL DIVISION), LLC IS FORMED IN ORDER TO FRAUDULENTLY OBTAIN SMALL BUSINESS SUBCONTRACTING OPPORTUNITIES

108.    As part of its services, RRSA Residential specializes in teaming with local contractors in order to rebuild communities in the aftermath of weather-related catastrophes throughout the United States. By 2011, Defendant RRSA Residential alone generating nearly $80 million in annual revenue performing roofing and siding projects in the private sector.

109.    Ultimately, the RRSA Affiliated Defendants determined that there were additional (and substantial) profits associated with government contracting opportunities related to similar roofing and siding projects the company was already performing in the private sector. However, they soon realized that RRSA Residential—a large, national roofing company—was nowhere near established enough to become a viable prime contractor in an industry full of long-standing, experienced government contractors. Further complicating matters was the fact that the RRSA

Affiliated Defendants, by virtue of RRSA Residential's success as a nationwide roofing company, did not qualify as an eligible small business under any of the applicable industry codes described in the North American Industry Classification System ("NAICS").

110.    Specifically, the size standard for any of the three relevant NAICS codes—238150 (glass and glazing contractors), 238160 (roofing contractors) and 238170 (siding contractors)—has been between $14 million and $15 million in average annual receipts over a three-year period.  In 2010, RRSA Residential (notwithstanding revenues from any of its affiliated entities) had at least $79 million in sales.  This revenue alone was well in excess of any of the applicable NAICS codes, which rendered any of the RRSA Affiliated Defendants from being an eligible small business entity.

111.    But the temptation to pursue lucrative small business subcontracts—for which eligible small businesses are often given a significant advantage—proved too much.  So rather than try to establish appropriate relationships among government contractors in the construction industry, the RRSA Affiliated Defendants elected to devise a scheme whereby they would simply create a sham business entity, which they would certify was "small" under relevant SBA rules in order to secure subcontracting opportunities from large construction companies, including the Prime Contractor Defendants, that were reserved for eligible small businesses under SBA rules and regulations.

112.    The RRSA Affiliated Defendants determined they would have a distinct advantage over any competition offered by legitimate small businesses by leveraging their own vast resources, bondability, materials and industry connections—all of which RRSA Residential had cultivated over the course of twenty years.

113.    And of these resources, the most critical has been the bondability that the RRSA Affiliated Defendants could rely upon to distinguish themselves from actual small businesses, whose limited revenue streams and sources of collateral pale in comparison.   A typical performance bond will offer a maximum single job size that the underwriter will approve for the firm and a maximum total work program the underwriter feels your firm can best handle. To be considered on a publicly-funded project, including government contracts like those at issue here, a contractor must be "bondable," meaning it qualifies for surety bonds on any given project. Surety bonds are a risk transfer device akin to insurance, but unlike insurance, a prime contractor passes on the risk of the subcontractor not completing a contract per the subcontract's specifications to a surety company. Surety bonds have proven to be a more cost-effective and efficient process than to have the taxpayer cover the additional expense that occurs to pre-qualify a subcontractor or as a result of a subcontractor's default.

114.    Taken as a whole, the RRSA Affiliated Defendants have and continue to possess significant bondability, recently touting bonding capacity at $100 million.   In other words, by virtue of its affiliation with the RRSA Affiliated Defendants (and the significant revenues generated therefrom), RRSA Commercial has been able to represent to the Prime Contractor Defendants that it retains more than sufficient bondability to ensure that the Prime Contractor Defendants were protected in the event of any default or project failure.  In contrast, it would be essentially impossible for a legitimate small business that did not have average annual receipts over a three-year period in excess of $14-$15 million to be able to secure anywhere near $100 million in bonding.

115. And, as described in more detail below, the RRSA Affiliated Defendants knew that the Prime Contractor Defendants would rely heavily on this bonding capacity when awarding small business contracts to RRSA Commercial.

116. Beyond bondability, the RRSA Affiliated Defendants leveraged their myriad connections within the construction industry. This was accomplished in large part when they hired Defendant Ron Nichols away from a competing roofing company in Texas. This was a calculated personnel decision that instantly armed the RRSA Affiliated Defendants with Nichols' nationwide system of close contacts with many of the country's largest construction companies, including the Prime Contractor Defendants.

117. Having the bondability and nationwide industry connections in place, the RRSA Affiliated Defendants determined that they needed to either apply to the SBA and get certified to be a small business, or that RRSA Residential would have to partner with an existing small business, including 8(a) small business entities. Otherwise, according to Nichols, he would be unable to secure small business subcontracts from the Prime Contractor Defendants because the Prime Contractor Defendants have small business subcontracting requirements for all of their government contracts.

118. Initially, the RRSA Affiliated Defendants interviewed a number of companies that were certified by the SBA as 8(a) businesses. The RRSA Affiliated Defendants explored whether they could persuade any of these 8(a) small businesses to act as a "pass through," meaning that RRSA Residential, as a large business, would use the legitimate 8(a) business to secure the subcontracting opportunities from the Prime Contractor Defendants and then RRSA Residential itself would perform the majority of the subcontracting work. In exchange for posing as the small business subcontractor and acting as the "pass-through," the 8(a) entity

would receive a "finder's fee" from RRSA. But the bulk of the subcontracting award would go to the RRSA Affiliated Defendants.

119.    Ultimately, RRSA elected not to pursue the pass-through scheme as its primary means of obtaining government contract work, deciding against having to pay another company. Instead, RRSA concocted a plan to keep all of the small business subcontracting revenues for itself. In order to do so, RRSA's senior management, including former CEO and founder Grady Marin Haight, Defendant Corey Sanchez and Defendant Jon Seymore chose to use RRSA Commercial—an entity previously formed within the RRSA family of companies—and falsely certify that it was a small business under SBA rules and regulations, despite having full knowledge that the combined revenues of the affiliated companies far exceeded the $14 million or (later) $15 million size standard.

120.    The next step in the fraudulent scheme was to create a profile for RRSA Commercial on the System for Award Management ("SAM") database, which is the Official United States Government registration system for businesses intending to do business with the Federal Government.

121.    The Government uses the SAM database as its primary source of vendor information, including to identify the size status of a small business. *See* FAR § 13.102 ("Source List"). The status information may also be used as the basis for ensuring that small businesses receive the maximum practicable opportunities to respond to solicitations. Contractors must also complete annual electronic representations and self-certifications in SAM in conjunction with required registration.

122.    Contractors are required to update the representations and certifications submitted to SAM as necessary, but at least annually, to ensure that they are kept current, accurate, and

complete. The representations and self-certifications are effective for one year from the date of submission or update to SAM. In provision 52.212-3, "Offeror Representations and Certifications–Commercial Items," contractors represent whether they meet the status requirements for various small business categories, including small businesses.

123.    So on March 6, 2013, the RRSA Affiliated Defendants falsely certified on the SAM registry that RRSA Commercial was a small business under SBA rules and regulations. Moreover, Defendants Jon Seymore and Corey Sanchez directed that the same misrepresentations regarding RRSA Commercial's size status be made on a Dun & Bradstreet report.  When questions were raised internally at the company regarding the legality of making these knowingly false certifications regarding RRSA Commercial's size status, Defendants Jon Seymore and Sanchez both responded that the Government was welcome to try and uncover the intentional misrepresentations and, if the Government ever uncovered the fraud, enough time would have elapsed that the RRSA Affiliated Defendants would no longer need the small business classification in order to secure government contracts.

124.    As recently as February 23, 2016, RRSA Commercial continues to certify falsely in its FAR Report submitted to the Government that it is a small business under the relevant NAICS codes.

125.    Also in 2013, RRSA Commercial set up an account to perform searches for government contracting on the Federal Business Opportunities ("FBO") website.  RRSA Commercial entitled its FBO Opportunity Search Agent "chaching," which is slang for the sound that a cash register makes when its drawer is closed after money has been put inside.  This term is often used in conversation to indicate that the person being spoken about is going to or already has made quite a profit at little expense.  RRSA Commercial's selection of "chaching" reflected

its view that securing small business government subcontracts—by falsely certifying its size status as small—was an easy mark, allowing it to make substantial profits.

126. RRSA Commercial's duplicity has proved to be quite profitable. From 2013 to 2016, RRSA Commercial grew by at least 400% percent, with sales reaching $56 million in 2015 alone—the vast majority of it from Government contracts it illegally obtained by virtue of its misrepresentations regarding its true size status.

## VI.  RRSA COMMERCIAL IS NOT A SMALL BUSINESS BECAUSE IT IS AFFILIATED WITH THE OTHER RRSA ENTITIES

127. As alleged in detail below, based on commonality of ownership, common management, identity of interests and other relevant factors, RRSA (Commercial Division), LLC, Roofing and Restoration Services of America, LLC, RRSA Commercial Roofing, Inc., Haight Construction Management Services, Inc., Andrew's Roofing & Restoration, Inc., Turco Construction, Inc., and MH Consulting and Construction, Inc., (the "RRSA Affiliated Defendants") are affiliated concerns and, when taken together, were at all times material hereto ineligible small businesses.

### A.  RRSA COMMERCIAL SHARES COMMON OWNERSHIP WITH THE RRSA AFFILIATED DEFENDANTS

128. RRSA Commercial shares common ownership with the RRSA Affiliated Defendants. 13 C.F.R. § 121.103(a)(1) (common ownership occurs when one has the power to control the other). Specifically, Defendants Jon Seymore, Corey Sanchez and Jennifer Seymore each hold ownership interests in RRSA Commercial and the RRSA Affiliated Defendants in percentages sufficient to exercise control over each of the other companies.

129. Evidence of common ownership can be found in a number of documents, including the financial statements prepared by the certified public accountant for the RRSA

Affiliated Defendants. For example, in a document entitled "Haight Construction Management, Inc., et al: Combined Financial Statements and Supplemental Information" for the year ending December 31, 2011, it is noted that "[a]ll companies"—including each of the RRSA Affiliated Defendants named herein—"are owned 100% by Grady M. Haight or Grady M. Haight and Tina L. Haight, husband and wife." The report adds that "[a] related individual owns 25% of [RRSA Residential] and [RRSA Commercial]." That related individual is Defendant Jon Seymore.

130. In a document entitled "Haight Construction Management, Inc., et al: Combined Financial Statements and Supplemental Information" for the year ending December 31, 2012, it is again noted that "[a]ll companies"—including each of the RRSA Affiliated Defendants named herein—"are owned 100% by Grady M. Haight or Grady M. Haight and Tina L. Haight, husband and wife." The report adds that "[a] related individual owns 25% of [RRSA Residential] and [RRSA Commercial]." That related individual is Defendant Jon Seymore.

131. In another document entitled "Haight Construction Management, Inc., et al: Combined Financial Statements and Supplemental Information" for the year ending December 31, 2013, it is noted that "[a]ll companies"—including each of the RRSA Affiliated Defendants named herein—"are owned 100% by Grady M. Haight or Grady M. Haight and Tina L. Haight, husband and wife." The report adds that "[a] related individual owns 25% of [RRSA Residential] and [RRSA Commercial]." The related individual is Defendant Jon Seymore.

132. Finally, in a document entitled "Roofing & Restoration Services of America, LLC et al: Combined Financial Statements and Supplemental Information" for the year ending December 31, 2014, it is noted that the "the combined financial statements referred to above present fairly, in all material respects, the financial position of" each of the RRSA Affiliated Defendants named herein. Further, in a section of the report entitled "Change in Ownership," it

Filed Under Seal

is noted that "[o]n June 29, 2014, all of the stock and membership interests in the Companies reported on in these combined financial statements were sold 75% to an unrelated individual who previously served the Companies in the capacity of Chief Operating Officer and 25% to a related individual who previously owned 25% of [RRSA Residential] and [RRSA Commercial]." The unrelated individual who previously served as COO is Defendant Corey Sanchez and the related individual is Defendant Jon Seymore.

133.   Based on this commonality of ownership, when the amount of total revenues generated by the RRSA Affiliated Defendants is combined, it far exceeds the size standards assigned to the small business NAICS codes under which RRSA Commercial certified its small business size status, thus making RRSA Commercial an ineligible small business subcontractor.

**B.   RRSA COMMERCIAL SHARES COMMON MANAGEMENT WITH THE RRSA AFFILIATED DEFENDANTS**

134.   Further, RRSA Commercial shares common management with the RRSA Affiliated Defendants because each entity maintains the ability to exercise critical influence or substantive control at RRSA Commercial.   13 C.F.R. § 121.103(e) (common management "arises where one or more officers, directors, managing members, or partners who control the board of directors and/or management of one concern also control the board of directors or management of another concern").

135.   For instance, in a January 1, 2013 document entitled "Consent in Lieu of a Special Meeting of the Members of RRSA (Commercial Division), LLC," it is agreed upon by members Grady Haight and Defendant Jon Seymore that Defendants Corey Sanchez and Jennifer Seymore are "appointed as additional Managers of the Company to serve until their death, resignation or removal," granting them "all of the powers and authority granted to them as Managers under the

Operating Agreement of the Company." In addition, the agreement confers upon Sanchez and Jennifer Seymore the authority "either acting along or together, to update any and all financial institutions in which the Company does business" and "to show the appointment of Mr. Sanchez and Ms. Seymore as additional persons authorized on any of the Company's accounts." Finally, the agreement provides that "both Mr. Sanchez and Ms. Seymore are hereby authorized and appointed as signatories on any of the Company's financial accounts" and are authorized "to update the financial institutions with the names of the current Managers of the Company, the names of the authorized signatories, and to complete any and all other documents, as required by each financial institution, to properly update the accounts."

136.    A similar document, also dated January 1, 2013, confers the identical powers of management to Defendants Sanchez and Jennifer Seymore for RRSA Residential.

137.    In addition, a document dated April 1, 2013 and entitled "Consent in Lieu of a Special Meeting of the Board of Directors of RRSA Commercial Roofing, Inc.," it is agreed upon by members Grady Haight and Defendant Jon Seymore that: (1) Marty Haight serve as President, Secretary and Treasurer; (2) Defendant Corey Sanchez serve as Chief Operating Officer; (3) Defendant Jennifer Seymore serve as Chief Financial Officer; and (4) Defendant Jon Seymore serve as Vice President. The individuals listed above are also granted the same management authority as those set forth in the preceding two paragraphs.

138.    Finally, a similar document, also dated April 1, 2013, identifies the same individuals and confers upon them the identical powers of management for Defendant HCMS.

139.    Based on the common management described above, RRSA Commercial is affiliated with the RRSA Affiliated Defendants under SBA rules and regulations. And taken together, the combined average annual receipts over the past three years for RRSA Commercial

and the RRSA Affiliated Defendants far exceed the relevant revenue thresholds for NAICS codes 238150 (glass and glazing contractors), 238160 (roofing contractors) and 238170.

### C.   RRSA COMMERCIAL SHARES AN IDENTITY OF INTEREST WITH THE RRSA AFFILIATED DEFENDANTS

140.   RRSA Commercial and the RRSA Affiliated Defendants are also affiliated based on their shared identity of interest.  13 C.F.R. § 121.103(f) ("Individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships) may be treated as one party with such interests aggregated."). Both RRSA Commercial and the remaining RRSA Affiliated Defendants are primarily in the business of providing roofing and siding services.

141.   In fact, RRSA Residential claims that it "has been involved in military projects including base housing, aircraft and cargo hangars, commissaries, and maintenance facilities," including work "on military sites in 23 states, including Hawaii." Because of the identity of interests in RRSA and the RRSA Affiliated Defendants, these companies are affiliated under SBA rules and regulations, thus making RRSA Commercial ineligible to be awarded small business subcontracts.

### D.   THE TOTALITY OF THE CIRCUMSTANCES CONFIRMS RRSA COMMERCIAL IS AFFILIATED WITH THE RRSA AFFILIATED DEFENDANTS

142.   Beyond just the clear common ownership, common management, and identity of interests shared by RRSA Commercial and the RRSA Affiliated Defendants, these entities are furthermore affiliated pursuant to the SBA's totality of the circumstances test. 13 C.F.R. § 121.103(a)(5).

143.    For example, affiliation is supported insofar as RRSA Commercial and the RRSA Affiliated Defendants share the same place of business.  Specifically, both companies have reported operating offices at the exact same address: 105 West Franklin, Waxahachie, Texas 75165.

144.    Further, the employees of RRSA Commercial and the RRSA Affiliated Defendants share the same email domain name: @roofsbyrrsa.com.  There exists no separate domain name beyond the one employed by RRSA Residential.  For example, the following represent the lone email addresses for members of the RRSA Affiliated Defendants' senior management: jseymore@roofsbyrrsa.com (Defendant Jon Seymore); csanchez@roofsbyrrsa.com (Defendant Corey Sanchez); jenseymore@roofsbyrrsa.com (Defendant Jennifer Seymore); rnichols@roofsbyrrsa.com (Defendant Ron Nichols); kmcbroom@roofsbyrrsa.com (Kevin McBroom); and mhaight@roofsbyrrsa.com (Marty Haight).  There are no differentiated email addresses for any RRSA Commercial personnel.

145.    Similarly, RRSA Commercial and RRSA Residential list an identical phone number for both companies: 855-268-RRSA (7772).

146.    RRSA Commercial's banking activities also betray the common affiliation it shares with several of the RRSA Affiliated Defendants.  Specifically, Five Points Bank issued at least four loans totaling $15 million for which the listed borrowers are HCMS, RRSA and RRSA Commercial.  Under the first three loans, Five Points Bank provided these three entities with $11.5 million in the form of a revolving line of credit.  The fourth loan was a $2.5 million term note also made to HCMS, RRSA and RRSA Commercial.  Marty Haight was the guarantor for each of the loans. And in exchange, the RRSA Affiliated Defendants offered the bank collateral in the form of, among other things, a blanket lien on all of HCMS, RRSA and RRSA

Commercial's assets as well as Marty Haight's ownership interests in HCMS, RRSA and RRSA Commercial.

147.    Further, when the RRSA Affiliated Defendants prepared their projected overhead budget for 2014, the documentation and corresponding calculations specifically combined together the yearly costs to be incurred by, among other related entities, HCMS, RRSA Residential and RRSA Commercial.

148.    Finally, statements under oath also underscore the extent to which RRSA Commercial has been been affiliated with the RRSA Affiliated Defendants during the relevant time period.  Specifically, Defendant Jennifer Seymore testified under oath that Defendant "Haight Construction Management Services has always been the parent umbrella for all of those," specifically referencing an exhibit list that included all RRSA Affiliated Defendants. Ms. Seymore, the CFO of the RRSA Affiliated Defendants, also conceded that the money generated by all the companies within the Haight organization is ultimately collected by Defendant HCMS.

149.    Based on all of the above factors, RRSA Commercial is affiliated with the RRSA Affiliated Defendants under SBA rules and regulations.  And taken together, the combined average annual receipts over the past three years for RRSA Commercial and the RRSA Affiliated Defendants far exceed the relevant revenue thresholds for NAICS codes 238150 (glass and glazing contractors), 238160 (roofing contractors) and 238170.

150.    Accordingly, RRSA Commercial was not an eligible small business and thus was precluded from being awarded small business subcontracts and/or receive monies that could have and should have been paid to legitimate small business concerns.

151.    Each time RRSA Commercial filed its annual self-certification, it acknowledged that "[u]nder 15 U.S.C. 645(d), any person who misrepresents a firm's status as a business

concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."

152.    RRSA Commercial's most recent annual self-certification, in which it avers that it is a small business concern, was made in 2016.

153.    RRSA Commercial's self-certifications were materially false when made.  RRSA Commercial made false representations that it was a small business, when it was, in fact, affiliated with the RRSA Affiliated Defendants, which made RRSA Commercial ineligible as a small business subcontractor under applicable rules and regulations.

154.    RRSA Commercial was ultimately paid monies for certain services that it would not otherwise have been paid had it fully disclosed the nature of its combined affiliated entity and that RRSA Commercial did not constitute a small business concern under the applicable rules and regulations.

155.    Because of RRSA Commercial's fraudulent size certifications, all small business subcontracts ultimately awarded to RRSA Commercial were void *ab initio*.

156.    Also, other legitimate, eligible small businesses were denied the awarding of these subcontract opportunities because of RRSA Commercial's material misrepresentations.

157.    Finally, as the direct result of the Prime Contractor Defendants' concealment from the Government of its knowledge that RRSA Commercial was affiliated with the RRSA Affiliated Defendants, the Prime Contractor Defendants gained additional business volume in the

form of more transfers and contractually-mandated monetary bonuses, which resulted in higher revenues and profits.

## VII.   THE PRIME CONTRACTOR DEFENDANTS WERE FULLY AWARE THAT RRSA COMMERCIAL WAS NOT A LEGITIMATE SMALL BUSINESS WHEN AWARDING IT GOVERNMENT SUBCONTRACTS

### A.   CLARK BUILDERS GROUP, LLC

158.   As a condition of receiving Government contracts, Prime Contractor Defendant Clark Builders Group, LLC ("Clark") was required to establish and implement a small business Subcontracting Plan, which required Clark to establish subcontracting goals for small businesses. Clark committed to implementing its plan, to meeting the Government's particular small business subcontracting targets, to using good faith efforts to meet its goals in accordance with applicable SBA requirements, and to reporting regularly to appropriate Federal agencies regarding its small business participation. Clark's small business Subcontracting Plan was incorporated into each Government contract by reference and made part of the contract.

159.   As required by 15 U.S.C. § 637(d) and FAR § 19.702, Clark's bid included a Subcontracting Plan. In its Subcontracting Plan, Clark represented that a portion of the work it subcontracted would go to small businesses.  By submitting a Subcontracting Plan, Clark certified that it would comply in good faith with the requirements of that Plan, as well as with the applicable statutory and regulatory requirements, including, but not limited to 15 U.S.C. § 637, FAR Subpart 19.7, and FAR §§ 52.219-8 and 52.219-9.

160.   By submitting its Subcontracting Plan, Clark understood that the Government would rely upon the statements in the Subcontracting Plan, and Clark also understood that if these various contracts were awarded to Clark, the Subcontracting Plan would be included in and made a material part of the resultant contract with the Government.

161.   The contracting officer for the United States reviewed and relied upon the statements that Clark made in its Subcontracting Plan in order to determine whether Clark had submitted an acceptable bid. Had the Government not relied on the statements that Clark made in its Subcontracting Plan, it would not have awarded these contracts to Clark.

162.   Because the SBA's affiliation rules render each of the RRSA Affiliated Defendants as entities "other than small businesses," they were ineligible to be claimed as small businesses by Clark on government construction contracts. But Clark was undeterred and turned a blind eye to the obvious fact that RRSA Commercial brought with it <u>all</u> the resources of the RRSA Affiliated Defendants. Clark recognized the enormous opportunity of subcontracting to a company that had nationwide capabilities and significant bondability, access to discounted materials and personnel, while at the same time being able to claim to the Government that it was entitled to bonuses and additional work orders from having subcontracted to a "small business."

163.   Through Greg Banks, a project manager at Clark Builders Group, RRSA Commercial also obtained roofing subcontracts at both the Naval Air Base Point Mugu and Port Hueneme in Port Hueneme, California in early 2014.  In private communications about the RRSA Commercial subcontract, Banks emailed that Defendant Nichols and RRSA Commercial "knows the gig" and required no additional pre-construction meetings or oversight before beginning work on either military base. Clark's full knowledge of the RRSA Affiliated Defendants' combined resources, bondability, and nationwide capability to carry out the roofing subcontract on both bases explains the complete lack of supervision in preparation for each project.

164.   On April 11, 2013, Clark entered into another subcontract with RRSA Commercial, knowing that RRSA Commercial was not an eligible small business.  Specifically,

the San Diego Family Housing project, which Clark referred to internally as "SDFH Cap Ex FY'13" and "Project 10-838," involved the re-roofing of approximately 142 residential units used by military personnel in the San Diego, California region.   The properties included residences at Hilleary Park, Lofgren Terrace, Park Summit, Prospect View, Ramona Vista, Admiral Hartman, Murphy Canyon, and Miramar.   The subcontract was originally worth $463,023. As part of its requirement to secure the subcontract, RRSA Commercial also obtained a surety bond in the same amount ($463,023)—a surety bond that it obtained only by virtue of having Defendants RRSA, HCMS, Jon Seymore and Jennifer Seymore serve as indemnitors under the general indemnity agreement.

165.   Subsequently, under the same circumstances described above, Clark entered into another subcontract with RRSA Commercial, knowing that RRSA Commercial was not an eligible small business.   Again, involving the San Diego Family Housing project, which Clark referred to this project internally as "SDFH Cap Ex FY'14" and "Project 10-837," involved the re-roofing of additional residential units used by military personnel in the San Diego, California region.   RRSA Commercial internally denoted this project as M1017.

166.   In addition to the San Diego Family Housing government subcontracts that Clark awarded the RRSA Affiliated Defendants—knowing that RRSA Commercial was not an eligible small business under SBA rules and regulation—Clark also awarded RRSA Commercial the following government "small business" subcontracts for roofing and siding:

(a) Ventura Family Housing projects, which the RRSA Affiliated Defendants catalogued internally as project numbers M1004CA and M1009;

(b) Military housing project at the Naval Base Ventura County ("NBVC") located in Point Mugu, California;

(c) The Quarters B military housing project at the NBVC in Port Hueneme, California;

(d) The Lemoore Naval Air Station located in Lemoore, California; and

(a) Scott Air Force Base located in St. Clair County, Illinois, which the RRSA Affiliated Defendants catalogued internally as project numbers M1014.

167.    And for any particular government subcontracting opportunity, Clark further conspired with RRSA Commercial—through Defendant Nichols—to secure such contracts by bidding within a pre-determined range. According to the secret arrangement, as long as RRSA Commercial bid within the range designated by Clark, RRSA Commercial was guaranteed the award.

168.    At the same time, Clark communicated internally that it wanted RRSA Commercial to win the subcontract because Clark knew RRSA Commercial was, in fact, a large business with the capacity to complete the project on time, with minimal supervision, and while carrying a significant performance bonding capacity.

169.    In fact, Clark traditionally did not make subcontracting opportunities publicly available to roofing contractors other than RRSA Commercial on which to bid. This closed solicitation is in violation of Section 8(d) of the Small Business Act and, in most cases, FAR § 19.7. These laws require prime contractors having contracts that exceed the simplified acquisition threshold to provide maximum practicable subcontracting opportunities to small business. Clark's failure to make its subcontracting opportunities available to otherwise eligible small businesses runs afoul of these laws.

170.    For each of these subcontracts, Clark was fully aware that RRSA Commercial was not, in fact, an eligible small business. And as a direct result of these misrepresentations, the

Government was induced to issue Clark additional business volume in the form of more transfers and contractually-mandated monetary bonuses, which resulted in higher revenues and profits.

**B.      HUNT COMPANIES, INC.**

171.    As a condition of receiving Government contracts, Prime Contractor Defendant Hunt Companies, Inc. ("Hunt") was required to establish and implement a small business Subcontracting Plan, which required Hunt to establish subcontracting goals for small businesses. Hunt committed to implementing its plan, to meeting the Government's particular small business subcontracting targets, to using good faith efforts to meet its goals in accordance with applicable SBA requirements, and to reporting regularly to appropriate Federal agencies regarding its small business participation. Hunt's small business Subcontracting Plan was incorporated into each Government contract by reference and made part of the contract.

172.    As required by 15 U.S.C. § 637(d) and FAR § 19.702, Hunt's bid included a Subcontracting Plan.  In its Subcontracting Plan, Hunt represented that a portion of the work it subcontracted would go to small businesses.   By submitting a Subcontracting Plan, Hunt certified that it would comply in good faith with the requirements of that Plan, as well as with the applicable statutory and regulatory requirements, including, but not limited to 15 U.S.C. § 637, FAR Subpart 19.7, and FAR §§ 52.219-8 and 52.219-9.

173.    By submitting its Subcontracting Plan, Hunt understood that the Government would rely upon the statements in the Subcontracting Plan, and Hunt also understood that if these various contracts were awarded to Hunt, the Subcontracting Plan would be included in and made a material part of the resultant contract with the Government.

174.    The contracting officer for the United States reviewed and relied upon the statements that Hunt made in its Subcontracting Plan in order to determine whether Hunt had

submitted an acceptable bid. Had the Government not relied on the statements that Hunt made in its Subcontracting Plan, it would not have awarded these contracts to Hunt.

175.    Hunt awarded the RRSA Affiliated Defendants various subcontracts relating to work on military housing developments and other government-related projects. For the reasons explained below, however, the RRSA Affiliated Defendants were not eligible small businesses and thus, despite their false misrepresentations to the contrary, were precluded from receiving subcontracting monies that were intended for eligible small businesses.

176.    At all times material hereto, RRSA Commercial has self-certified to the Government that it is a small business eligible for small business subcontracting. In addition, the RRSA Commercial has self-certified to the Government that, since at least 2013, its average annual receipts over the prior three years have been less than the prior $14 million threshold (in effect from 2011 through 2012, and the current $15 million threshold.

177.    However, a review of the SBA's affiliation factors reveals that, when taken together, the combined total revenues of the RRSA Affiliated Defendants are well above the applicable revenue thresholds, thus causing the RRSA Affiliated Defendants to be "other than a small business" concern.

178.    And Hunt was fully aware of this fact. For example, Pete McNamara, Hunt's Quality Control Director for Construction Services, revealed that Hunt knew of RRSA Commercial's nationwide reputation and was taking full advantage of claiming credit for subcontracting to a "small business" while at the same time getting the results that a large business could provide. On January 7, 2014, McNamara emailed RRSA Commercial sales representative Kevin McBroom, writing that:

Good afternoon, per our conversation this past week we have some upcoming roofing work at Camp Pendleton that I would like you to look at and bid on. There are approximately another 75 duplexes up at San Onofre I and two additional neighborhoods that need complete replacements, then there's also one neighborhood that needs miscellaneous repairs. If you're interested in coming out and spending sometime looking at the properties please let me know as we were very pleased with your previous work at San Onofre I."

179.    Subsequently, on February 28, 2014, Defendant Jon Seymore sent an email to, among others, Defendants Nichols and Sanchez: "We got the contract for hunt in today. The girls are scanning it in, and I will get it sent out sometime this afternoon. Just wanted to let everybody know it was in our possession since we have been waiting for it all week." RRSA Commercial internally denoted this project as M1018.

180.    In addition to this government subcontract that Hunt awarded the RRSA Affiliated Defendants—knowing that RRSA Commercial was not an eligible small business under SBA rules and regulation—Hunt also awarded RRSA Commercial another government "small business" subcontract for roofing and siding that RRSA Commercial internally referred to as "Hunt-Pilot," which was assigned an internal project number of M1013.

181.    For each of these subcontracts, Hunt was fully aware that RRSA Commercial was not, in fact, an eligible small business.  And as a direct result of these misrepresentations, the Government was induced to issue Hunt additional business volume in the form of more transfers and contractually-mandated monetary bonuses, which resulted in higher revenues and profits

### C.    LINCOLN PROPERTY COMPANY/LINCOLN MILITARY HOUSING

182.    As a condition of receiving Government contracts, Prime Contractor Defendant Lincoln Property Company/Lincoln Military Housing ("Lincoln") was required to establish and implement a small business Subcontracting Plan, which required Lincoln to establish subcontracting goals for small businesses.  Lincoln committed to implementing its plan, to

meeting the Government's particular small business subcontracting targets, to using good faith efforts to meet its goals in accordance with applicable SBA requirements, and to reporting regularly to appropriate Federal agencies regarding its small business participation. Lincoln's small business Subcontracting Plan was incorporated into each Government contract by reference and made part of the contract.

183.   As required by 15 U.S.C. § 637(d) and FAR § 19.702, Lincoln's bid included a Subcontracting Plan. In its Subcontracting Plan, Lincoln represented that a portion of the work it subcontracted would go to small businesses. By submitting a Subcontracting Plan, Lincoln certified that it would comply in good faith with the requirements of that Plan, as well as with the applicable statutory and regulatory requirements, including, but not limited to 15 U.S.C. § 637, FAR Subpart 19.7, and FAR §§ 52.219-8 and 52.219-9.

184.   By submitting its Subcontracting Plan, Lincoln understood that the Government would rely upon the statements in the Subcontracting Plan, and Lincoln also understood that if these various contracts were awarded to Lincoln, the Subcontracting Plan would be included in and made a material part of the resultant contract with the Government.

185.   The contracting officer for the United States reviewed and relied upon the statements that Lincoln made in its Subcontracting Plan in order to determine whether Lincoln had submitted an acceptable bid. Had the Government not relied on the statements that Lincoln made in its Subcontracting Plan, it would not have awarded these contracts to Lincoln.

186.   Lincoln awarded the RRSA Affiliated Defendants various subcontracts relating to work on military housing developments and other government-related projects. For the reasons explained below, however, the RRSA Affiliated Defendants were not eligible small businesses

and thus, despite their false misrepresentations to the contrary, were precluded from receiving subcontracting monies that were intended for eligible small businesses.

187.    At all times material hereto, RRSA Commercial has self-certified to the Government that it is a small business eligible for small business subcontracting. In addition, the RRSA Commercial has self-certified to the Government that, since at least 2013, its average annual receipts over the prior three years have been less than the prior $14 million threshold (in effect from 2011 through 2012, and the current $15 million threshold.

188.    However, a review of the SBA's affiliation factors reveals that, when taken together, the combined total revenues of the RRSA Affiliated Defendants are well above the applicable revenue thresholds, thus causing the RRSA Affiliated Defendants to be "other than a small business" concern.

189.    And Lincoln was fully aware of this fact.

190.    In an email at the time, Ron Nichols touts the ongoing subcontracting work on at least three military subcontracts that RRSA has with Lincoln, while simultaneously pitching RRSA's "mainstay which is our storm division" and trying to connect people at RRSA and Lincoln "in each region with regard to yearly budget work."

191.    Specifically, Defendant Nichols, in a March 21, 2014 email to Dennis Credico, the construction manager at Lincoln Property Company, writes:

> Thanks for taking my call yesterday. I am sending this email in regards to what we talked about yesterday with setting up a meeting to discuss how best RRSA could try and secure work with your other divisions and also in the non military sector. At this time we working on 2 Lincoln sites back east at Lejeune which are Heroes Manor 1 and 2 and these site are progressing well, and I know that San Diego and Ventura are going at this time and we recently completed Lemoore.

It is my understanding that we have had very few issues and for the most par it is all progressing well. We have a division in RRSA which is actually are mainstay which is our storm division and we would like to talk with you about this division and get you opinion on how we might be able to present this to Lincoln and whom we'd need to reach out to In order to accomplish this. We would also like to try and get in touch with people in each region with regards to yearly budget work so any names you could share would be great.

We would greatly appreciate an hour of your time the week of the 1st, maybe over lunch just to get your advice and opinions in how we should proceed in trying to build our relationship with Lincoln. Any advice or direction from you in these areas would be grealty [sic] appreciated. I would also like you to meet our 2 owners Corey and Marty.

192.    This email reveals that Lincoln knew RRSA Commercial—when considering its combined resources with the RRSA Affiliated Defendants—was not a small business.

193.    For each of the subcontracts it awarded, Lincoln was fully aware that RRSA Commercial was not, in fact, an eligible small business. And as a direct result of these misrepresentations, the Government was induced to issue Lincoln additional business volume in the form of more transfers and contractually-mandated monetary bonuses, which resulted in higher revenues and profits.

D.    HARPER CONSTRUCTION COMPANY, INC.

194.    Harper earns a substantial portion of its revenue through government contracting on construction projects across the country.

195.    Specifically, Harper entered into a number of government contracts to construct facilities at Camp Pendleton and Camp Lejeune. The contracts required Harper to subcontract a certain percentage of work to small disadvantaged businesses. Such requirements arise from measures intended to ensure that a fair proportion of federal contract and subcontract dollars are awarded to small businesses. Harper claimed it met this requirement when, in fact, it

subcontracted with RRSA Commercial Division, which Harper knew was not an eligible small business.

196.    As a condition of receiving Government contracts, Prime Contractor Defendant Harper Construction Company, Inc. ("Harper") was required to establish and implement a small business Subcontracting Plan, which required Harper to establish subcontracting goals for small businesses. Harper committed to implementing its plan, to meeting the Government's particular small business subcontracting targets, to using good faith efforts to meet its goals in accordance with applicable SBA requirements, and to reporting regularly to appropriate Federal agencies regarding its small business participation. Harper's small business Subcontracting Plan was incorporated into each Government contract by reference and made part of the contract.

197.    As required by 15 U.S.C. § 637(d) and FAR § 19.702, Harper's bid included a Subcontracting Plan. In its Subcontracting Plan, Harper represented that a portion of the work it subcontracted would go to small businesses. By submitting a Subcontracting Plan, Harper certified that it would comply in good faith with the requirements of that Plan, as well as with the applicable statutory and regulatory requirements, including, but not limited to 15 U.S.C. § 637, FAR Subpart 19.7, and FAR §§ 52.219-8 and 52.219-9.

198.    By submitting its Subcontracting Plan, Harper understood that the Government would rely upon the statements in the Subcontracting Plan, and Harper also understood that if these various contracts were awarded to Harper, the Subcontracting Plan would be included in and made a material part of the resultant contract with the Government.

199.    The contracting officer for the United States reviewed and relied upon the statements that Harper made in its Subcontracting Plan in order to determine whether Harper had

submitted an acceptable bid. Had the Government not relied on the statements that Harper made in its Subcontracting Plan, it would not have awarded these contracts to Harper.

200.    Harper awarded the RRSA Affiliated Defendants various subcontracts relating to work on military housing developments and other government-related projects. For the reasons explained below, however, the RRSA Affiliated Defendants were not eligible small businesses and thus, despite their false misrepresentations to the contrary, were precluded from receiving subcontracting monies that were intended for eligible small businesses.

201.    At all times material hereto, RRSA Commercial has self-certified to the Government that it is a small business eligible for small business subcontracting. In addition, the RRSA Commercial has self-certified to the Government that, since at least 2013, its average annual receipts over the prior three years have been less than the prior $14 million threshold (in effect from 2011 through 2012, and the current $15 million threshold.

202.    However, a review of the SBA's affiliation factors reveals that, when taken together, the combined total revenues of the RRSA Affiliated Defendants are well above the applicable revenue thresholds, thus causing the RRSA Affiliated Defendants to be "other than a small business" concern.

203.    And Harper was fully aware of this fact.

204.    Specifically, Harper entered into a subcontract with RRSA Commercial to perform roofing and wall panel work for a project for the Department of the Navy to develop a hangar ("Yuma P535 Hangar").   The subcontract, based on Harper's full knowledge that RRSA Commercial was not a legitimate small business, was initially worth $1,970,000.00,

205.    The subcontract (transaction Number 112007-0019) was awarded on May 6, 2013, and RRSA Commercial was ultimately paid $12,027,369. RRSA Commercial internally denoted this project as M1003-AZ.

206.    In addition to this government subcontract that Harper awarded the RRSA Affiliated Defendants—knowing that RRSA Commercial was not an eligible small business under SBA rules and regulation—Harper also awarded RRSA Commercial a government "small business" subcontracts for to perform roofing at Quantico for at least $1,045,000.00.

207.    For each of these subcontracts, Harper was fully aware that RRSA Commercial was not, in fact, an eligible small business. And as a direct result of these misrepresentations, the Government was induced to issue Harper additional business volume in the form of more transfers and contractually-mandated monetary bonuses, which resulted in higher revenues and profits

E.      LEND LEASE (US) PUBLIC PARTNERSHIPS, LLC

208.    As a condition of receiving Government contracts, Prime Contractor Defendant Lend Lease (US) Public Partnerships, LLC ("Lend Lease") was required to establish and implement a small business Subcontracting Plan, which required Lend Lease to establish subcontracting goals for small businesses. Lend Lease committed to implementing its plan, to meeting the Government's particular small business subcontracting targets, to using good faith efforts to meet its goals in accordance with applicable SBA requirements, and to reporting regularly to appropriate Federal agencies regarding its small business participation. Lend Lease's small business Subcontracting Plan was incorporated into each Government contract by reference and made part of the contract.

209.    As required by 15 U.S.C. § 637(d) and FAR § 19.702, Lend Lease's bid included a Subcontracting Plan.  In its Subcontracting Plan, Lend Lease represented that a portion of the work it subcontracted would go to small businesses.  By submitting a Subcontracting Plan, Lend Lease certified that it would comply in good faith with the requirements of that Plan, as well as with the applicable statutory and regulatory requirements, including, but not limited to 15 U.S.C. § 637, FAR Subpart 19.7, and FAR §§ 52.219-8 and 52.219-9.

210.    By submitting its Subcontracting Plan, Lend Lease understood that the Government would rely upon the statements in the Subcontracting Plan, and Lend Lease also understood that if these various contracts were awarded to Lend Lease, the Subcontracting Plan would be included in and made a material part of the resultant contract with the Government.

211.    The contracting officer for the United States reviewed and relied upon the statements that Lend Lease made in its Subcontracting Plan in order to determine whether Lend Lease had submitted an acceptable bid.  Had the Government not relied on the statements that Lend Lease made in its Subcontracting Plan, it would not have awarded these contracts to Lend Lease.

212.    Lend Lease awarded the RRSA Affiliated Defendants various subcontracts relating to work on military housing developments and other government-related projects.  For the reasons explained below, however, the RRSA Affiliated Defendants were not eligible small businesses and thus, despite their false misrepresentations to the contrary, were precluded from receiving subcontracting monies that were intended for eligible small businesses.

213.    At all times material hereto, RRSA Commercial has self-certified to the Government that it is a small business eligible for small business subcontracting.  In addition, the RRSA Commercial has self-certified to the Government that, since at least 2013, its average

annual receipts over the prior three years have been less than the prior $14 million threshold (in effect from 2011 through 2012, and the current $15 million threshold.

214.    However, a review of the SBA's affiliation factors reveals that, when taken together, the combined total revenues of the RRSA Affiliated Defendants are well above the applicable revenue thresholds, thus causing the RRSA Affiliated Defendants to be "other than a small business" concern.

215.    And Lend Lease was fully aware of this fact.

216.    As part of his effort to persuade the RRSA Affiliated Defendants to pursue small business government contracting opportunities, Defendant Nichols regularly referenced the strong contact he maintained with a number of the Prime Contractor Defendants, including Lend Lease. For example, in the summer of 2012, Nichols texted Haight to let him know that he was "[h]aving drinks with Lend Lease"—a company Nichols stated was "[o]ur probably biggest customer."

217.    And those drinks paid off. Lend Lease's familiarity with Defendant Nichols and its full knowledge of the RRSA Affiliated Defendants' nationwide reputation and accessibility to bonding and materials was enough to ensure that RRSA Commercial obtained a number of small business subcontracts it (and Lend Lease) knew RRSA Commercial was not entitled to.

218.    Shortly thereafter, RRSA Commercial secured a subcontract with Lend Lease on a government contract to assist in roofing and siding projects associated with the Heroes Manor military housing communities located in Camp Lejeune, North Carolina. The Heroes Manor subcontract, originally estimated to by $2.5 million, was internally denoted by RRSA Commercial as project number M1001.

219.    Subsequently, RRSA Commercial secured a subcontract with Lend Lease on a government contract to assist in renovations in Fort Knox, Kentucky.  RRSA Commercial's intentional misrepresentations regarding its size status resulted in a contract exceeding over a quarter of a million dollars for its work on the Fort Knox military installation, which RRSA Commercial internally denoted this job as project M1007.

220.    In addition, RRSA Commercial secured another subcontract with Lend Lease on a government contract to assist in the Midway Park Base Housing construction project located in Camp Lejeune, North Carolina, also known as the Midway Park 3 and Midway Park 4 projects. RRSA Commercial's intentional misrepresentations regarding its size status (and Lend Lease's knowledge thereof) resulted in a $200,000 subcontract for roofing and siding at the Midway Park 3 military housing project, which RRSA Commercial internally denoted as M1005 and a $600,000 subcontract for RRSA Commercial's work on the Midway Park 4 military housing project, which RRSA Commercial internally denoted this project as M1008.

221.    Finally, Lend Lease knowingly selected RRSA Commercial to serve as a small business contractor for the roofing and siding projects related to the Atlantic Marine Corp Communities Family Housing project located at MCAS Cherry Point in North Carolina.  RRSA Commercial's intentional misrepresentations regarding its size status (and Lend Lease's knowledge thereof) resulted in RRSA Commercial being on the receiving end of a contract exceeding $1 million for its work on the Binders Village project, which RRSA Commercial tracked internally as job number M1011.

222.    In addition to this government subcontract that Lend Lease awarded the RRSA Affiliated Defendants—knowing that RRSA Commercial was not an eligible small business under SBA rules and regulation—Harper also awarded RRSA Commercial a government "small

business" subcontracts for to perform roofing for the Fort Hood Family Housing project in Fort Hood, Texas for at least $1,700,000.00.  RRSA Commercial tracked internally as job number M1006.

223.   For each of these subcontracts, Lend Lease was fully aware that RRSA Commercial was not, in fact, an eligible small business.  And as a direct result of these misrepresentations, the Government was induced to issue Lend Lease additional business volume in the form of more transfers and contractually-mandated monetary bonuses, which resulted in higher revenues and profits.

### F.   WALSH CONSTRUCTION COMPANY

224.   As a condition of receiving Government contracts, Prime Contractor Defendant Walsh Construction Company ("Walsh") was required to establish and implement a small business Subcontracting Plan, which required Walsh to establish subcontracting goals for small businesses.  Walsh committed to implementing its plan, to meeting the Government's particular small business subcontracting targets, to using good faith efforts to meet its goals in accordance with applicable SBA requirements, and to reporting regularly to appropriate Federal agencies regarding its small business participation.  Walsh's small business Subcontracting Plan was incorporated into each Government contract by reference and made part of the contract.

225.   As required by 15 U.S.C. § 637(d) and FAR § 19.702, Walsh's bid included a Subcontracting Plan.  In its Subcontracting Plan, Walsh represented that a portion of the work it subcontracted would go to small businesses.  By submitting a Subcontracting Plan, Walsh certified that it would comply in good faith with the requirements of that Plan, as well as with the applicable statutory and regulatory requirements, including, but not limited to 15 U.S.C. § 637, FAR Subpart 19.7, and FAR §§ 52.219-8 and 52.219-9.

226.     By submitting its Subcontracting Plan, Walsh understood that the Government would rely upon the statements in the Subcontracting Plan, and Walsh also understood that if these various contracts were awarded to Walsh, the Subcontracting Plan would be included in and made a material part of the resultant contract with the Government.

227.     The contracting officer for the United States reviewed and relied upon the statements that Walsh made in its Subcontracting Plan in order to determine whether Walsh had submitted an acceptable bid.  Had the Government not relied on the statements that Walsh made in its Subcontracting Plan, it would not have awarded these contracts to Walsh.

228.     Walsh awarded the RRSA Affiliated Defendants various subcontracts relating to work on military housing developments and other government-related projects. For the reasons explained below, however, the RRSA Affiliated Defendants were not eligible small businesses and thus, despite their false misrepresentations to the contrary, were precluded from receiving subcontracting monies that were intended for eligible small businesses.

229.     At all times material hereto, RRSA Commercial has self-certified to the Government that it is a small business eligible for small business subcontracting.  In addition, the RRSA Commercial has self-certified to the Government that, since at least 2013, its average annual receipts over the prior three years have been less than the prior $14 million threshold (in effect from 2011 through 2012, and the current $15 million threshold.

230.     However, a review of the SBA's affiliation factors reveals that, when taken together, the combined total revenues of the RRSA Affiliated Defendants are well above the applicable revenue thresholds, thus causing the RRSA Affiliated Defendants to be "other than a small business" concern.

231.     And Walsh was fully aware of this fact.

232.    On September 16, 2013, Walsh and RRSA Commercial entered into a subcontract in which RRSA Commercial was to furnish and install standing seam metal roof at the Volar Barracks located in Fort Polk, Louisiana, which RRSA Commercial internally denoted this project as M1010. Under prime contract number W9126G11C0064 and subcontract transaction number 211139S36, Walsh issued the subcontract to RRSA Commercial on February 11, 2014. The subcontract amount was $1,948,000. And, as evidence of the RRSA Affiliated Defendants' scheme to secure this subcontract reserved for legitimate small businesses, RRSA Residential (not RRSA Commercial) was listed as the entity to qualify for the surety bond in the same amount to perform the work.

233.    RRSA Commercial was awarded another subcontract involving a government facility when Walsh Construction Company II, LLC selected RRSA Commercial to perform roofing and siding for the sewer and traffic operations project in Pierce County, Washington for $944,000, which RRSA Commercial internally denoted this project as M1012.

234.    In addition to this government subcontract that Walsh awarded the RRSA Affiliated Defendants—knowing that RRSA Commercial was not an eligible small business under SBA rules and regulation—Walsh also awarded RRSA Commercial the following government "small business" subcontracts for roofing and siding:

(a) The VA Loma Linda Health Care Center located in Loma Linda, California; and

(b) Military housing at Fort Carson, located in Colorado Springs, Colorado.

235.    For each of these subcontracts, Walsh was fully aware that RRSA Commercial was not, in fact, an eligible small business. And as a direct result of these misrepresentations, the Government was induced to issue Walsh additional business volume in the form of more

transfers and contractually-mandated monetary bonuses, which resulted in higher revenues and profits.

## VIII. THE RRSA AFFILIATED DEFENDANTS PAID CLARK ILLEGAL BRIBES IN EXCHANGE FOR AWARDING OF SUBCONTRACTS

236.   In addition to falsely certifying that it was a legitimate small business for purposes of securing government subcontracts, the RRSA Affiliated Defendants also paid illegal kickbacks to the Prime Contractor Defendants to ensure they would be awarded such subcontracts.

237.   In exchange for Clark's agreement to award them government subcontracts, the RRSA Affiliated Defendants paid kickback proceeds to project supervisors at Clark, who received as much as $50,000.

238.   More specifically, there was a meeting held at the residence of Marty Haight in approximately late 2013.  In attendance at this meeting were Marty Haight, Defendant Ron Nichols and Defendant Corey Sanchez, among others.  During the meeting, there was a discussion about Nichols' upcoming trip to San Diego to meet with project managers from Clark, who were overseeing a number of upcoming and ongoing government contracts at various military bases.

239.   Near the end of the conversation about Nichols' meeting with Clark representatives, Marty Haight used two hands to place approximately four or five rolls of cash— each wrapped in a currency strap with $10,000—in the hands of Defendant Nichols.  The purpose of providing Nichols with the bank rolls in advance of his meeting with Clark project managers was to induce Clark to award RRSA Commercial with subcontracts.

240.    Clark and the RRSA Affiliated Defendants thus violated the Anti-Kickback Act of 1986, 41 U.S.C. § 51 *et seq.*, by providing money, fees, commission, credit, gift, gratuity, thing of value, or compensation of any kind by improperly obtaining or rewarding favorable treatment government contracts.  Clark and the RRSA Affiliated Defendants provided and/or received "thing[s] of value . . . to [a] prime contractor, subcontractor [or] prime contractor employee . . . for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contractor in connection with a subcontract relating to a prime contract." *Id.* § 52.

241.    An AKA violation is a proper predicate for FCA liability on the grounds that:  1) Clark and the RRSA Affiliated Defendants expressly undertook to comply with the AKA as a condition of payment under the prime contracts held with the Government agencies and the flow down provisions therein, and thereafter certified (expressly and/or impliedly) that they had complied with the AKA as a condition of payment, thereby supporting liability for making false certifications (express and/or implied); and/or 2) violations of the AKA "taint" the claims submitted to the Government and render the claims "factually false" and ineligible for payment because they violate a condition of payment.

242.    All of these subcontracts were therefore void *ab initio* because they were tainted by illegal kickbacks.

## IX.    DEFENDANTS INTENTIONALLY MISREPRESENTED THEIR SIZE STATUS

243.    All Defendants have been aware of the risk posed by the RRSA Affiliated Defendants not meeting the size standard requirements under SBA rules and regulations.

244.   The size certifications made by the RRSA Affiliated Defendants, which are mandatory for SBA participation, expressly create a continuing duty to comply with the conditions of participation in and payment by the Government.   Prior to certifying its small business size, the RRSA Affiliated Defendants were advised of the criminal, civil, and administrative penalties misrepresenting their size status.   Among those penalties are criminal sanctions for fraud, concealment and any trick, scheme or device or scheme to defraud, any false or fraudulent statement or representation or any false writing or document, violations of the FCA, civil penalties for billing for services that the firm knows or should know was not provided as claimed.

245.   In addition to the certifications and recertifications that the Prime Contractor Defendants made with regard to each Government contract, when they submitted electronic payment invoices to the Government, they did so subject to and under the terms of their certifications to the United States and States that they had met the small business subcontracting requirements under those Government contracts.

246.   As a result of Defendants' misconduct, all of the payment invoices submitted by the Prime Contractor Defendants after such false certifications were executed constituted false claims that the Government should not and would not have paid.

247.   As a result of Defendants' false and/or fraudulent representations and conduct in securing small business subcontracts, and the Government's reliance thereon, the Government was falsely and/or fraudulently induced to enter into and accept contract and terms and conditions to which it would not have agreed had it known the truth. Because the Government was falsely and/or fraudulently induced to pay monies to Defendants, each claim for payment under these Government contracts was a false and/or fraudulent claim. The claims submitted and

caused to be submitted by Defendants were also false and/or fraudulent because the Defendants

knowingly failed to abide by their obligations under the law.

## X.   DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO DEFRAUD THE UNITED STATES

248.   As alleged in this Complaint, one facet of Defendants' scheme involved one or

more plans with other entities to further the overall fraudulent representations of the Defendants'

size through a pattern and practice of false and misleading representations ("overt acts").

249.   The overt acts included the submission to Government Programs by these

affiliated entities of knowingly false certifications of compliance with laws that are conditions of

Government Program payments (which certifications were false at the time the certifications

were made). As a result of these false certifications, Government Programs made payments to

Defendants that Defendants were ineligible to receive.  The Co-Conspirators include numerous

other related entities through which Defendants have conducted their fraudulent scheme.

250.   Defendants and their co-conspirators shared in the conspiratorial objective to

deceive the United States and States concerning their affiliated relationships with one another

and other parties and further agreed and intended to each perform and to each benefit from these

unlawful overt acts in furtherance of Defendants' scheme to target and financially injure

Government Programs.  Accordingly, Defendants and the co-conspirators entered into these

unlawful financial relationships for the purpose of Defendants' planned scheme to target

Government Programs and submit or cause the submission of false or fraudulent claims and

records.

251.   As described in this Complaint, Defendants intentionally conspired amongst

themselves and with one or more of these affiliated entities to get a false or fraudulent claims

allowed or paid by the United States; one or more of these conspirators performed one or more overt acts to effect the object of the conspiracy; and Government Programs suffered damages as a result of the false or fraudulent claims.

252.    Through the acts and omissions described in this Complaint, and from at least 2011 to the present, Defendants, with each other and with affiliated entities known and unknown, knowingly agreed and conspired to defraud the Government by having false or fraudulent statements, records, certifications, and invoices submitted to, paid and approved by Government officials, their contractors, intermediaries and/or their agents.

253.    By virtue of their conspiratorial agreement, Defendants caused to be presented, made and/or used false or fraudulent invoices, and/or false records or statements, including size status certifications to Government, causing the United States to suffer significant damages.

254.    The United States is therefore entitled to recover from Defendants treble damages under the Federal FCA, in an amount to be proved at trial, plus a civil penalty of at least $5,500 for each violation.

## XI.    DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS

255.    Businesses seeking to do business with the Government must complete and sign a FAR Report that contains representations and certifications relating to the businesses' eligibility to participate in certain Government programs.  This FAR Report, which is ultimately submitted in the System for Award Management ("SAM") database, contains the following averment:

> I have read each of the FAR and DFARS provisions presented below. By submitting this certification, I, [company representative], am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table. I understand that I may be subject to penalties if I misrepresent [the company] in any of the below representations or certifications to the Government.

Filed Under Seal

256.    In addition, contractors (like the Prime Contractor Defendants), which do business with the Government typically submit invoices for payment to the Government using paper, email (less common) and electronic portals (most common).

257.    The process begins when a contractor completes an electronic invoice form, which requires certain information including the contract number, the contractor's code and the method for payment.  Also included on the invoice are fields indicating whether the contract is unrestricted or a set-aside acquisition.

258.    Defendants submitted numerous false claims to the Government in the form of invoices on their unlawfully obtained contracts, which impliedly certified that the RRSA Affiliated Defendants were legitimate small business concerns when they were awarded subcontracts by the Prime Contractor Defendants under various Government contracts.

259.    Also, the Prime Contractor Defendants made fraudulent representations to the United States each time they submitted their semi-annual Individual Subcontract Reports ("ISRs") or Summary Subcontract Reports ("SSRs"), in which they disclosed the details of each of the subcontracts purportedly awarded to small businesses, as well as the extent of its compliance with its small business subcontracting plan.

260.    Defendants' fraudulent scheme served its intended purpose, as they induced the Government to pay Defendants bonuses as well as other monies for services that involved work performed by ineligible small business subcontractors.

261.    The intentional misrepresentations regarding the true size of the RRSA Affiliated Defendants, which were contained in their certifications submitted to Government Programs, were false within the meaning of the federal False Claims Act.

262.   Claims for payments submitted by the Prime Contractor Defendants to Government Programs, in part or in whole, were based on their knowledge that the RRSA Affiliated Defendants misrepresented their size as small, and thus were false within the meaning of the federal False Claims Act.

263.   The RRSA Affiliated Defendants' misrepresentations regarding their size as small caused them to be awarded subcontracts that were void *ab initio* and ultimately caused the submission of claims for payment that were false when made.

264.   The RRSA Affiliated Defendants' misrepresentations regarding their size as small were made knowingly and with the intent to cause the submission of false claims to Government Programs.

265.   Government Programs paid the Prime Contractor Defendants bonuses and made additional transfers, increasing revenue and profits, based on Defendants' false claims, and as a result have incurred and continue to incur significant damages due to Defendants' intentional misrepresentations regarding the RRSA Affiliated Defendants' size as small.

266.   By falsely certifying its eligibility to receive monies on small business subcontracts, and causing subsequent claims for payment to be made that the Defendants knew were ineligible for payment by Government Programs, the Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as described herein.

267.   Defendants' unlawful conduct resulted in tens of millions of dollars in improper payments by Government Programs.

## XII.   SYSTEMIC DAMAGES CAUSED BY SMALL BUSINESS
## MISREPRESENTATION FRAUD

268.   Firms that misrepresent their small business status to win subcontracts create severe harm to the country in a number of respects.   First, and most apparent, the misrepresentation harms legitimate small businesses because it denies them the opportunity to win subcontracts.  The Defendants have directly harmed hundreds if not thousands of legitimate small businesses who have lost work they would have been entitled to win but for the unclean hands of the Defendants.

269.   Second, at the scale of the Defendants' fraud, the misrepresentation distorts the true picture of federal agencies' annual small business spending.  This chokes off future dollars for small business in the budgeting process.

270.   Specifically, Federal agencies are required to track and report their annual spending with small business subcontracting, and are evaluated against negotiated yearly goals. Agencies use the tracking data in the budget and planning process to decide on the dollar level of future work that must be set aside for small business subcontracting so the goals can be reached.

271.   The Defendants' misconduct falsely led agencies to believe that millions of dollars of contract revenue went to small businesses, when in fact those dollars went to the unlawful enterprises created or otherwise supported by the Defendants.

272.   But for the misrepresentations, agencies would have realized they were farther behind their goals, and would have increased the percentage of required small business subcontracting. Thus, many small businesses were deprived of opportunities.

273.   The sustained misrepresentation also undermines the public's confidence in the integrity of the competitive bidding process and in the small business programs as a whole.

## COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))[1]

274.    Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Complaint as though fully set forth herein.

275.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

276.    Through the acts described above, the Defendants and their agents and employees knowingly misrepresented submitted or caused to be submitted to the United States Government knowingly false or fraudulent claims for set-aside small business contracts.

277.    As alleged herein, the Defendants' representations to the United States were knowingly false. By engaging in the conduct described herein, the Defendants knowingly submitted, or caused to be submitted, false claims for payment to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

278.    Through the acts described above, the Defendants and their agents and employees knowingly made, used or caused to be made or used false statements and records to get such false and fraudulent claims paid and approved by the United States Government.

279.    The United States, unaware of the falsity of the records, statements and claims made by the Defendants, paid the Defendants for claims that would otherwise not have been allowed.

280.    By reason of the Defendants' false records, statements and claims, the United States Government has been damaged and continues to be damaged in the amount of tens of millions of dollars.

---

[1] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(1) (2006).

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))[2]

281.   Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Complaint as though fully set forth herein.

282.   As alleged herein, the Defendants knowingly made false representations to the United States. The Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

283.   Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))[3]

284.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

285.   As detailed above, the Defendants knowingly conspired, and may still be conspiring, with the various entities and/or persons described herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). The Defendants and these entities and/or persons committed overt acts in furtherance of the conspiracy as described above.

---

[2]  To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(2) (2006).

[3]  To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(3) (2006).

286.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

**COUNT IV**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))[4]**

287.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

288.    As alleged in detail above, the Defendants knowingly avoided or decreased their obligation to pay or transmit money to the Government. Specifically, the Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

289.    As a result of the Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

**PRAYER FOR RELIEF**

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

A.    That the Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 *et seq.*;

B.    That judgment be entered in Relator's favor and against the Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States for losses resulting

---

[4] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(7) (2006).

Filed Under Seal

from the various schemes undertaken by the Defendants, together with penalties for specific claims to be identified at trial after full discovery;

    C.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

    D.     That the Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

    E.     That judgment be granted for Relator against the Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

    F.     That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Respectfully submitted,

SIMMER LAW GROUP, PLLC

**Andrew M. Miller**
Texas Bar No. 24041483
**W. Scott Simmer (pro hac vice pending)**

600 New Hampshire Ave., NW, Ste. 10A
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

**COUNSEL FOR PLAINTIFF-RELATOR**

Dated:  July 6, 2016

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States ex rel. [UNDER SEAL]

**DEFENDANTS**

[UNDER SEAL]  **3-16CV1975-M**

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  **Ellis County, Texas**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**RECEIVED**

**JUL - 6 2016**

CLERK, DISTRICT COURT
DISTRICT OF TEXAS

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Andrew M. Miller; W. Scott Simmer; Simmer Law Group, PLLC; 600 New Hampshire Ave. NW, Ste. 10A, Washington, DC 20037; 202.333.4562

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
     Plaintiff

☐ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation -
     Transfer

☐ 8 Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Federal Civil False Claims Act; 31 U.S.C. § 3729 et seq.
Brief description of cause:
Violation of the Federal False Claims Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
    UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE
07/06/2014

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____