## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* TINA HAIGHT, | § § § | |
| *Plaintiff-Relator,* | § § | |
| v. | § § | Civil Action No. 3:16-cv-1975-S |
| RRSA (COMMERCIAL DIVISION), LLC; ROOFING & RESTORATION SERVICES OF AMERICA, LLC; RRSA COMMERCIAL ROOFING, INC.; HAIGHT CONSTRUCTION MANAGEMENT SERVICES, INC.; COREY S. SANCHEZ; JON R. SEYMORE; JENNIFER N. SEYMORE; and RONALD SCOTT NICHOLS, | § § § § § § § § § § | JURY TRIAL DEMANDED |
| *Defendants.* | § § | |

## PLAINTIFF-RELATOR TINA HAIGHT'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................................1

FACTUAL BACKGROUND.................................................................................................................1

ARGUMENT AND AUTHORITIES ................................................................................................3

    I.    Relator has standing to bring her FCA claims, and thus the Court has subject matter jurisdiction over those claims..................................................................................4

        A.  Public policy does not favor enforcement of the Release because the government was unaware of potential FCA claims before Relator executed the Release..........................................................................................................5

        B.  The Ninth's Circuit's opinions in *Northrop* and *Hall* explain why Defendants' Release argument fails. ..........................................................................8

        C.  Even if enforceable, the Release cannot apply to future false claims.................11

    II.   Defendants' regulatory noncompliance (as well as their false statements and fraudulent conduct) constitute a false claim. ...............................................................13

CONCLUSION .....................................................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Budner v. Wellness Intern. Network, Ltd.,*
    CIVA 3:06CV0329 K, 2007 WL 806642 (N.D. Tex. Mar. 15, 2007) ................................. 12

*Fernandez–Montes v. Allied Pilots Ass'n,*
    987 F.2d 278 (5th Cir. 1993) ................................................................................ 13

*In re BP p.l.c. Sec. Litig.,*
    4:10-CV-4214, 2015 WL 6674576 (S.D. Tex. Oct. 30, 2015) .................................... 13

*In re LandSource Communities Dev., LLC,*
    612 B.R. 484 (D. Del. 2020) ................................................................................ 11

*Israel Discount Bank Ltd. v. Entin,*
    951 F.2d 311 (11th Cir. 1992) .............................................................................. 8

*Oxy USA, Inc. v. Southwestern Energy Prod. Co.,*
    161 S.W.3d 277 (Tex. App.—Corpus Christi 2005, pet. filed) ............................... 12

*Solis v. Evans,*
    951 S.W.2d 44 (Tex. App.—Corpus Christi 1997, no writ) ................................... 12

*States ex rel. Ladas v. Exelias, Inc.,*
    824 F.3d 16 (2d Cir. 2016) .................................................................................. 6

*Town of Newton v. Rumery,*
    480 U.S. 386 (1987) ........................................................................................... 5

*U.S. ex rel. Gebert v. Transp. Admin. Services,*
    260 F.3d 909 (8th Cir. 2001) .............................................................................. 11

*U.S. ex rel. Longhi v. Lithium Power Techs., Inc.,*
    481 F. Supp. 2d 815 (S.D. Tex. 2007) ................................................................. 5

*U.S. ex rel. Longhi v. United States,*
    575 F.3d 458 (5th Cir. 2009) ....................................................................... passim

*U.S. ex rel. Ritchie v. Lockheed Martin Corp.,*
    558 F.3d 1161 (10th Cir. 2009) ..................................................................... 4, 11

*U.S., ex rel. Abbott-Burdick v. Univ. Med. Associates,*
    2:96-1676-12, 2002 WL 34236885 (D.S.C. May 23, 2002) ...................................... 6

*United States ex rel. Bahrani v. Conagra, Inc.,*
    183 F. Supp. 2d 1272 (D. Colo. 2002) ................................................................. 6

*United States ex rel. Class v. Bayada Home Health Care, Inc.,*
    CV 16-680, 2018 WL 4566157 (E.D. Pa. Sept. 24, 2018) ................................ 4, 10

*United States ex rel. Hall v. Teledyne Chang Albany,*
    104 F.3d 230 (9th Cir. 1997) ................................................................. 4, 6, 9, 11

*United States ex rel. Jackson v. Univ. of N. Tex.,*
    673 F. App'x. 384 (5th Cir. 2016) ....................................................................... 4

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.,*
    No. 99–3298, 2004 WL 2009413 (D.D.C. May 17, 2004) ....................................... 8

*United States ex rel. Powell, American InterContinental Univ., Inc.,*
    No. 08-cv-2277, 2012 WL 2885356 (N.D. Ga. July 12, 2012) ............................... 10

*United States ex rel. Public Integrity v. Therapeutic Technology, Inc.,*
    895 F. Supp. 294 (S.D. Ala. 1995) ...................................................................... 8

*United States ex rel. Spay v. CVS Caremark Corp.,*
    913 F. Supp. 2d 125 (E.D. Pa. 2012) ................................................................. 10

*United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*,
    336 F.3d 375 (5th Cir. 2003) ............................................................................ 14

*United States v. Cooperative Grain & Supply Co.*,
    476 F.2d 47 (8th Cir. 1973) .............................................................................. 12

*United States v. ex rel. Atkins v. McInteer*,
    470 F.3d 1350 (11th Cir. 2006) ........................................................................ 10

*United States v. NHC Health Care Corp.*,
    00-3128-CV-S-4-ECF, 2000 WL 33146582 (W.D. Mo. Nov. 15, 2000) .......................... 12

*United States v. Northrop Corp.*,
    59 F.3d 953 (9th Cir. 1995) ........................................................................ passim

*United States v. Purdue Pharma L.P.*,
    600 F.3d 319 (4th Cir. 2010) ...................................................................... 4, 8, 11

*United States v. United States ex rel. Thornton*,
    207 F.3d 769 (5th Cir. 2000) ......................................................................... 5, 6, 7

*United States v. Univ. of N. Tex.*,
    4:13-CV-734, 2016 WL 369693 (E.D. Tex. Feb. 1, 2016) ............................................ 4, 5, 6

**Statutes**

31 U.S.C. § 3730(b)(1) (1999) ............................................................................. 6

**INTRODUCTION**

This case has been on file since July of 2016 and unsealed since May of 2019. Now, for the first time, Defendants seek dismissal by contending this Court lacks jurisdiction. Contrary to Defendants' belated reliance on a release purportedly signed in June of 2014, the FCA claims before this Court can be vindicated through Relator's *qui tam* action. Defendants' Motion should be denied.

First, a release of a *qui tam* claim is enforceable only if the government both <u>knew of and had the opportunity to investigate</u> the fraudulent conduct before the release was executed. Here, neither the government nor Relator had the requisite knowledge or opportunity to investigate when the release was purportedly signed in 2014.

Second, even if the release is enforceable, it can only apply to conduct occurring prior to its date of execution. Defendants do not cite a single case enforcing a release for <u>future</u> *qui tam* violations. On the contrary, it is hornbook law that prospective releases of intentional torts, criminal conduct, and the like are void because they violate public policy. Not only that, the very language on which Defendants rely speaks in terms of existing, not future, disputes.

Finally, Defendants' one-paragraph argument that the false certifications in the SAM database cannot form the basis of a false claim suit is wrong, because the very certifications at issue expressly incorporate the False Claims Act (FCA).

**FACTUAL BACKGROUND**

Relator is the widow of Grady Martin Haight ("Mr. Haight"), who, during his lifetime, established and operated RRSA (Commercial Division), LLC; Roofing & Restoration Service of America, LLC; RRSA Commercial Roofing, Inc.; and Haight Construction Management Services, Inc. (collectively, the "entity-Defendants").[1] Mr. Haight died on March 27, 2014, in what would ultimately

---

[1] <u>Exhibit A</u>, Declaration of Tina Haight, at ¶ 1 (Appx. 002-004).

be ruled a suicide.[2] Relator filed for divorce from Mr. Haight in 2009, but at the time of his death, the divorce had not been finalized.[3] Relator was not involved with the operations of the entity-Defendants after the divorce was filed.[4]

In April of 2014, less than a month after Mr. Haight's death, Relator entered into discussions that contemplated the sale of the entity-Defendants to Corey Sanchez and others in exchange for, among other things, the assumption of debt and a disclaimer of interests in Mr. Haight's estate.[5] What happened during this time period (including which operative documents control) is the subject of other lawsuits that remain pending in other courts and are being handled by separate counsel for Ms. Haight.[6] It suffices to say that Ms. Haight maintains she did not assent to the Settlement and Mutual Release Agreement (the "Release") and the Equity Purchase Agreement (the "Purchase Agreement") that Defendants attach as Exhibit A and B to their motion, but rather, that she only ever signed naked, undated, signature pages, which were subsequently affixed to documents that were finalized after-the-fact.[7] Relator does not waive those arguments here. Rather, as set forth in Section I below, even if the Court assumes the agreements' validity, they are unenforceable in this case as a matter of law.

Over a year after the date of the Release, Relator learned of the small business scheme at the center of this action.[8] Specifically, after the return of Mr. Haight's cell phone from the police department investigating his death, Relator found evidence of fraud on the United States that, upon

---

[2] Exhibit A, Declaration of Tina Haight, at ¶ 2 (Appx. 002-004).
[3] Exhibit A, Declaration of Tina Haight, at ¶ 3 (Appx. 002-004).
[4] Exhibit A, Declaration of Tina Haight, at ¶ 4 (Appx. 002-004).
[5] Exhibit A, Declaration of Tina Haight, at ¶ 5 (Appx. 002-004).
[6] Exhibit A, Declaration of Tina Haight, at ¶ 6 (Appx. 002-004). For example, there has not been a final order in the state court case between Ms. Haight and Mr. Sanchez. See Docket Sheet for *Tina Haight, et al. v. Corey Stanton Sanchez, Jennifer Seymore, Five Points Bank, et al.*, Cause No. 94402, District Court of the 40th Judicial District, Ellis County, Texas, attached as Exhibit B (Appx. 006-040).
[7] Exhibit A, Declaration of Tina Haight, at ¶ 7 (Appx. 002-004). Relator has no recollection of Gretchen L. McGill being involved in the negotiation, drafting, or signing of Exhibits A and B and contests that Ms. McGill can authenticate them. See Exhibit A, Declaration of Tina Haight, at ¶ 8 (Appx. 002-004).
[8] Exhibit A, Declaration of Tina Haight, at ¶ 9 (Appx. 002-004).

further investigation, was ongoing.[9] In January of 2016, Relator retained attorneys Scott Simmer and Andrew Miller (then at Simmer Law Group, PLLC) to represent her in a potential *qui tam* action.[10]

On or around January 28, 2016, Mr. Miller first informed the government through the United States Attorney's Office in the Northern District of Texas that he was investigating a potential *qui tam* claim on behalf of Relator.[11] On June 30, 2016, Mr. Miller submitted Confidential Disclosure Statement No. 1 to Scott Hogan (then Deputy Civil Chief at the United States Attorney's Office in the Northern District of Texas) regarding Relator's information and the false claims that are the subject of this suit.[12] Relator has been informed the United States intends to file a Statement of Interest in response to Defendants' Motion that, among other things, will advise the Court about the government's knowledge of these claims.

Defendants' Motion asserts the Release bars Relator's *qui tam* claims. Further, Defendants contend that the Purchase Agreement requires Relator to:

> indemnify Mr. Sanchez and the Acquired Entities for any judgments, damages and costs that may be incurred in the *qui tam* action brought by Relator. This would include any monies Mr. Sanchez, his affiliates or the Acquired Entities may be required to pay to the government or third parties (for example, attorney fee awards).[13]

## ARGUMENT AND AUTHORITIES

Defendants' Motion is without merit and should be denied. Federal law is clear that "release and indemnity" clauses like the one Defendants seek to apply here are unenforceable as a matter of law and do not act as a jurisdictional bar. First, a prospective relator can only release potential *qui tam* claims prior to filing suit if the government had <u>knowledge</u> of and the <u>opportunity to investigate</u> the fraudulent conduct before the release was executed. Here, neither the government nor Relator knew

---

[9] <u>Exhibit A</u>, Declaration of Tina Haight, at ¶ 9 (Appx. 002-004).
[10] <u>Exhibit A</u>, Declaration of Tina Haight, at ¶ 10 (Appx. 002-004).
[11] <u>Exhibit C</u>, Declaration of Andrew M. Miller ¶ 3 (Appx. 042-043).
[12] <u>Exhibit C,</u> Declaration of Andrew M. Miller ¶ 4 (Appx. 042-043).
[13] <u>Exhibit D</u>, Indemnification Notice and Demand (Appx. 044).

of or had the opportunity to investigate the claims at issue when the Release was purportedly signed in 2014. Second, release and indemnity clauses that purport to apply to <u>future</u> intentional torts (including false claims) are unenforceable because they violate public policy. Finally, Defendants' one-paragraph argument that making false statements on governmental reporting systems cannot support a False Claims Act violation is wrong.

I.      **Relator has standing to bring her FCA claims, and thus the Court has subject matter jurisdiction over those claims.**

Defendants argue the Court does not have subject matter jurisdiction because (1) the Release contemplates FCA claims, and (2) public policy supports the enforcement of the Release. (Mot. at 5-9.) Notably absent from Defendants' Motion, however, is any reference to the primary "focus of the Court's inquiry . . . whether the allegations of fraud were sufficiently disclosed to the government." *United States v. Univ. of N. Tex.*, 4:13-CV-734, 2016 WL 369693, at *3 (E.D. Tex. Feb. 1, 2016), *aff'd sub nom. United States ex rel. Jackson v. Univ. of N. Tex.*, 673 F. App'x. 384 (5th Cir. 2016).

There is emerging agreement within courts of appeals that pre-filing releases bar subsequent *qui tam* claims only if (1) the release can be fairly interpreted to encompass *qui tam* claims and (2) public policy does not otherwise outweigh enforcement of the release. *United States v. Purdue Pharma L.P.*, 600 F.3d 319, 329 (4th Cir. 2010); *U.S. ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1168-70 (10th Cir. 2009); *United States ex rel. Hall v. Teledyne Chang Albany*, 104 F.3d 230, 232-33 (9th Cir. 1997); *see United States ex rel. Class v. Bayada Home Health Care, Inc.*, CV 16-680, 2018 WL 4566157, at *5 (E.D. Pa. Sept. 24, 2018). The second prong is a balancing test: whether the public interest in favor of encouraging parties to settle private disputes outweighs the competing public interest in bringing otherwise undetected fraudulent activity to light. *See U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 474 (5th Cir. 2009); *Ritchie*, 558 F.3d at 1170; *United States v. Northrop Corp.*, 59 F.3d 953, 960 (9th Cir. 1995). The Fifth Circuit has applied this test when deciding whether a release provision bars a later-filed *qui tam* action. *U.S. ex rel. Longhi*, 575 F.3d at 474; *see Univ. of N. Tex.*, 4:13-CV-734, 2016 WL

369693, at *3. Thus, under the law of this circuit, "the focus of the Court's inquiry must be on whether the allegations of fraud were sufficiently disclosed to the government – whether the government was generally aware of the claims – before Relator signed the release." *Univ. of N. Tex.*, 4:13-CV-734, 2016 WL 369693, at *3.

Here, the release and indemnity provisions that Defendants seek to apply are unenforceable because the government was unaware of allegations of fraud until 2016—two years after the Release was purportedly signed—and the public interest favoring the use of *qui tam* suits to supplement federal enforcement of fraud prohibits enforcing the clauses here.

### A.  Public policy does not favor enforcement of the Release because the government was unaware of potential FCA claims before Relator executed the Release.

"Public policy is meant to view the forest, not the trees." *U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 481 F. Supp. 2d 815, 819 (S.D. Tex. 2007). When evaluating whether enforcing the Release would be contrary to public policy, this Court must consider not only the effect of enforcement on Relator's case, but on that of all future relators. *See id.* This policy is laid out in Congress's decision to enact the FCA, which

> reflects Congress's judgment that incentives to file suit were necessary for the government to learn of the fraud or to spur government authorities into action; permitting a prefiling release when the government has neither been informed of, nor consented to, the release would undermine this incentive, and therefore, frustrate one of the central objectives of the [FCA].

*Northrop Corp.*, 59 F.3d at 965; *see United States v. United States ex rel. Thornton*, 207 F.3d 769, 771 (5th Cir. 2000).

The Supreme Court's decision in *Town of Newton v. Rumery*, 480 U.S. 386 (1987), establishes the framework for determining whether public policy prevents enforcement of settlement agreements in the context of *qui tam* cases. *See Longhi*, 575 F.3d at 474. Specifically, the Supreme Court held that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by the enforcement of the agreement." *Rumery*, 480 U.S. at 392 (citation omitted).

Courts have applied *Rumery* to a broad spectrum of pre- and post-filing releases of *qui tam* claims entered into without the United States' knowledge or consent. *See, e.g., Hall*, 104 F.3d at 233; *Northrop Corp.*, 59 F.3d at 956, 969 (finding a pre-filing release invalid); *see also Longhi*, 575 F.3d at 474; *United States ex rel. Bahrani v. Conagra, Inc.*, 183 F. Supp. 2d 1272 (D. Colo. 2002) (denying defendants' motion to dismiss and finding a pre-filing release invalid because the government only started investigating the matter after the *qui tam* action was filed), *rev'd on other grounds*, 465 F.3d 1189 (10th Cir. 2006).

Congress purposefully intended the litigation structure under the FCA to be uniquely pro-plaintiff. *Longhi*, 481 F. Supp. 2d at 823 (citing *U.S., ex rel. Abbott-Burdick v. Univ. Med. Associates*, 2:96-1676-12, 2002 WL 34236885, at *5 (D.S.C. May 23, 2002)). To vindicate the public interest in preserving the government fisc, "[t]he FCA allows a private citizen with special knowledge of fraud against the government to commence suit in the name of the government." *Thornton*, 207 F.3d at 771 (citing 31 U.S.C. § 3730(b)(1) (1999)). It is in the public interest to protect the federal treasury and ensure the integrity and honesty of those receiving government funds. *Longhi*, 481 F. Supp. 2d at 818. Hence, in the FCA context, a "pre-filing release of a relator's right to bring a *qui tam* action" is enforceable only if "the relator's allegations of fraud were sufficiently disclosed to the government prior to the release, and the government had opportunity to fully investigate the allegations." *Univ. of N. Tex.*, 4:13-CV-734, 2016 WL 369693, at *3; *see Hall*, 104 F.3d at 232 (upholding a release only where the defendant proves that (1) the federal government had *full knowledge* of the plaintiff's charges before the release was executed, and (2) the federal government had *already investigated* the allegations prior to their release); *Northrop Corp.*, 59 F.3d at 969 ("[P]refiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim."); *see also States ex rel. Ladas v. Exelias, Inc.*, 824 F.3d 16 (2d Cir. 2016) (declining to enforce a pre-filing release as a matter of public policy).

As will be set forth the Government's Statement of Interest, Relator's allegations of fraud were not known to the government until Relator came forward, and the government had no opportunity to investigate them until that time—almost two years after the date of the Release. Thus, because the government had neither knowledge nor an opportunity to investigate, public policy clearly outweighs Defendants' purported "interest" in enforcing the release and indemnity clauses.

Enforcing a global release like the one at issue here would encourage those guilty of fraud on the United States to insulate themselves from the reach of the FCA by forcing potential relators to sign general releases. *See Longhi*, 575 F.3d at 474. For example, employers who engage in fraud would have strong incentives to build releases like these into their employment or separation agreements. This, in turn, would impair the government's ability to investigate FCA claims and would run contrary to the policy objectives embodied in the statute: to incentivize those who have or gain special knowledge of fraud to speak up. *See Longhi*, 575 F.3d at 474; *United States v. United States ex rel. Thornton*, 207 F.3d 769, 771 (5th Cir. 2000) ("The *qui tam* provisions of the False Claims Act create incentives for potential whistle blowers to assist the government to discover fraud against the taxpayers."). If a relator believed that a general release barred a *qui tam* action for false claims of which the government was ignorant at the time of the release, the relator would never bring the fraud to light. This is not and cannot be a result intended by Congress.

Not only do Defendants seek to use the release to bar this action, they seek to deploy the indemnity provision to prevent Relator from voluntarily participating in the government's investigation of Defendants' fraud. They contend that Relator must indemnify them for any liability resulting from that participation, including the very judgment Relator seeks to obtain for the government's benefit in this case.[14] The Fifth Circuit has made it clear that the same public policy test applicable to releases is used for indemnification clauses. *See Longhi*, 575 F.3d at 474. And the reasoning

---

[14] Exhibit D, Indemnification Notice and Demand (Appx. 044).

is identical. No potential relator would bring fraud to the government's attention if the relator believed that doing so would require her to indemnify the fraudster. It is for that reason that courts consistently conclude that indemnity is not available for FCA claims. *See Longhi*, 481 F. Supp. 2d at 818 ("And finally, case law squarely on point suggests that any indemnification of a *qui tam* defendant by the relator fails as a matter of law.") (citing *Israel Discount Bank Ltd. v. Entin*, 951 F.2d 311, 315 (11th Cir. 1992)) ("[T]here is no right to indemnity . . . under the FCA."); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, No. 99–3298, 2004 WL 2009413, *7 (D.D.C. May 17, 2004) (holding that defendants "do not have any rights to indemnity . . . under the FCA"); *United States ex rel. Public Integrity v. Therapeutic Technology, Inc.*, 895 F. Supp. 294, 297 (S.D. Ala. 1995) ("[*Q*]*ui tam* defendants lack a right to bring claims that will have the effect of offsetting FCA liability.").

To state the obvious, affirming Defendants' extraordinary position would greatly undermine the government's ability to learn of, investigate, prosecute, and deter future fraud against the government. *See Longhi*, 575 F.3d at 474; *Purdue Pharma L.P.*, 600 F.3d at 331. That is the reason Congress enacted the FCA and the reason why courts refuse to enforce prefiling releases unless the government has knowledge and opportunity to investigate. Because the government here did not have that knowledge and because Defendants' position would effectively prevent relator from ever giving the government that knowledge, neither the release nor the indemnity clauses may be enforced.

**B.  The Ninth's Circuit's opinions in *Northrop* and *Hall* explain why Defendants' Release argument fails.**

A contrasting pair of Ninth Circuit cases clearly explain why the purported Release is unenforceable. The central question in both cases is whether the government's interest in being made aware of fraud has been sufficiently vindicated.

In the first, *United States v. Northrop Corp.*, the relator filed and settled various state law claims with his former employer and others; the settlement included a general release. 59 F.3d at 956. Subsequently, the relator filed a *qui tam* action, which gave the government its first opportunity to

investigate the alleged fraud. *Id.* Thereafter, the United States undertook an investigation of the allegations made in the complaint. *Id.* After conducting an inquiry that lasted several months, the United States declined to intervene in the suit. *Id.* at 956-57. The defendants then argued that the *qui tam* action should be dismissed on the basis of the release. *Id.* at 957.

The Ninth Circuit rejected that argument because "enforcing the release . . . would impair a substantial public interest" by "nullify[ing] the incentives Congress intended to create in amending the provisions of the False Claims Act." *Id.* at 963. According to the court, "if the release [would] be enforced, [the potential relator would] have no right or reason to file a *qui tam* claim," thereby undermining the FCA's "deterrent objectives." *Id.* at 965. *Northrop*'s holding is clear and unequivocal: "that prefiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim." *Id.* at 969.

A few years later, sitting *en banc*, the Ninth Circuit upheld a prefiling release in *United States ex rel. Hall v. Teledyne Chang Albany* because, contrary to the facts in *Northrop Corp.*, "the government had full knowledge of the . . . charges and had investigated them before [the relator and the defendant] settled." 104 F.3d at 231. The *Hall* court explained its prior holding that its "refusal to enforce the release in [*Northrop Corp.*] turned on the public interest in learning about claims of government contractor fraud, and upon the fact that in that case, the government had not been aware of [the relator's] allegations at the time of the settlement release." *Id.* at 233. But because the government was aware of and had investigated the claims raised by the relator in *Hall*, "the public interest in having information brought forward that the government could not otherwise obtain [was] not implicated." *Id.* In fact, the *Hall* court made this very clear when it stated that it "deemed the question of the government's lack of knowledge 'critical' " to its decision. *Id.*

The FCA's entire purpose is encouraging those with knowledge of potential fraud to come forward by providing financial incentives. Then the FCA gives the government a window of time in

which to investigate and the option to intervene and take over prosecution of the case. This structure presupposes the government's knowledge arising from the relator's act of coming forward. Hence, whatever impairs the government's acquisition of knowledge of the fraud necessarily conflicts with the FCA's scheme. It is for that reason that the Ninth Circuit focused so closely in *Northrop* and *Hall* on the state of the government's knowledge. And as in *Northrop*, the government here did not know of the fraud at the time of the Release and so, as in *Northrop*, the Release is unenforceable.

This calculus does not change when the government declines to intervene. *See Northrop Corp.*, 59 F.3d at 956; *United States ex rel. Class v. Bayada Home Health Care, Inc.*, CV 16-680, 2018 WL 4566157, at *11 (E.D. Pa. Sept. 24, 2018). First, the government routinely declines intervention in a *qui tam* action for reasons that have nothing to do with the merits of the case. *See, e.g., United States v. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) ("We do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient or the qui tam relator's allegations for fraud to be without merit. In any given case, the government may have a host of reasons for not pursuing a claim."); *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 144 n.3 (E.D. Pa. 2012) ("[T]he government emphasized that its decision not to intervene should not be interpreted as a comment on the merits of Plaintiff's claims."); *United States ex rel. Powell, American InterContinental Univ., Inc.*, No. 08-cv-2277, 2012 WL 2885356, at * 11 (N.D. Ga. July 12, 2012).

Second, relators often do not know if the government will intervene in an action. If a release only becomes unenforceable if the government intervenes, then potential relators are forced to speculate about whether the government will intervene before filing a *qui tam* action. Being unable to ascertain whether a release will be enforceable before filing a *qui tam* action would result in fewer relators coming forward to expose fraud and so undermine the FCA's central purpose. *See Powell*, 2012 WL 2885356, at * 11; *Bayada Home Health Care, Inc.*, CV 16-680, 2018 WL 4566157, at *11. For this

reason, a declination of intervention has no bearing on the analysis of whether a pre-suit release is enforceable, and public policy is strongly against barring Relator's claims here.

The facts before the Court are distinct from those in *Hall*, *Ritchie*, and *Purdue Pharma L.P.* because here the government did not have sufficient knowledge of Relator's allegations prior to the signing of the release and indemnification clauses. This case is more analogous to *Northrop Corp.* and *Longhi* where the underlying policy of encouraging laypeople to come forward with information to assist the government with uncovering fraud would not be served by enforcing the Release.

### C.   Even if enforceable, the Release cannot apply to future false claims.

Defendants do not cite a single case enforcing a release for <u>future</u> *qui tam* violations.[15] This absence is telling and leads to the ineluctable conclusion that the Release does not and cannot bar a *qui tam* action for false claims made post-execution. Thus, even if the Court finds the Release enforceable in this case (and it should not), the release and indemnity cannot apply to false claims submitted after the date of the Release.

First, the terms of the Release are limited to existing claims and retrospective conduct. The Release defines "Disputes": "Whereas certain disputes **have arisen** between Tina, the Estate, Cory, Jon and Jenny relating to the operation and ownership of the Companies and other matters discussed and negotiated between the parties (the 'Disputes')." (Ex. A to Mot. at 2 (App'x_0004).) (emphasis added).[16] Because the Release used the past tense to define the term, "Disputes" can only refer to disputes that existed as of the date of the release. In addition, the complementary definitional phrase

---

[15] Relator has not located any cases enforcing a release of claims for future violations of the FCA. Two cases in the specific context of bankruptcy do mention "future claims," in what appears to be a reference to to-be-filed claims for violations that preceded the date of the release, not a reference to prospective future violations. *See U.S. ex rel. Gebert v. Transp. Admin. Services*, 260 F.3d 909, 917-18 (8th Cir. 2001); *In re LandSource Communities Dev., LLC*, 612 B.R. 484, 499 (D. Del. 2020), *aff'd sub nom. LandSource Communities Dev. LLC v. Citizens Against Corp. Crime, LLC*, 834 F. App'x 747 (3d Cir. 2020). In any event, both cases turned on considerations unique to bankruptcy that are inapplicable here.

[16] As stated in Relator's declaration, she was unaware of these *qui tam* claims in 2014, and they were not a dispute that "had arisen" between the parties. Notably, the Release makes no express mention of *qui tam* claims, and this is yet another reason why the Release and Purchase Agreement are inapplicable here.

---

"other matter discussed and negotiated" further specifies that the "Disputes" being waived are things that were discussed and negotiated in the past. Further evidence of only retrospective nature of the Release comes from the "Seller's Release" provision, which ostensibly releases claims that "arise out of or are in anyway related to the Disputes, the Relationship, the Equity, any matter discussed herein or by reason of acts and all acts, omissions, events or facts **occurring or existing as of the date hereof**." (Ex. A to Mot. at 11 (App'x_0013).) (emphasis added). Under its own terms, the Release is not prospective.

Second, parties cannot prospectively release claims for intentional torts such as the frauds at issue here. As this Court has previously held, "Defendants cannot prospectively limit their liability for intentional torts such as those pleaded by Plaintiffs. Texas courts have held that a party cannot prospectively insulate itself contractually from liability for intentional torts." *Budner v. Wellness Intern. Network, Ltd.*, CIVA 3:06CV0329 K, 2007 WL 806642, at *8 (N.D. Tex. Mar. 15, 2007) (citing *Solis v. Evans*, 951 S.W.2d 44, 50 (Tex. App.—Corpus Christi 1997, no writ) (concluding that it would be contrary to public policy to enforce contractual provision exculpating party from liability for future intentional torts)); *see Oxy USA, Inc. v. Southwestern Energy Prod. Co.*, 161 S.W.3d 277, 283 (Tex. App.—Corpus Christi 2005, pet. filed) (providing that a party may not prospectively contractually exculpate itself with respect to intentional torts). Because FCA claims are intentional torts, any release could only apply retroactively, not prospectively. *See United States v. NHC Health Care Corp.*, 00-3128-CV-S-4-ECF, 2000 WL 33146582, at *1 (W.D. Mo. Nov. 15, 2000) (citing *United States v. Cooperative Grain & Supply Co.*, 476 F.2d 47, 60 (8th Cir. 1973)).

By virtue of the express language of the Release as well as the rule that prospective claims for intentional torts cannot be released, the Release, to the extent that it is enforceable at all, cannot bar any portion of the *qui tam* action seeking to recover for false claims made after the date of the Release.

## II. Defendants' regulatory noncompliance (as well as their false statements and fraudulent conduct) constitute a false claim.

Defendants devote one paragraph of their motion to an argument that "regulatory noncompliance" fails to state a claim under Federal Rule of 12(b)(6). *See In re BP p.l.c. Sec. Litig.*, 4:10-CV-4214, 2015 WL 6674576, at *2 (S.D. Tex. Oct. 30, 2015) (quoting *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)). ("In deciding whether to dismiss a case for failure to state a claim under Rule 12(b)(6), 'the district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff.' "). Defendants claim that making false certifications to the government on the System for Award Management ("SAM") database or through submitting false information in a FAR Report does not constitute a "false claim" within the scope of the FCA. That is not the case. The SAM.gov website provides a warning that by "submitting this certification," the individual is "attesting to the accuracy of the representations and certifications contained here . . . [and] understand[s] that [they] may be subject to . . . civil liability under the False Claims Act."

> I have read each of the FAR and DFARS provisions presented on this page. By submitting this certification, I, Jennifer Seymore, am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table. I understand that I may be subject to criminal prosecution under Section 1001, Title 18 of the United States Code or civil liability under the False Claims Act if I misrepresent  RRSA ( Commercial Division ), LLC in any of these representations or certifications to the Government.

(*See* Ex. A to First Am. Compl., Dkt. 104-1 at 64.) Further, the same warning is provided at the top of FAR Reports, including the one attached by Defendants to their Response to the Motion to Compel (Dkt. 123-1 at 23.)



| FAR Report |
| --- |
| **Certification for: RRSA ( Commercial Division ), LLC**<br>**DUNS: 078762276**<br>**Certification Validity From:Tue Jan 24 10:06:18 EST 2017**<br>**To :Wed Jan 24 10:06:18 EST 2018** |

I have read each of the FAR and DFARS provisions presented on this page. By submitting this certification, I, Jennifer Seymore, am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table. I understand that I may be subject to criminal prosecution under Section 1001, Title 18 of the United States Code or civil liability under the False Claims Act if I misrepresent RRSA ( Commercial Division ), LLC in any of these representations or certifications to the Government.

And, Relator has alleged in its First Amended Complaint that on March 6, 2013 through January 24, 2018, RRSA Management (including Ms. Seymore) falsely certified on the SAM registry that RRSA Commercial was a small business under SBA rules and under the relevant NAICS codes 238150, 238160, and 238170. (*See, e.g.*, Dkt. 104 at ¶¶ 119-120.) Without a doubt, false representations or certifications to the government through the SAM database support a False Claims Act violation under 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), or 3729(a)(1)(C).

The First Amended Petition also contains allegations of false statements and a fraudulent course of conduct outside of the misrepresentations discussed above. (*See, e.g.*, Dkt. 104 at ¶¶ 121, 182, 213, 228, 229, 230, 231, 233, 244.) The purpose of this fraudulent conduct was to obtain government contracts for which Defendants were not eligible. FCA liability may be imposed "when the contract under which payment is made was procured by fraud." *Longhi*, 575 F.3d at 467-68 (citing *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 384 (5th Cir. 2003). Under such a fraudulent inducement theory, although the Defendants' subsequent claims for payment made under the contract were not literally false (given Defendants performed the roofing work), because the work was awarded to Defendants as a result of the original fraudulent misrepresentation, those claims for payment are actionable false claims. *See id.*

In short, false representations or certifications to the government through the SAM database support a False Claims Act violation, and the First Amended Complaint contains detailed allegations of false statements made and a fraudulent course of conduct of each of the Defendants outside of the misrepresentations on the SAM database and FAR Reports.

## <u>CONCLUSION</u>

Accordingly, Plaintiff-Relator Tina Haight respectfully requests that the Court deny Defendants' Motion to Dismiss First Amended Complaint.

Dated: March 8, 2021

Respectfully Submitted,

/s/ Darren P. Nicholson

Darren P. Nicholson
State Bar No. 24032789
dnicholson@burnscharest.com
Mallory Biblo
State Bar No. 24087165
mbiblo@burnscharest.com
BURNS CHAREST, LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 458-9890
Facsimile: (469) 444-5002

and

Christopher A. Payne
State Bar No. 15651500
Chris.Payne@Payne-Asltrin.com
Christina Alstrin
State Bar No. 24068019
Christina.Alstrin@Payne-Alstrin.com
PAYNE ALSTRIN, PLLC
9101 LBJ Freeway, Suite 710
Dallas, Texas 75243
Telephone: (214) 945-1022
Facsimile: (214) 945-1023

Counsel for Plaintiff-Relator Tina Haight

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on

March 8, 2021 via e-service to all counsel of record.

*/s/ Darren P. Nicholson*
Darren P. Nicholson