# United States District Court
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* TINA HAIGHT | § § § | |
| v. | § § | CIVIL ACTION NO. 3:16-CV-1975-S |
| RRSA (COMMERCIAL DIVISION), LLC; ROOFING & RESTORATION SERVICES OF AMERICA, LLC; RRSA COMMERCIAL ROOFING, INC.; HAIGHT CONSTRUCTION MANAGEMENT SERVICES, INC.; COREY S. SANCHEZ; JON R. SEYMORE; JENNIFER N. SEYMORE; and RONALD SCOTT NICHOLS | § § § § § § § § § § | |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion and Order addresses Defendants RRSA (Commercial Division), LLC; Roofing & Restoration Services of America, LLC; RRSA Commercial Roofing, Inc.; Haight Construction Management Services, Inc.; Corey S. Sanchez; Jon R. Seymore; Jennifer N. Seymore and Ronald Scott Nichols's Motion to Dismiss First Amended Complaint and Memorandum of Law in Support of Motion to Dismiss ("Motion to Dismiss") [ECF No. 115]. For the reasons that follow, the Court **DENIES** the Motion to Dismiss.

### I. PROCEDURAL HISTORY

On July 6, 2016, Relator Tina Haight ("Relator") filed this *qui tam* action under seal pursuant to the False Claims Act. Compl. for False Claims Act Violations under 31 U.S.C. § 3729 *et seq.* ("Complaint") [ECF No. 2]. The United States of America ("Government") declined to intervene and the Court subsequently lifted the seal on the Complaint and ordered that it be served on Defendants. Order [ECF No. 21]. As set forth in the Court's prior Memorandum Opinion and Order ("*Haight I*"), Defendant Ronald Scott Nichols and the "RRSA Defendants" separately

moved to dismiss for failure to state a claim and failure to plead fraud with sufficient particularity. *United States ex rel. Haight v. RRSA (Commercial Division), LLC*, Civil Action No. 3:16-cv-1975-S, 2020 WL 6163139 (N.D. Tex. Oct. 20, 2020). The Court granted in part and denied in part the motions to dismiss, but granted Relator leave to replead. *Haight*, 2020 WL 6163139, at *9. Relator subsequently filed an amended complaint. Pl.-Relator Tina Haight's First Am. Compl. for False Claims Act Violations under 31 U.S.C. § 3729 *et seq.* ("Amended Complaint") [ECF No. 104].

## II. FACTUAL BACKGROUND

The details regarding Relator's allegations are described in *Haight I* and need not be fully restated. *Haight*, 2020 WL 6163139. In brief, Relator realleges in the Amended Complaint that Defendants RRSA (Commercial Division), LLC, Roofing & Restoration Services of America, LLC, RRSA Commercial Roofing, Inc., Haight Construction Management Services, Inc., Corey S. Sanchez, Jon R. Seymore, Jennifer N. Seymore, and Ronald Scott Nichols (collectively, "Defendants") violated the False Claims Act by devising a fraudulent scheme to obtain Government subcontracting opportunities that are reserved for eligible small businesses under the Small Business Act ("SBA"). Am. Compl. ¶¶ 1-4. Specifically, Relator contends that one or more Defendants falsely represented that RRSA (Commercial Division), LLC ("RRSA Commercial") was an eligible small business for the purpose of securing lucrative small business subcontracts, when, in reality, under the SBA rules and regulations, RRSA Commercial was ineligible because of its affiliation with other business entities. *Id.* ¶¶ 4, 9. Pursuant to the scheme, one or more Defendants allegedly submitted false certifications regarding RRSA Commercial's status as a small business via the System for Award Management ("SAM") database and in Federal Acquisition Regulation ("FAR") reports, pursued subcontracting opportunities from various Government contractors—who awarded RRSA Commercial subcontracts despite knowing that RRSA Commercial was *not* an eligible small business, and caused such Government contractors

2

to submit false claims to the Government for payment. *See generally id.* ¶¶ 1-15, 119-20. Relator also maintains that Corey S. Sanchez, Jon R. Seymore, Jennifer N. Seymore, and Ronald Scott Nichols paid illegal kickbacks to one or more Government contractors to ensure RRSA Commercial received subcontracts, in violation of the Anti-Kickback Act. *Id.* ¶ 5. According to Relator, the Government paid "tens of millions of dollars" for work performed pursuant to the scheme, which diverted funds the Government intended to be paid to legitimate small businesses and deprived legitimate small businesses of subcontracting opportunities. *See id.* ¶¶ 11, 280, 284-85, 293.

Based on these allegations, Relator avers that one or more Defendants knowingly submitted or caused to be submitted false claims for payment to the Government, in violation of 31 U.S.C. § 3729(a)(1)(A); knowingly used false records or statements to get false claims paid by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B); and knowingly conspired to make such claims or statements, in violation of 31 U.S.C. § 3729(a)(1)(C).[1] *See id.* ¶¶ 287-99.

Defendants move to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting for the first time that Relator does not have standing to pursue her claims because she purportedly signed a settlement agreement prior to filing the instant *qui tam* action, releasing "any and all claims related to the matters therein settled," which Defendants argue encompasses Relator's *qui tam* claims. *See* Mot. to Dismiss 1-3. Alternatively, Defendants move to dismiss pursuant to Federal Rule of Procedure 12(b)(6). *See id.* 1, 10. The Motion to Dismiss is fully briefed and pending before the Court. The Government filed a statement of interest, United States of America's Statement of Interest ("Statement of Interest") [ECF No. 143], to which the

---

[1] The Court notes that Relator pleads Counts 1 and 2 against all Defendants, except for Haight Construction Management Services, Inc., and Count 3 against all Defendants. Am Compl. ¶¶ 287-99.

Defendants replied, Defs.' Reply to Pl. United States of America's Statement of Interest [ECF No. 146].

### III.     LEGAL STANDARD

#### A.     *Rule 12(b)(1)*

Federal Rule of Civil Procedure 12(b)(1) requires a court to dismiss a claim if the court does not have subject matter jurisdiction over the dispute. FED. R. CIV. PROC. 12(b)(1); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Standing is a component of subject matter jurisdiction and is properly raised by a motion to dismiss under Rule 12(b)(1). *See Hollis v. Lynch*, 121 F. Supp. 3d 617, 626 (N.D. Tex. 2015) (noting that "whether a party has proper standing is a question of subject matter jurisdiction" (citing *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006))).

A party can challenge subject matter jurisdiction by making a "facial attack" or a "factual attack." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). A facial attack is based solely on the pleadings and the Court must examine the sufficiency of the allegations in the complaint, which are presumed to be true. *See id.* If the jurisdictional allegations are sufficient, the complaint stands. *Id.* A factual attack, by contrast, challenges the factual allegations underlying the assertion of jurisdiction and the court may consider matters outside the pleadings, such as affidavits, testimony, or other evidentiary materials. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citation omitted); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). When a defendant mounts a factual attack, the presumption of truthfulness does not attach to plaintiff's allegations and the court is free to weigh the evidence to determine whether the court has subject matter jurisdiction. *See Williamson*, 645 F.2d at 412-13 (citation omitted). To defeat a factual attack, a plaintiff must prove the existence of subject matter jurisdiction by a

preponderance of the evidence. *Irwin v. Veterans Admin*, 874 F.2d 1092, 1096 (5th Cir. 1989) (citation omitted).

**B.     *Rule 12(b)(6)***

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). At the motion to dismiss stage, the court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

**IV.     ANALYSIS**

**A.     *Standing***

Defendants have mounted a factual attack to this Court's subject matter jurisdiction by submitting evidence that Relator lacks standing because she allegedly executed an agreement releasing her *qui tam* claims. *See* Mot. to Dismiss 5-7. Relator is the widow of Grady Martin Haight ("Haight") who passed away on March 27, 2014. *See id.* at 2; Resp. 1. During his lifetime, Haight established, built, and operated RRSA Commercial, Roofing & Restoration Service of America, LLC, RRSA Commercial Roofing, Inc., and Haight Construction Management Services, Inc. (collectively, "Business Defendants"). Mot. to Dismiss 1-2; Resp. 1-2. The parties dispute what happened next, which is the subject of other lawsuits. Resp. 2. After Haight's death,

Defendants assert that Relator acquired an ownership interest in the Business Defendants. Mot. to Dismiss 2. Defendants contend that disputes subsequently arose between Relator and the Business Defendants' management. *Id.* As a result, Defendants allege Relator sold her interest in the Business Defendants to Corey S. Sanchez. *Id.*

Defendants have presented two agreements that allegedly document the sale and settlement of disputes. *Id.* at 2. The first is a Settlement and Mutual Release Agreement ("Settlement Agreement"), dated June 6, 2014, by and between Tina L. Haight, in her individual and representative capacities, as Seller, and Corey Sanchez, Jennifer Haight Seymore, and Jon Seymore, as Buyers. App'x to Defs.' Mot. to Dismiss First Am. Compl., Ex. A [ECF No. 116]. The second is an Equity Purchase Agreement ("Purchase Agreement"), dated June 6, 2014, by and between Tina L. Haight, in her individual and representative capacities, as Seller, and Corey Sanchez, as Buyer. *Id.*, Ex. B. According to Defendants, the Settlement Agreement contains a broad release pursuant to which, *inter alia*, Relator agreed to release the Defendants "from all claims related to the operation of the Business Defendants" ("Release").[2] Mot. to Dismiss 2. Defendants contend that the Release is sufficiently broad to encompass Relator's *qui tam* claims and, consequently, Relator lacks standing because she supposedly bargained away her right to bring the instant action.[3] *See id.* at 1-2, 5, 7.

In opposition, Relator asserts that the Settlement Agreement and Purchase Agreement (collectively, "Agreements") are not enforceable for several reasons. First, Relator claims she did

---

[2] The Court notes that Defendant Ronald Scott Nichols is not a party to the Settlement Agreement or Purchase Agreement.

[3] Defendants assert that on "multiple occasions, the Settlement Agreement has been upheld as valid and enforceable by Texas Courts." Mot. to Dismiss 1. The single case Defendants cite, however, addresses the enforceability of the Settlement Agreement solely with respect to the appellees in that case, who are not Defendants in this case, and does not consider whether the Settlement Agreement bars Relator's *qui tam* claims. *See Haight v. Koley Jessen PC, LLO*, No. 10-18-00057-CV, 2019 WL 2479953, at *1, *3-4 (Tex. App. – Waco June 12, 2019, pet. denied).

not assent to the terms of the Agreements because she maintains she signed "naked, undated signature pages" that were subsequently affixed to the Agreements. Pl.-Relator Tina Haight's Resp. to Defs.' Mot. to Dismiss First Am. Compl. ("Response") 2 [ECF No. 132]. Second, Relator asserts that parties cannot prospectively release claims for intentional torts, including *qui tam* claims. *Id.* at 12. Third, even if the Agreements are enforceable, Relator argues that the Release only pertains to retrospective conduct that was discussed and negotiated, not future claims such as the *qui tam* claims, which Relator claims she discovered *after* the date the Agreements were allegedly executed. *See id.* at 2, 11. Finally, Relator argues that enforcing the Release would be contrary to public policy. *Id.* at 5-11. The Court agrees that the Release is not enforceable on public policy grounds and, therefore, need not determine Relator's remaining arguments. *See United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 957 (9th Cir. 1995) (assuming for purposes of analysis that prefiling release encompassed relator's *qui tam* claims, but holding that release was nonetheless unenforceable because it would impermissibly impair a substantial public policy); *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 23 (2d Cir. 2016) (same).

### (1) *Enforceability of Prefiling Release*

Under the plain language of the False Claims Act ("FCA"), a *qui tam* relator may not unilaterally enter into an enforceable settlement agreement or release *after* filing an FCA action. *See* 31 U.S.C. § 3730(b)(1) ("The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."); *United States ex rel. Longhi*, 575 F.3d 458, 474-75 (5th Cir. 2009) (affirming district court's refusal to enforce a *postfiling* release and indemnification on the grounds that the plain language of the FCA prohibits dismissal without the court's and Attorney General's consent and the interest in enforcing the release and indemnification were outweighed by public policy concerns). The FCA, however, is silent as to the enforceability of a *prefiling* release. *Green*, 59 F.3d at 959.

Although the Fifth Circuit has not yet considered the enforceability of a prefiling release, circuit courts that have considered the issue have applied the balancing test first articulated by the Ninth Circuit in *Green* and *United States ex rel Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230 (9th Cir. 1997). *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161 (10th Cir. 2009); *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319 (4th Cir. 2010); *Ladas*, 824 F.3d 16. Similarly, at least one district court within the Fifth Circuit has applied this balancing test to determine whether a release may bar a later-filed *qui tam* action. *United States ex rel. Jackson v. Univ. of N. Tex.*, Case No. 4:13-cv-734, 2016 WL 369693 (E.D. Tex. Feb. 1, 2016). Given the lack of Fifth Circuit precedent, the Court will apply the *Green* and *Hall* balancing test considering its widespread adoption among the circuits. *See, e.g.*, *Ladas*, 824 F.3d at 23 (noting courts have widely applied the framework reflected in *Green* and *Hall*); *Radcliffe*, 600 F.3d at 329 (observing that most courts considering the enforceability of prefiling releases apply the analytical framework established in *Green* and *Hall*).

In *Green*, the Ninth Circuit considered whether the release of a *qui tam* claim, entered into without the Government's knowledge or consent, and prior to the filing of the *qui tam* action, was enforceable. *Green*, 59 F.3d at 956. To make this determination, the Ninth Circuit established a balancing test derived from the Supreme Court's decision in *Town of Newton v. Rumery*, 480 U.S. 386 (1987). *Id.* at 958. Under the balancing test, the Ninth Circuit analyzed whether the interest in enforcing the release was outweighed in the circumstances by a public policy harmed by enforcing the release. *Id.* at 958, 962 (citing *Rumery*, 480 U.S. at 392). The Ninth Circuit concluded that enforcement of the prefiling release would "impair a substantial public interest" because the release "would threaten to nullify" the "central purpose of the *qui tam* provisions of

8

the FCA"—to incentivize insiders privy to fraud on the Government to "blow the whistle on crime." *Id.* at 963 (citations omitted).

Crucial to the Ninth Circuit's analysis was the fact that the Government only learned of the fraud allegations "*because of the filing of the qui tam complaint.*" *Id.* at 966 (emphasis in original). Given that a successful relator will receive at most 30 percent of the recovery, if prefiling releases were enforceable, "a rational relator would be willing to accept a substantially smaller amount to settle the claim immediately than to preserve the right to eventually file a *qui tam* action in which the government would retain the lion's share of the proceeds." *Id.* at 965-66. As a result, relators would be incentivized to settle *before* filing a *qui tam* action and the Government would likely never learn of the fraud, eviscerating the incentives created by the *qui tam* provisions of the FCA. *See id.* at 965; *see also id.* (emphasis in original) ("Accordingly, when we consider, as we do here, a release of a claim in the *pre*filing period, it is clear that our focus must be on what impact the release will have on the incentive effect Congress intended to create and the importance of that incentive effect in achieving the FCA's goals of detecting and deterring fraud on the government."). For these reasons, the Ninth Circuit held that prefiling releases, when entered into without the Government's knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim. *Id.* at 969.

In *Hall*, however, the Ninth Circuit held that a prefiling release was enforceable because, in contrast to *Green*, the Government had full knowledge of the relator's claims and had investigated them *before* the parties executed the release. 104 F.3d at 231. Unlike the factual circumstances in *Green*, Hall voiced concerns to his employer that their nuclear manufacturing process was faulty and the employer informed the Nuclear Regulatory Commission of Hall's concerns and the steps it was taking to demonstrate the adequacy of the process. *Id.* at 231. Hall

also filed his own complaint with the Nuclear Regulatory Commission. *Id.* After being terminated, Hall filed suit in state court, the parties settled, and Hall executed a broadly worded release. *Id.* at 232. After the release was executed, Hall filed a *qui tam* action. *Id.* In these circumstances, the Ninth Circuit held that the release was enforceable because the concerns that led the Ninth Circuit to deny enforcement in *Green* (i.e., the fact that the Government had not been aware of Green's allegations at the time the release was executed) were not present. *Id.* at 232-33. Because the Government in *Hall* had been aware of the allegations due, in part, to the employer's self-reporting, the public interest in having information brought forward that the Government could not otherwise obtain was not implicated. *Id.* at 233. Thus, under this set of facts, there were no federal concerns that would justify overriding the general policy favoring settlement of disputes. *Id.*; *see also Radcliffe*, 600 F.3d at 323, 333 (finding prefiling release was enforceable when the Government had already been investigating relator's allegations in the years prior to the date relator signed a release and filed a *qui tam* suit).

Applying this framework, the Court finds that Relator's case is akin to the factual circumstances in *Green*. Assuming, *arguendo*, that the Release is enforceable and encompasses Relator's *qui tam* claims, it is undisputed that the Government did not know about Relator's fraud allegations at the time the Release was supposedly executed on June 6, 2014. *See* Statement of Interest 6-7; Resp. 8. According to Relator's declaration, Relator did not learn of the small business scheme until over a year *after* the date of the Release. App. to Pl.-Relator Tina Haight's Resp. to Defs.' Mot. to Dismiss First Am. Compl., Ex. A (Declaration of Tina Haight) ¶ 9 [ECF No. 133] ("Over a year after the date of the Release, I learned of the small business scheme at the center of this action. Specifically, after the return of Mr. Haight's cell phone from the police department investigating his death, I found evidence of fraud on the United States that, upon

10

further investigation, was ongoing."). Relator's assertions are supported by a declaration submitted by her prior counsel and the Government's Statement of Interest. *See id.*, Ex. C (Declaration of Andrew M. Miller) ¶¶ 2-5 (stating he was retained in January 2016 to represent Relator in a potential *qui tam* action, he first informed the Government on or about January 28, 2016, that he was investigating a potential *qui tam* claim on behalf of Relator, and he submitted a Disclosure Statement to the Government on June 30, 2016, shortly before filing the *qui tam* complaint); *see also* Statement of Interest 7 (stating that there was no existing investigation of the alleged fraud at the time the Government began communicating with Relator's counsel and that the Government did not have the opportunity to investigate Relator's claims until Relator provided her Disclosure Statement on June 30, 2016). Because it is undisputed that the Government was not aware of the alleged fraud at the time Relator allegedly executed the Release, the Court finds it would be contrary to well-established public policy to enforce the Release for the purpose of barring Relator's *qui tam* claims. *See Hall*, 104 F.3d at 233 ("Our refusal to enforce the release in *Green* turned on the public interest in learning about claims of government contractor fraud, and upon the fact that in that case, the government had not been aware of Green's allegations at the time of the settlement release."); *see also Ladas*, 824 F.3d at 24 (holding prefiling release was unenforceable as a matter of public policy because the record indicated that the Government did not have sufficient knowledge of fraud allegations at the time the release was executed).

### (2) *Defendants' Arguments Supporting Enforcement*

Defendants assert that enforcing the Release *in this case* would not be contrary to public policy. Defendants cite a District of Columbia Circuit case for the general proposition that the FCA's incentives to encourage whistleblowing is balanced against the need to discourage "opportunistic plaintiffs," and argue that Relator "falls squarely within the category of opportunistic plaintiffs." Mot. to Dismiss 8 (citing *United States ex rel. Springfield Terminal Ry.*

*Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)). Without citing any additional authority, Defendants categorize Relator as an "opportunistic plaintiff" because she had access to and knowledge of the facts giving rise to her *qui tam* claims, sold her interest in the Business Defendants for substantial benefits, and then took advantage of her position as a prior owner with access to confidential and proprietary information and filed the instant *qui tam* action. *Id.* Defendants also assert that the cases in which courts refuse to enforce a prefiling release in violation of public policy represent "instances where a company is trying to silence a departing employee who is aware of fraud on the government." *Id.* (citations omitted). Because Relator was a prior owner and not an employee, Defendants argue that the Release should be enforced because the "*qui tam* provisions are not meant to protect someone like the Relator, who instead of coming forward with knowledge of the alleged fraud, took advantage of the opportunity to profit in an amount more than $30 million." *Id.* at 9. Finally, in reply to Plaintiff's Response, Defendants also assert that Plaintiff "would have been the defendant in the *qui tam* suit but for the release" and argue that the "public interest should not be taken so far as to permit a would-be defendant to turn into a *qui tam* relator." Defs.' Reply in Supp. of Mot. to Dismiss First Am. Compl. 8 ("Reply") [ECF No. 140].

These arguments are meritless. First, as explained in the District of Columbia Circuit case cited by Defendants, Congress amended the FCA in 1986 to strike a balance between discouraging "opportunistic plaintiffs" and encouraging legitimate citizen enforcement actions. *See Springfield Terminal Ry. Co.*, 13 F.3d at 351-53. To achieve this balance, Congress enacted the "original source" exception, which prohibits *qui tam* suits based on publicly disclosed information unless the *qui tam* relator is the original source of the information. *Id.* (citing 31 U.S.C. § 3730(e)(4)(A)). In this context, an "opportunistic plaintiff" refers to someone who brings a *qui tam* lawsuit based

on publicly disclosed information. *See id.* at 351 (citations omitted) (noting that Congress has sought to discourage "opportunistic plaintiffs who have no significant information to contribute of their own," as exemplified by the "notorious plaintiff who copied the information on which his *qui tam* suit was based from the government's own criminal indictment"); *see also United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376 (5th Cir. 2009) (citations omitted) (emphasis added) ("The history of the FCA's *qui tam* provisions demonstrates repeated attempts by Congress to balance two competing policy goals. On the one hand, the provisions seek to encourage whistleblowers with genuinely valuable information to act as private attorneys general in bringing suits for the common good. On the other hand, the provisions seek to discourage opportunistic plaintiffs from filing parasitic lawsuits *that merely feed off previous disclosures of fraud.*").

Defendants do not claim that Relator brought the instant suit based on publicly disclosed information. In fact, they acknowledge that Relator was a prior owner of the Business Defendants with inside information. *See* Mot. to Dismiss 8. To the extent Defendants argue that Relator should be considered an "opportunistic plaintiff" because she sold her interest in the Business Defendants, profited from the sale, and subsequently filed a *qui tam* suit, such argument fails because it is unsupported by case law and the FCA's policy objective to encourage insiders privy to fraud on the Government to come forward. *See Green*, 59 F.3d at 963 (cleaned up) ("It is commonly recognized that the central purpose of the *qui tam* provisions of the FCA is to set up incentives to supplement government enforcement of the Act by encouraging insiders privy to fraud on the government to blow the whistle on the crime.").

Second, Defendants' attempt to distinguish *Green* and its progeny from the facts in this case on the basis that Relator was a prior owner and not an employee is unconvincing. Although

it is true that many of these cases involve a former employee who signed a prefiling release with a former employer, Defendants cite no authority suggesting that the holding in *Green* is limited to the employee/employer context. To the contrary, the Ninth Circuit stated clearly that its holding in *Green* hinged on the fact that, like here, the Government had no knowledge of the alleged fraud at the time the release was executed. *Hall*, 104 F.3d at 233. Thus, the focus of the *Green* and *Hall* inquiry is whether enforcement of a prefiling release would undermine the Government's ability to learn of fraud, not the relator's status as a former employee.[4] *See id.*

Finally, Defendants' assertion that the Court should not allow a "would-be defendant to turn into a *qui tam* relator" also lacks merit. Reply 8. Defendants fail to offer any facts or legal theory explaining why Relator is a "would-be defendant." Defendants do not accuse Relator of knowingly participating in the alleged fraudulent scheme and there is no evidence in the record suggesting that Relator had any involvement in the operation of the Business Defendants during the time period addressed in the Amended Complaint. According to Relator, she filed for divorce from Haight in 2009 and was not involved in the operation of the Business Defendants after filing for divorce, *see* Decl. of Tina Haight ¶¶ 3-4, which Defendants do not dispute. Moreover, even if Relator was involved in the alleged fraudulent scheme or profited from the alleged fraudulent scheme by virtue of being an owner of the Business Defendants during the relevant time period,

---

[4] Defendants also cite a bankruptcy case for the proposition that courts have declined to follow *Green* in other contexts. Mot. to Dismiss 3 (citing *United States ex rel. Gebert v. Transp. Admin. Servs.*, 260 F.3d 909, 917, 919 (8th Cir. 2001)). In *Gebert*, the Eighth Circuit upheld a prefiling release under principles of standing, settlement and release, and judicial estoppel, but the Eighth Circuit explicitly limited its holding to the unique circumstances present in the bankruptcy context in which the Eighth Circuit found that the policy concerns articulated in *Green* were not implicated. 260 F.3d at 916-17, 919 ("the unique context of this case will have an exceedingly narrow application").

14

Defendants cite no authority supporting their argument that the Court should enforce the Release on this basis.[5]

Accordingly, because it is undisputed that the Government did not know about Defendants' alleged fraud at the time the Release was executed, the Court finds that the public interest in permitting this case to go forward outweighs the public interest in enforcing the Release. *Green*, 59 F.3d at 966, 969. The Court, therefore, finds that Relator has standing to bring the instant *qui tam* suit and denies the Motion to Dismiss on this basis.

### B. *Failure to State a Claim*

At the conclusion of their Motion to Dismiss, Defendants assert in one paragraph that even if Relator has standing, Relator's allegation that Defendants made false statements on Government reporting systems (i.e., false certifications allegedly made in FAR reports and other certifications submitted via the SAM database) do not support an FCA violation. *See* Mot. to Dismiss 10. Defendants do not develop this argument, do not address the full scope of allegations made in the Amended Complaint, and do not cite any relevant authority. *Id.* In her Response, Relator refutes this argument, asserting that false certifications to the Government do, in fact, support an FCA violation because the SAM.gov website and FAR reports expressly warn that by submitting a certification, an individual attests to the accuracy of such certification and may be subject to civil liability under the FCA. Resp. 13-14. Defendants appear to abandon their failure to state a claim argument because they do not address Relator's rebuttal in their Reply. *See JP Morgan Chase Bank, N.A. v. Wolfe*, Civil Action No. 4:06-CV-240-Y, 2006 WL 8438501, at *2 n.1 (N.D. Tex.

---

[5] The Court also dismisses this argument because it was made for the first time in Defendants' Reply and was not responsive to anything raised by Relator in her Response. *See United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) (citation omitted) (explaining that arguments raised for the first time in a reply are generally waived).

Aug. 17, 2006) (deeming defendant's failure to respond to plaintiff's argument made in response to motion to dismiss as a concession as to the argument's persuasiveness).

Moreover, the Court already addressed Relator's allegations regarding Defendants' false certifications on Government reporting systems in *Haight I*. *Haight*, 2020 WL 6163139. The Court clearly identified the claims against each Defendant that survived and gave Relator leave to replead with respect to the claims and parties that were dismissed. *Id.*, at *9. Thus, Defendants must specify *as to those claims and parties that were previously dismissed* why the allegations set forth in the Amended Complaint are supposedly insufficient to state a claim. Absent a change in controlling authority, the Court will not revisit the merits of *Haight I* with regard to the claims and parties that survived. Accordingly, Defendants' undeveloped argument that Relator has not alleged sufficient facts to state a claim fails. *See Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 190 (5th Cir. 2007) (citation omitted) (holding that an issue was inadequately briefed and therefore waived where the party failed to provide "any legal argument beyond bare assertions"); *United States v. Stalnaker*, 571 F.3d 428, 440 (5th Cir. 2009) (citations omitted) (concluding that undeveloped arguments lacking citations to relevant law were waived for inadequate briefing). The Court, therefore, denies the Motion to Dismiss on this basis.

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants RRSA (Commercial Division), LLC; Roofing & Restoration Services of America, LLC; RRSA Commercial Roofing, Inc.; Haight Construction Management Services, Inc.; Corey S. Sanchez; Jon R. Seymore; Jennifer N. Seymore and Ronald Scott Nichols's Motion to Dismiss First Amended Complaint and Memorandum of Law in Support of Motion to Dismiss [ECF No. 115].

**SO ORDERED.**

SIGNED April 30, 2021.

                                                        **KAREN GREN SCHOLER**
                                                        **UNITED STATES DISTRICT JUDGE**