## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TINA HAIGHT<br><br>*Plaintiff-Relator*,<br><br>v.<br><br>RRSA (COMMERCIAL DIVISION), LLC, *et al.*,<br><br>*Defendants*. | Civil Action No. 3:16-cv-1975-S |

## APPENDIX TO DEFENDANTS' MOTION TO COMPEL

Defendants RRSA (Commercial Division), LLC; Roofing & Restoration Services of America, LLC; RRSA Commercial Roofing, Inc.; Haight Construction Management Services, Inc.; Corey S. Sanchez; Jon R. Seymore; Jennifer N. Seymore and Ronald Scott Nichols (collectively, "Defendants") submit this Appendix in support of Defendants' Motion to Compel ("Motion").

| No. | Description | Bates Numbers |
|---|---|---|
| 1 | Defendants' Requests for Production of Documents to Plaintiff-Realtor, United States of America Ex Rel. Tina Haight | App.00001 – App.00007 |
| 2 | Plaintiff-Relator's Responses to Defendants' Requests for Production | App.00008 – App.00015 |
| 3 | Excerpts from the first deposition of Plaintiff-Relator Tina Haight, dated November 16, 2021 | App.00016 – App.00021 |
| 4 | Excerpts from the second deposition of Plaintiff-Relator Tina Haight, dated March 1, 2022 | App.00022 – App.00037 |
| 5 | Order on Motion for Sanctions, filed on January 10, 2017 | App.00038 – App.00043 |

Dated:  March 16, 2022

DVORAK LAW GROUP, LLC

By: ___/s/ Gretchen L. McGill_____

    Heather S. Anson (*pro hac vice*)
    hvoegele@ddlawgroup.com
    Gretchen L. McGill (*pro hac vice*)
    gmcgill@ddlawgroup.com
    Claire E. Monroe (*pro hac vice*)
    cmonroe@ddlawgroup.com
    9500 W. Dodge Rd., Ste. 100
    Omaha, NE 68132
    Telephone:  (402) 934-4770
    Telecopier:  (402) 933-9630

and

BELL NUNNALLY & MARTIN LLP

    Christopher B. Trowbridge
    Texas State Bar No. 24008182
    christophert@bellnunnally.com
    Benjamin L. Riemer
    Texas State Bar No. 24065976
    briemer@bellnunnally.com
    Troy (T.J.) Hales
    Texas State Bar No. 24099011
    thales@bellnunnally.com
    2323 Ross Ave., Ste. 1900
    Dallas, Texas  75201
    Telephone:  (214) 740-1400
    Telecopier:  (214) 740-1499

**ATTORNEYS FOR DEFENDANTS RRSA (COMMERCIAL DIVISION), LLC; ROOFING & RESTORATION SERVICES OF AMERICA, LLC; RRSA COMMERCIAL ROOFING, INC.; HAIGHT CONSTRUCTION MANAGEMENT SERVICES, INC.; COREY S. SANCHEZ; JON R. SEYMORE; JENNIFER N. SEYMORE AND RONALD SCOTT NICHOLS.**

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2022, a true and correct copy of the foregoing document was served upon counsel of record via the Court's CM/ECF filing system and via e-mail as indicated below:

Darren P. Nicholson
Bobby Hill
Burns Charest, LLP
900 Jackson Street, Suite 500
Dallas, TX  75202
dnicholson@burnscharest.com
bhill@burnscharest.com

Christopher A. Payne
Christina Alstrin
Payne Alstrin, PLLC
9330 LBJ Freeway, Suite 1165
Dallas, TX  75243
cpayne@cappc.com
Christina.Alstrin@Payne-Alstrin.com

Mitchell Madden
Melissa Johnson
Holmgren Johnson Mitchell Madden, LLP
12801 North Central Expressway, Suite 140
Dallas, TX 75243
mmadden@hjmmlegal.com
melissa@hjmmlegal.com

_/s/ Gretchen L. McGill_
Gretchen L. McGill

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | § | |
| TINA HAIGHT, | § | |
| | § | |
| Plaintiff-Relator, | § | |
| | § | Civil Action No. 3:16-CV1975-S |
| V. | § | |
| | § | |
| RRSA (COMMERCIAL DIVISION), LLC; | § | |
| ROOFING & RESTORATION SERVICES OF | § | |
| AMERICA, LLC; RRSA COMMERCIAL | § | |
| ROOFING, INC.; HAIGHT CONSTRUCTION | § | |
| MANAGEMENT SERVICES, INC.; TURCO | § | |
| CONSTRUCTION INC.; ANDREW'S | § | |
| ROOFING & RESTORATION; CLARK | § | |
| BUILDERS GROUP, LLC; CLARK | § | |
| BUILDERS GROUP, LLC; HUNT | § | |
| COMPANIES, INC.; LEND LEASE (US) | § | |
| CONSTRUCTION, INC.; LEND LEASE (US) | § | |
| PUBLIC PARTNERSHIPS HOLDINGS, LLC; | § | |
| LINCOLN PROPERTY COMPANY; | § | |
| HARPER CONSTRUCTION COMPANY; | § | |
| INC.; WALSH CONSTRUCTION | § | |
| COMPANY; COREY S. SANCHEZ; JON R. | § | |
| SEYMORE; JENNIFER N. SEYMORE; | § | |
| RONALD SCOTT NICHOLS; AND JOHN | § | |
| DOES # 1-50; FICTITIOUS NAMES, | § | |
| | § | |
| Defendants. | § | |

_____

### DEFENDANTS RRSA (COMMERCIAL DIVISION), LLC; ROOFING & RESTORATION SERVICES OF AMERICA, LLC; RRSA COMMERCIAL ROOFING, INC.; HAIGHT CONSTRUCTION MANAGEMENT SERVICES, INC.; TURCO CONSTRUCTION INC.; ANDREW'S ROOFING & RESTORATION; COREY S. SANCHEZ; JON R. SEYMORE AND JENNIFER N. SEYMORE'S REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF-RELATOR, UNITED STATES OF AMERICA EX REL. TINA HAIGHT

TO:   United States of America *ex rel.* Tina Haight, Plaintiff-Relator, and her attorney of record, Andrew Miller, Baron & Budd, P.C., 600 New Hampshire Avenue NW, 10th Floor, Washington, DC 20037

**DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS**          **PAGE 1**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, you are hereby requested to produce and permit the undersigned to inspect and copy within thirty (30) days from the date of the service hereof, the documents requested within this request for production of documents. Such documents are to be sent to the undersigned's attorneys, Dvorak Law Group, LLC 13625 California Street, Suite 110, Omaha, Nebraska 68154, for inspection and copying by such date.

### DEFINITIONS

1.      "Document" shall mean any written, printed, typed or other graphic matter of any kind or nature, all mechanical and electrical sound recording or transcript thereof, all photographic, video tape or other visual record, in your possession or control or in the possession or control of your agents, or known by you to exist; it shall also mean all copies of documents by whatever means made.

2.      "Identify" or "Identity" when used in reference to a document means to state the date and author, type of document (e.g. letter, memoranda, telegram, chart, etc.) or some other means of identifying it, and its present location and/or custodian. If any such document was but is no longer in your possession or subject to your control, state what disposition was made of it and the date of such disposition. With respect to document identification, documents prepared subsequent to the time or period specified in the interrogatories but which relate or refer to such time or period are to be included.

3.      "Identify" or "Identity" when used in reference to an individual person means to state his full name and present business and home address, his present or last known position and business affiliation and address, and his position and business affiliation at the time in question.

4.      "You" or "Your" means you and your agents, and all other persons acting or purporting to act on behalf of you or your agents.

**DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS**          **PAGE 2**

5.      "You" or "Your" when used in reference to documents shall include documents in your possession or custody or under your control or known by you to exist, as well as those prepared by you unless otherwise stated.

6.      As used herein, the terms "pertain to" or "relate to" mean refer to, reflect or in any logically or factually manner connected with the matter discussed.

## DOCUMENTS TO BE PRODUCED

**REQUEST NO. 1:**     All items pertaining to the allegations in Plaintiff's Complaint, except correspondence exclusively between your legal counsel and you.

   **RESPONSE:**


**REQUEST NO. 2:**     All items you sent to or received from Defendants, their attorneys or any other agent of Defendants related to the allegations in Plaintiff's Complaint.

   **RESPONSE:**


**REQUEST NO. 3:**     All items you sent to or received from the United States Government, their attorneys or any other agent of United States Government related to the allegations in Plaintiff's Complaint.

   **RESPONSE:**


**REQUEST NO. 4:**     With regard to your allegation that Defendant's violated the False Claims Act, please produce all Documents and electronically-stored information on which you rely to support such allegation.

   **RESPONSE:**

**REQUEST NO. 5:**   All tangible reports, physical models, compilations of date, inspections, tests or other material prepared by and/or for any individual retained and/or expected to provide expert testimony during the trial of the above-captioned lawsuit.

   **RESPONSE:**

**REQUEST NO. 6:**   All items your attorney, representative, agent, officer and/or director sent to or received from any expert whose opinions may be presented at trial that (i) relate to compensation for the expert's study or testimony; (ii) identify facts or date provided to the expert and that the expert considered in forming the opinions to be expressed; or (iii) identify assumptions provided to the expert and that the expert relied on in forming the opinions to be expressed.

   **RESPONSE:**

**REQUEST NO. 7:**   All Documents, electronically stored information and tangible things related to the properties and units the RRSA Defendants owned and/or operated that allegedly support Plaintiff's claims pursuant to Plaintiff's Rule 26(a)(1) Initial Disclosures.

   **RESPONSE:**

**REQUEST NO. 8:**   All Documents, electronically stored information and tangible things related to the RRSA Defendants' payroll, tax, and banking information that allegedly support Plaintiff's claims pursuant to Plaintiff's Rule 26(a)(1) Initial Disclosures.

   **RESPONSE:**

App.00004

**REQUEST NO. 9:**   All Documents, electronically stored information and tangible things regarding the RRSA Defendants' bidding materials, procurement opportunities, contracts, subcontracts and bond reports that allegedly support Plaintiff's claims pursuant to Plaintiff's Rule 26(a)(1) Initial Disclosures.

      **RESPONSE:**

**REQUEST NO. 10:**   All Documents, electronically stored information and tangible things regarding payments made on behalf of the RRSA Defendants for the purpose of securing one or more contracts that allegedly support Plaintiff's claims pursuant to Plaintiff's Rule 26(a)(1) Initial Disclosures.

      **RESPONSE:**

App.00005

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By:   */s/ Benjamin L. Riemer*
      Christopher B. Trowbridge
      Texas State Bar No. 24008182
      christophert@bellnunnally.com
      Benjamin L. Riemer
      Texas State Bar No. 24065976
      briemer@bellnunnally.com
      Troy (T.J.) Hales
      Texas State Bar No. 24099011
      thales@bellnunnally.com

2323 Ross Ave., Ste. 1900
Dallas, TX 75201
Telephone:  (214) 740-1400
Telecopier:  (214) 740-1499

**DVORAK LAW GROUP, LLC**

      Heather S. Voegel-Anson
      Nebraska Bar License No. 22730
      hvoegele@ddlawgroup.com
      Gretchen L. McGill
      Nebraska Bar License No. 21726
      gmcgill@ddlawgroup.com

9500 W. Dodge Road, Suite 100
Omaha, NE 68114
Telephone:  (402) 934-4770
Telecopier:  (402) 933-9630

**ATTORNEYS FOR DEFENDANTS RRSA (COMMERCIAL DIVISION), LLC; ROOFING & RESTORATION SERVICES OF AMERICA, LLC; RRSA COMMERCIAL ROOFING, INC.; HAIGHT CONSTRUCTION MANAGEMENT SERVICES, INC.; TURCO CONSTRUCTION INC.; ANDREW'S ROOFING & RESTORATION; COREY S. SANCHEZ; JON R. SEYMORE AND JENNIFER N. SEYMORE**

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2020, a true and correct copy of the foregoing Request for Production was served via e-mail upon the following parties:

Andrew Miller, Esq.
Baron & Budd, P.C.
600 New Hampshire Avenue NW, 10th Floor
Washington, DC 20037
Andrew.miller@baronbudd.com

*Attorneys for Plaintiffs*

Gene R. Besen, Esq.
Bradley Arant Boult Cummings LLP
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
gbesen@bradley.com

*Attorney for Ronald Scott Nichols*

Clay R. Mahaffey
Assistant United States Attorney
Wyoming Bar No. 6-3355
1100 Commerce Street, Third Floor
Dallas, TX 75242-1699
Clay.Mahaffey@usdoj.gov

*Attorneys for the United States of America*

/s/ Benjamin L. Riemer
Benjamin L. Riemer

5256247_1.docx/10518.00002

**DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS**          **PAGE 7**

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

UNITED STATES OF AMERICA *ex rel.*
TINA HAIGHT,

               *Plaintiff-Relator*,

     v.

RRSA (COMMERCIAL DIVISION), LLC,
*et al.*,

               *Defendants.*

**CIVIL ACTION NO.: 3:16-cv-1975-S**

## PLAINTIFF-RELATOR'S RESPONSES TO
## DEFENDANTS' REQUESTS FOR PRODUCTION

Plaintiff-Relator Tina Haight ("Plaintiff") answers Defendants' Requests for Production as follows:

1.      All items pertaining to the allegations in Plaintiff's Complaint, except correspondence exclusively between your legal counsel and you.

**RESPONSE: Plaintiff objects to this request on the following grounds:**

- **The documents sought by the Request are irrelevant. The scope of this Request is inconceivably large; countless documents relate in some small way to the allegations in the Amended Complaint, the vast majority of which are likely irrelevant to the legal issues in the case. As one obvious example among many, this Request seeks all statements and communications related to background information, such as small-business contracting goals and regulations, Compl. ¶¶ 47-91, the formation and strictures of the Anti-Kickback Act, *id.* ¶¶ 92-100, and remedies under the False Claims Act for small-business fraud, *id.* ¶¶ 101-07. Furthermore, because the Request is not reasonably limited in time or scope, it plainly seeks information that is irrelevant to any claim or defense in this case. *See, e.g.*, *United States v. Baisden*, 881 F. Supp. 2d 1203, 1207 (E.D. Cal. 2012) ("Because Defendant fails to specifically identify a defense or explain how the requested information is reasonably calculated to lead to admissible evidence, his requests exceed the limits of what a party may seek via discovery.").**

- **The Request is disproportional to the needs of the case. Because the scope of this Request is inconceivably large and many of the documents sought by this Request are in the possession of Defendant or Defendant's own employees or agents, it is impermissible under Fed. R. Civ. P. 26(b)(1). The importance of the issues at stake in the action and the amount in controversy do not justify the thousands of hours**

that would be required to compile the information sought by this Request, which is unlimited in time and nearly unlimited in scope, nor does the benefit of the information sought by this Request—most of which is irrelevant—outweigh this enormous burden. Furthermore, Defendant has greater access to many, if not most, of the documents sought by this Request and greater resources with which to undertake the appropriate investigation. *Cf. Rollins v. Cone Distrib., Inc.*, No. 4:15CV486-RH/CAS, 2016 WL 10650414, at *1 (N.D. Fla. Apr. 28, 2016) ("Discovery about the reason for the plaintiff's termination is within the proper scope of discovery. A searching review of the defendant's entire personnel operation is not.").

- The Request is vague, overly broad, unduly burdensome, and seeks information not in Plaintiff's possession or that Plaintiff reasonably could obtain. For the reasons identified above, it would be impossible for Plaintiff to identify every document created by any person that relates in any way to any of the allegations in the Amended Complaint. Moreover, the vast majority of such documents certainly are in the possession of persons other than Plaintiff, and Plaintiff is not privy to the substance or existence of such documents. As explained above, it would take thousands of hours for Plaintiff to assemble the documents sought by this Request, which imposes an undue burden. *See, e.g.*, *Coleman v. Am. Red Cross*, 23 F.3d 1091, 1098 (6th Cir. 1994) (denying discovery request that "would have required the Red Cross to search every file that exists at National Headquarters for any documents that might be of any relevance to any matter in the case").

- This Request seeks material protected by the attorney-client privilege. "[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications." *Hodges, Grant & Kaufmann v. I.R.S.*, 768 F.2d 719, 720-21 (5th Cir. 1985) (citations omitted). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.

- This Request seeks work product protected by Fed. R. Civ. P. 26(b)(3)(A). To the extent this Request seeks counsel's "mental impressions, conclusions, opinions, or legal theories," the work-product doctrine is inviolate. Fed. R. Civ. P. 26(b)(3)(B); *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 1, 4 (D.D.C. 2004) (holding that such documents "are never to be disclosed"). To the extent this Request seeks any of counsel's investigatory material, Defendant has failed to demonstrate a substantial need for the material sought by this Request, and the substance of any such material can be obtained by Defendant by other means without undue hardship. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii); *Hickman v. Taylor*, 329 U.S. 495, 509-13 (1947) ("[T]he essence of what petitioner seeks . . . is readily available to him direct from the witnesses for the asking."). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.

- **This request seeks material protected by the common-interest privilege. *See Miller v. Holzmann*, 240 F.R.D. 20, 22-24 (D.D.C. 2007). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

2.      All items you sent to or received from Defendants, their attorneys or any other agent of Defendants related to the allegations in Plaintiff's Complaint.

**RESPONSE: To the extent this Request seeks material sent by Plaintiff's counsel to Defendants' counsel, or material sent by Defendants' counsel to Plaintiff's counsel, Defendants are already in possession of any such items. Defendants, their agents, and their attorneys have not otherwise given any items to Plaintiff, nor has Plaintiff given any items to Defendants, their agents, or their attorneys.**

3.      All items you sent to or received from the United States Government, their attorneys or any other agent of United States Government related to the allegations in Plaintiff's Complaint.

**RESPONSE: Plaintiff objects to this Request on the following grounds:**

- **This Request seeks work product protected by Fed. R. Civ. P. 26(b)(3)(A). To the extent this Request seeks counsel's "mental impressions, conclusions, opinions, or legal theories," the work-product doctrine is inviolate. Fed. R. Civ. P. 26(b)(3)(B); *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 1, 4 (D.D.C. 2004) (holding that such documents "are never to be disclosed"). To the extent this Request seeks any of counsel's investigatory material, Defendant has failed to demonstrate a substantial need for the material sought by this Request, and the substance of any such material can be obtained by Defendant by other means without undue hardship. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii); *Hickman v. Taylor*, 329 U.S. 495, 509-13 (1947) ("[T]he essence of what petitioner seeks . . . is readily available to him direct from the witnesses for the asking."). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This request seeks material protected by the common-interest privilege. *See Miller v. Holzmann*, 240 F.R.D. 20, 22-24 (D.D.C. 2007). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

4.      With regard to your allegation that Defendant's [*sic*] violated the False Claims Act, please produce all Documents and electronically-stored information on which you rely to support such allegation.

**RESPONSE: Plaintiff objects to this Request on the following grounds:**

- **This Request is duplicative of Requests 7, 8, 9, and 10.**

- **This Request essentially asks for a "narrative account" of Plaintiff's entire case, which is overly broad and unduly burdensome. *See Lucero v. Valdez*, 240 F.R.D.**

591, 594 (D.N.M. 2007). **The importance of the issues at stake in the action and the amount in controversy do not justify the many hours that would be required to compile the documents sought by this Request, nor does the benefit of the information sought by this Request outweigh this enormous burden. Furthermore, Defendant has greater access to much of the information sought by this Request and greater resources with which to undertake the appropriate investigation.**

- **This Request seeks material protected by the attorney-client privilege. "[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications."** *Hodges, Grant & Kaufmann v. I.R.S.*, **768 F.2d 719, 720-21 (5th Cir. 1985) (citations omitted). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This Request seeks work product protected by Fed. R. Civ. P. 26(b)(3)(A). To the extent this Request seeks counsel's "mental impressions, conclusions, opinions, or legal theories," the work-product doctrine is inviolate. Fed. R. Civ. P. 26(b)(3)(B);** *Banks v. Office of Senate Sergeant-at-Arms*, **222 F.R.D. 1, 4 (D.D.C. 2004) (holding that such documents "are never to be disclosed"). To the extent this Request seeks any of counsel's investigatory material, Defendant has failed to demonstrate a substantial need for the material sought by this Request, and the substance of any such material can be obtained by Defendant by other means without undue hardship.** *See* **Fed. R. Civ. P. 26(b)(3)(A)(ii);** *Hickman v. Taylor*, **329 U.S. 495, 509-13 (1947) ("[T]he essence of what petitioner seeks . . . is readily available to him direct from the witnesses for the asking."). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This request seeks material protected by the common-interest privilege.** *See Miller v. Holzmann*, **240 F.R.D. 20, 22-24 (D.D.C. 2007). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

5.      All tangible reports, physical models, compilations of date, inspections, tests or other material prepared by and/or for any individual retained and/or expected to provide expert testimony during the trial of the above-captioned lawsuit.

**RESPONSE: Plaintiff objects to this Request. The Request seeks premature disclosure of expert materials in violation of Fed. R. Civ. P. 26(a)(2)(D) and the Scheduling Order governing this case.**

**Plaintiff is not withholding otherwise responsive material pursuant to this objection.**

6.      All items your attorney, representative, agent, officer and/or director sent to or received from any expert whose opinions may be presented at trial that (i) relate to compensation for the expert's study or testimony; (ii) identify facts or date provided to the expert and that the

expert considered in forming the opinions to be expressed; or (iii) identify assumptions provided to the expert and that the expert relied on in forming the opinions to be expressed.

**RESPONSE: Plaintiff objects to this Request. The Request seeks premature disclosure of expert materials in violation of Fed. R. Civ. P. 26(a)(2)(D) and the Scheduling Order governing this case.**

**Plaintiff is not withholding otherwise responsive material pursuant to this objection.**

7.      All Documents, electronically stored information and tangible things related to the properties and units the RRSA Defendants owned and/or operated that allegedly support Plaintiff's claims pursuant to Plaintiff's Rule 26(a)(1) Initial Disclosures.

**RESPONSE: Plaintiff objects to this Request on the following grounds:**

- **This Request is duplicative of Requests 4, 8, 9, and 10.**

- **This Request seeks material protected by the attorney-client privilege. "[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications."** *Hodges, Grant & Kaufmann v. I.R.S.*, **768 F.2d 719, 720-21 (5th Cir. 1985) (citations omitted). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This Request seeks work product protected by Fed. R. Civ. P. 26(b)(3)(A). To the extent this Request seeks counsel's "mental impressions, conclusions, opinions, or legal theories," the work-product doctrine is inviolate. Fed. R. Civ. P. 26(b)(3)(B);** *Banks v. Office of Senate Sergeant-at-Arms*, **222 F.R.D. 1, 4 (D.D.C. 2004) (holding that such documents "are never to be disclosed"). To the extent this Request seeks any of counsel's investigatory material, Defendant has failed to demonstrate a substantial need for the material sought by this Request, and the substance of any such material can be obtained by Defendant by other means without undue hardship.** *See* **Fed. R. Civ. P. 26(b)(3)(A)(ii);** *Hickman v. Taylor*, **329 U.S. 495, 509-13 (1947) ("[T]he essence of what petitioner seeks . . . is readily available to him direct from the witnesses for the asking."). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This request seeks material protected by the common-interest privilege.** *See Miller v. Holzmann*, **240 F.R.D. 20, 22-24 (D.D.C. 2007). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

**This Request is vague, contains undefined terms (including "properties," "units," and "claims"), and is phrased in a manner that makes it difficult to understand. Plaintiff interprets this Request to seek all documents, electronically stored information, and tangible**

**things that support Counts I-IV of the Complaint. In response to this Request, see the documents labeled HAIGHT_00001 through HAIGHT_001673.**

8.      All Documents, electronically stored information and tangible things related to the RRSA Defendants' payroll, tax, and banking information that allegedly support Plaintiff's claims pursuant to Plaintiff's Rule 26(a)(1) Initial Disclosures.

**RESPONSE: Plaintiff objects to this Request on the following grounds:**

- **This Request is duplicative of Requests 4, 7, 9, and 10. In her response to Request 7, Plaintiff has already produced any documents responsive to this Request.**

- **This Request seeks material protected by the attorney-client privilege. "[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications."** *Hodges, Grant & Kaufmann v. I.R.S.*, **768 F.2d 719, 720-21 (5th Cir. 1985) (citations omitted). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This Request seeks work product protected by Fed. R. Civ. P. 26(b)(3)(A). To the extent this Request seeks counsel's "mental impressions, conclusions, opinions, or legal theories," the work-product doctrine is inviolate. Fed. R. Civ. P. 26(b)(3)(B);** *Banks v. Office of Senate Sergeant-at-Arms*, **222 F.R.D. 1, 4 (D.D.C. 2004) (holding that such documents "are never to be disclosed"). To the extent this Request seeks any of counsel's investigatory material, Defendant has failed to demonstrate a substantial need for the material sought by this Request, and the substance of any such material can be obtained by Defendant by other means without undue hardship.** *See* **Fed. R. Civ. P. 26(b)(3)(A)(ii);** *Hickman v. Taylor*, **329 U.S. 495, 509-13 (1947) ("[T]he essence of what petitioner seeks . . . is readily available to him direct from the witnesses for the asking."). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This request seeks material protected by the common-interest privilege.** *See Miller v. Holzmann*, **240 F.R.D. 20, 22-24 (D.D.C. 2007). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

9.      All Documents, electronically stored information and tangible things regarding the RRSA Defendants' bidding materials, procurement opportunities, contracts, subcontracts and bond reports that allegedly support Plaintiff's claims pursuant to Plaintiff's Rule 26(a)(1) Initial Disclosures.

**RESPONSE: Plaintiff objects to this Request on the following grounds:**

- **This Request is duplicative of Requests 4, 7, 8, and 10. In her response to Request 7, Plaintiff has already produced any documents responsive to this Request.**

- **This Request seeks material protected by the attorney-client privilege. "[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications."** *Hodges, Grant & Kaufmann v. I.R.S.*, **768 F.2d 719, 720-21 (5th Cir. 1985) (citations omitted). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This Request seeks work product protected by Fed. R. Civ. P. 26(b)(3)(A). To the extent this Request seeks counsel's "mental impressions, conclusions, opinions, or legal theories," the work-product doctrine is inviolate. Fed. R. Civ. P. 26(b)(3)(B);** *Banks v. Office of Senate Sergeant-at-Arms*, **222 F.R.D. 1, 4 (D.D.C. 2004) (holding that such documents "are never to be disclosed"). To the extent this Request seeks any of counsel's investigatory material, Defendant has failed to demonstrate a substantial need for the material sought by this Request, and the substance of any such material can be obtained by Defendant by other means without undue hardship.** *See* **Fed. R. Civ. P. 26(b)(3)(A)(ii);** *Hickman v. Taylor*, **329 U.S. 495, 509-13 (1947) ("[T]he essence of what petitioner seeks . . . is readily available to him direct from the witnesses for the asking."). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This request seeks material protected by the common-interest privilege.** *See Miller v. Holzmann*, **240 F.R.D. 20, 22-24 (D.D.C. 2007). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

10.     All Documents, electronically stored information and tangible things regarding payments made on behalf of the RRSA Defendants for the purpose of securing one or more contracts that allegedly support Plaintiff's claims pursuant to Plaintiff's Rule 26(a)(1) Initial Disclosures.

**RESPONSE: Plaintiff objects to this Request on the following grounds:**

- **This Request is duplicative of Requests 4, 7, 8, and 9. In her response to Request 7, Plaintiff has already produced any documents responsive to this Request.**

- **This Request seeks material protected by the attorney-client privilege. "[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications."** *Hodges, Grant & Kaufmann v. I.R.S.*, **768 F.2d 719, 720-21 (5th Cir. 1985) (citations omitted). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.**

- **This Request seeks work product protected by Fed. R. Civ. P. 26(b)(3)(A). To the extent this Request seeks counsel's "mental impressions, conclusions, opinions, or**

legal theories," the work-product doctrine is inviolate. Fed. R. Civ. P. 26(b)(3)(B); *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 1, 4 (D.D.C. 2004) (holding that such documents "are never to be disclosed"). To the extent this Request seeks any of counsel's investigatory material, Defendant has failed to demonstrate a substantial need for the material sought by this Request, and the substance of any such material can be obtained by Defendant by other means without undue hardship. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii); *Hickman v. Taylor*, 329 U.S. 495, 509-13 (1947) ("[T]he essence of what petitioner seeks . . . is readily available to him direct from the witnesses for the asking."). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.

- This request seeks material protected by the common-interest privilege. *See Miller v. Holzmann*, 240 F.R.D. 20, 22-24 (D.D.C. 2007). Plaintiff is withholding the otherwise responsive documents identified in the privilege log accompanying these responses.

Date: September 9, 2020                    Respectfully,

                                           */s/ Andrew M. Miller*
                                           Andrew M. Miller – TX Bar No. 24041483
                                           BARON & BUDD, P.C.
                                           600 New Hampshire Ave. NW, 10th Floor
                                           Washington, DC 20037
                                           Tel. No.: 202.333.4562
                                           *Attorney for Plaintiff-Relator*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2020, I caused the foregoing Responses to Defendants' Interrogatories to be served via email upon counsel for Defendants RRSA (Commercial Division), LLC; Roofing & Restoration Services of America, LLC; RRSA Commercial Roofing, Inc.; Haight Construction Management Services, Inc.; Turco Construction Inc.; Andrew's Roofing & Restoration; Corey S. Sanchez; Jon R. Seymore; and Jennifer N. Seymore's Requests for Production of Documents to be served on counsel for Defendants RRSA (Commercial Division), LLC; Roofing & Restoration Services of America, LLC; RRSA Commercial Roofing, Inc.; Haight Construction Management Services, Inc.; Turco Construction Inc.; Andrew's Roofing & Restoration; Corey S. Sanchez; Jon R. Seymore; Jennifer N. Seymore; and Ronald Scott Nichols.

                                           */s/ Andrew M. Miller*
                                           Andrew M. Miller
                                           *Attorney for Plaintiff-Relator*

App. 00015

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA ex rel. )
TINA HAIGHT,                      )
          Plaintiff-Relator,      )
VS.                               ) CIVIL ACTION NO.
                                  ) 3:16-CV-1975-S
                                  )
RRSA (COMMERCIAL DIVISION), LLC,  )
et al.,                           )
          Defendants.             )


*******************************************
VIDEOTAPED ORAL DEPOSITION OF
TINA HAIGHT
NOVEMBER 16, 2021
VOLUME 1

Page 211, Line 1 to Page 219, Line 21
Sealed and Bound Under Separate Cover
*******************************************


          ORAL DEPOSITION OF TINA HAIGHT, a witness

produced on behalf of the Defendants, and duly sworn,

was taken in the above-styled and -numbered cause on

the 16th day of November, 2021, from 9:31 a.m. to 8:04

p.m., before Cynthia K. Honza, CSR in and for the State

of Texas, recorded by machine shorthand, at the offices

of Burns Charest LLP, 900 Jackson Street, Suite 500, in

the City of Dallas, County of Dallas, and State of

Texas, pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record or attached

hereto; that the deposition shall be read and signed

before any notary public.

TINA HAIGHT November 16, 2021

Page 110

```
 1      Q.   Did they have -- did you review any e-mails?

 2      A.   E-mails from?

 3      Q.   Did you review any e-mails on those computers?

 4      A.   On those computers, no.

 5      Q.   Did you at any time after Marty's death review

 6  his e-mail accounts?

 7      A.   I don't know how to answer -- I don't know how

 8  to answer that, his e-mail accounts.  Like, did I

 9  access his e-mail?

10      Q.   Yes.

11      A.   No.

12      Q.   Did you review any e-mails involving Marty on

13  those or other computers?

14      A.   On those computers, I didn't review them on

15  the computer.

16      Q.   How did you review the e-mails?

17      A.   On a -- on a CD.

18      Q.   And how did those e-mails end up on a CD?

19      A.   The forensic.

20      Q.   So did you also turn the computers over to a

21  forensic company?

22      A.   The e-mails and text messages from the phone.

23      Q.   So what I want to understand is, other than

24  government contracts, can you remember anything else

25  you reviewed from Marty's computers?
```

TINA HAIGHT November 16, 2021

Page 112

```
 1      A.   No.

 2      Q.   It was Marty's computer?

 3      A.   I don't know.

 4      Q.   You don't know if it was Marty's computer?

 5      A.   No.

 6      Q.   You don't know whose computer it was?

 7      A.   No.

 8      Q.   You turned it over to the attorneys?

 9      A.   Yes.

10      Q.   Have you ever seen a report of what was on

11  that computer?

12      A.   No.

13      Q.   Did you contact the feds about the fact that

14  you had located another computer?

15      A.   I contacted my attorneys.

16      Q.   Okay.  Now, in regard to the text message and

17  e-mails, you reviewed those on a -- from Marty's phone,

18  phones.  You received those on a CD?

19      A.   Yes.

20      Q.   How many CDs did you receive?

21      A.   I don't remember.

22      Q.   Approximately how many hours have you spent

23  reviewing that information?

24      A.   A lot.

25      Q.   More than twenty?
```

App.00018

TINA HAIGHT November 16, 2021

Page 207

1   we're talking about here, that Marty was discussing

2   corporate matters with his lawyers?

3       A.   Yes.

4       Q.   Okay.  And when you sold the company to Corey

5   Sanchez and others, did you return their

6   attorney-client privileged communications to the

7   company?

8       A.   I gave them to the attorneys.

9       Q.   That wasn't my question.  My question was, did

10  you give Corey Sanchez or anyone else at RRSA

11  Commercial or RRSA a copy of the e-mails of the

12  corporate correspondence between counsel?

13      A.   No.

14              MS. ANSON:  Let's take a five-minute

15  break.

16              VIDEOGRAPHER:  We're off record at

17  3:57 p.m.

18              (Off the record, 3:57 to 4:30 p.m.)

19              VIDEOGRAPHER:  We're back on record at

20  4:30 p.m.

21              MS. ANSON:  Prior to the break in the

22  deposition, Ms. Haight had identified certain documents

23  she had reviewed that had correspondence between Marty

24  Haight and certain lawyers at certain law firms, and

25  then we discussed the corporate nature of some of those

TINA HAIGHT  November 16, 2021

Page 208

1  documents, and I asked counsel if they had possession

2  of those documents.  And I'll let Mr. Payne identify

3  what their response is.

4             MR. PAYNE:  It's our understanding that

5  those were contained on CDs or DVDs that were furnished

6  by Ms. Haight to Andrew Miller.  Andrew Miller then

7  transferred those to us.  Whether those have been

8  uploaded, whether they're corrupted, at this point none

9  of us knows.  And the individual who was working on

10  that was a paralegal by the name of Julianna, who is on

11  pregnancy leave right now.  We have someone working on

12  trying to determine right now whether or not we have

13  those in a produceable format, and I can't answer that

14  until I get a report from him, but I don't expect that

15  I'm going to get it until sometime later tonight or

16  tomorrow.

17             MS. ANSON:  And for purposes of the

18  record, none of those documents have been produced to

19  us in this litigation to date.  On 9/9 of '20, we

20  received answers to our first set of requests for

21  production of documents that specifically in numerous

22  requests requested such documents, and we have not

23  received them to date.  We'll see where we are at the

24  end of the deposition in terms of the discovery and the

25  availability of those, but for now we'll continue with

Amy Massey & Associates

TINA HAIGHT November 16, 2021

Page 209

1   the deposition.

2     Q.   (BY MS. ANSON)  Ms. Haight, you understand

3   you're still --

4             MR. PAYNE:  And for the record, I'm not

5   agreeing that we've received requests that were

6   responsive to these or that we haven't turned any of

7   them over.

8             MS. ANSON:  Well, do you have any Bates

9   numbers that you can identify where such documents --

10            MR. PAYNE:  As I'm sitting here right now,

11   no, I don't.

12            MS. ANSON:  Okay.  So let me finish my

13   question.  My understanding, as we sit here today,

14   there's no ability to identify, one, whether the

15   documents have been produced; two, any Bates labels

16   associated with the documents; and three, whether the

17   documents have even been uploaded to date?

18            MR. PAYNE:  I don't have the ability to

19   tell you that.  That's accurate.

20     Q.   (BY MS. ANSON)  Ms. Haight, you understand

21   you're still under oath?

22     A.   Yes.

23     Q.   And just prior to the break, we were talking

24   about documents that you reviewed, which were between

25   Marty Haight and certain lawyers?

Amy Massey & Associates

CONFIDENTIAL

Page 203

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION
3   UNITED STATES OF AMERICA      :
    ex rel. TINA HAIGHT           :
4                                 :
        Plaintiff-Relator,        :
5                                 :  Civil Action No.
    V.                            :  3:16-cv-1975-S
6                                 :
    RRSA (COMMERCIAL              :
7   DIVISION), LLC, et al.,       :
                                  :
8       Defendants.               :
9        **********************************************
10               C O N F I D E N T I A L
11         REMOTE ORAL and VIDEOTAPED DEPOSITION OF
12                    TINA L. HAIGHT
13                    MARCH 1, 2022
14                       VOLUME 2
15       **********************************************
16      REMOTE ORAL and VIDEOTAPED DEPOSITION of TINA L.
17  HAIGHT, produced as a witness at the instance of the
18  Defendant, and duly sworn, was taken in the above-styled
19  and numbered cause on Tuesday, the 1st day of March,
20  2022, from 10:08 a.m. to 1:57 p.m., before Pat English
21  Arredondo, CSR (TX), RMR, CRR, CLR, in and for the State
22  of Texas, reported by machine shorthand with the
23  reporter being located in Houston, Texas and the Witness
24  in Dallas, Texas, pursuant to the Federal Rules of Civil
25  Procedure; that the Witness will read the deposition.

CONFIDENTIAL

Page 290

1    with the contracts you saw.

2              Did you look at them?

3        A.   I don't remember them, actually.  I just know

4    that they were on there.

5              Did I look at them?  Yes.                    13:09

6        Q.   Okay.  And what did you look at them for?

7        A.   To see what it was.  I was curious.

8        Q.   When did you look at them?

9        A.   I don't know.

10       Q.   No recollection?                              13:09

11       A.   I don't.  I'm sorry.

12       Q.   Okay.  So on the -- once you got the CDs from

13   the company, the forensic company -- do we understand

14   what we're talking about?

15       A.   Yes.                                          13:09

16       Q.   And there were four.  Right?

17       A.   Four CDs.

18            MR. NICHOLSON:  Object to the form.

19       Q.   (By Ms. Anson)  Yeah.

20       A.   I believe there is four.                      13:09

21       Q.   Okay.  You understand what CDs are?

22       A.   Yes.

23       Q.   You understand what the number four is?

24       A.   I do, but I'm not 1,000 percent sure that

25   there are four but --                                  13:09

CONFIDENTIAL

Page 291

1                    (Simultaneously speaking.)

2        Q.   (By Ms. Anson)   That's not my question.

3             Do you understand what the number four

4    is?

5        A.   Yes, I do.                                      13:09

6        Q.   So there were four CDs from the forensic

7    company?

8        A.   I believe so.

9        Q.   Okay.

10            MR. NICHOLSON:   Heather, just so there         13:09

11   is -- just so there is no confusion, my paralegal tells

12   me this morning that the actual count is seven, not

13   four.

14            That was my mistake, but that's the

15   number of discs that were retrieved from Roshend.       13:10

16            (Court reporter clarification.)

17            MS. ANSON:   Okay.   Well, I'm deposing

18   Ms. Haight.

19       Q.   (By Ms. Anson)   And you recall four CDs.

20   Correct?                                                 13:10

21       A.   That's what I -- I thought.   I'm not --

22       Q.   Okay.   When you got those CDs, what did you do

23   with the CDs?

24            MR. NICHOLSON:   Object to the form.

25       Q.   (By Ms. Anson)   Ms. Haight, did you get CDs    13:10

CONFIDENTIAL

Page 298

1        A.    I don't remember.  I know I got his phone.

2        Q.    Ms. Haight, what devices did you take to the

3   forensic company to have the CDs made of?

4        A.    When?

5        Q.    When you took them to the forensic company to        13:19

6   have them -- the CDs made, what devices did you take?

7        A.    Well, there is different -- there is

8   different.

9        Q.    Okay.  So now -- so there's different times

10  you took devices to the forensic company?               13:19

11       A.    Yes.

12       Q.    Okay.  When was the first time you took

13  something to the forensic company?

14       A.    In 2015.

15       Q.    Okay.  When in 2015?                           13:19

16       A.    The day that I got the thumbs back.

17       Q.    What devices did you take to the forensic

18  company in February or March of 2015?

19       A.    I am 100 percent sure mine and Marty's phones,

20  but I'm not sure about the other -- the other devices,    13:19

21  what else I gave them that day.

22       Q.    When was the next time you took electronics to

23  the forensic company to have CDs made?

24       A.    I'm not sure.  It was -- it was -- I'm not

25  sure.                                                     13:20

CONFIDENTIAL

Page 299

1      Q.   Okay.

2      A.   It would be in 2015.

3      Q.   What prompted you to take additional

4   electronics to the forensic company sometime later in

5   2015?                                                 13:20

6      A.   Because when Marty died, he died of suicide

7   and I had to know -- I had to know.  I had to know why.

8      Q.   Ms. Haight, did you acquire additional

9   electronic devices that prompted you to take them to the

10  forensic company later in 2015?                       13:20

11     A.   There was devices like found around the house

12  that were just like -- ended up being kids' phones, but

13  I took them.  I didn't know if there were text messages

14  or anything on those.

15     Q.   So you took devices you didn't know what they  13:21

16  were?

17     A.   Yes.

18     Q.   When was the next time you took devices to the

19  technology company or the forensic company?

20     A.   It was in 2015.  I don't know when.            13:21

21     Q.   Okay.  What prompted you at that time to take

22  additional devices?

23     A.   Well, I had the "receivers" from the office

24  and I thought maybe they could get something off of

25  those.                                                 13:21

CONFIDENTIAL

Page 300

1      Q.    You had the what from the office?

2      A.    I think they are servers.  Servers.

3      Q.    Okay.  So you took servers.  Was there another

4  time you took devices to the forensic company to have

5  CDs created?                                          13:22

6      A.    I believe that we had some stuff taken, but I

7  don't remember when.  I don't remember.  It was in --

8  everything was given to the forensic in 2015.

9      Q.    What do you mean you had some stuff taken?

10     A.    I don't -- I don't -- I just know that I      13:22

11  didn't personally take them.  I had some stuff taken

12  there.

13     Q.    Who did you have take them there?

14     A.    Mary Day.

15     Q.    Who is Mary Day?                             13:22

16     A.    She was -- is a good friend of mine.

17     Q.    Why did you have Ms. Day take the devices?

18     A.    Because she was working with me.  She was

19  helping me.

20     Q.    Helping you what?                            13:23

21     A.    She was just being my best friend.  She was

22  just helping me.

23     Q.    Helping you what?

24     A.    Anything I needed, she did.  Like

25  she -- anything I needed.                             13:23

CONFIDENTIAL

Page 292

1    from the forensic company?

2         A.   Yes.

3         Q.   When you got the CDs from the forensic

4    company, what did you do with them?

5         A.   I took them to Office Depot.                13:10

6         Q.   And what did you do at Office Depot with the

7    desks -- or the CDs you got from the forensic company?

8         A.   I had them print everything off and put them

9    in binders.

10        Q.   Okay.  Where are those binders today?        13:11

11        A.   The attorneys and the government have had

12   them.

13        Q.   Which attorneys have them?

14        A.   My attorneys.

15        Q.   Which attorneys?                             13:11

16        A.   My federal attorneys.

17        Q.   All three of them, all three firms?

18        A.   Well, at that point it was Andrew Miller.

19        Q.   So then how do you know your current attorneys

20   have them?                                            13:11

21        A.   Because they do.

22        Q.   Okay.  And you've witnessed them have them?

23        A.   I've witnessed them having -- yes, documents.

24        Q.   And you said some of the binders are with the

25   government.  What binders do you allege are with the   13:11

CONFIDENTIAL

Page 301

1          Q.   Did she review documents with you?

2          A.   I don't know if she reviewed documents.

3          Q.   After the CDs were completed and you took the

4     CDs to Office Depot and the documents were printed out,

5     you indicated you looked through the documents.  Do you        13:23

6     recall that?

7          A.   Yes.

8          Q.   What were you looking for in the documents?

9          A.   Why Marty killed himself.

10         Q.   In those documents were there RRSA company           13:23

11    documents?

12         A.   In the documents from the Office Depot?

13         Q.   Yes.

14         A.   Yes.

15         Q.   What kind of RRSA company documents were in          13:24

16    those documents you reviewed from Office Depot?

17         A.   There was all kinds.

18         Q.   Please give me a list of what kinds.

19         A.   I don't -- there were emails.  There were text

20    messages.                                                      13:24

21         Q.   What kind of emails?

22         A.   With Marty and different people.  Anything

23    that Marty was, you know, cc'd on.

24         Q.   Was it your impression that the CDs

25    contained -- and the documents that were printed out by        13:24

CONFIDENTIAL

Page 302

1    Office Depot included a complete download of Marty's

2    email account?

3         A.   I don't know.

4         Q.   Okay.  When you reviewed the emails were they

5    all emails that Marty had either sent, received or was        13:25

6    copied on?

7         A.   I don't know if all of them were.

8         Q.   And what were you looking for in Marty's

9    emails?

10        A.   Why he killed himself.                              13:25

11        Q.   Were you also trying to build a case against

12   the companies?

13        A.   No.

14        Q.   You never reviewed a document that was

15   produced by Office Depot for purposes of creating a case      13:25

16   against the companies or the RRSA Defendants?

17        A.   My mentality at that point was to know why.

18        Q.   Did your mentality at some point change about

19   reviewing the documents for purposes of creating a case

20   against the RRSA Defendants?                                  13:26

21             MR. NICHOLSON:  Object to the form.

22        A.   When I started seeing documents, then I

23   started wondering what this was.

24        Q.   (By Ms. Anson)  When did that occur?

25        A.   Later in -- I don't know.  It was sometime in       13:26

App.00030

Page 303

1   2015.

2       Q.   Ms. Haight, do you know when you filed your

3   original complaint in the federal courts?

4       A.   In July of 2016.

5       Q.   Okay.  At any point between the time you          13:26

6   received the Office Depot documents and the time you

7   filed your complaint in July 2016, did you ever review

8   any of those documents for purposes of this litigation?

9            MR. NICHOLSON:  Object to the form.

10      A.   Yes.                                               13:26

11      Q.   (By Ms. Anson)  Okay.  In particular, from the

12   time you made that decision to look at documents for

13   purposes of this case, until you filed the complaint in

14   July of 2016, what documents did you review in that

15   regard?                                                    13:27

16      A.   There were emails that I reviewed.

17      Q.   What emails?

18      A.   I can't say specifically.

19      Q.   Well, you recall that you reviewed emails.

20   Who were the emails between?                               13:27

21      A.   Just different people.

22      Q.   What different people?

23      A.   I honestly don't -- I don't really remember

24   every single one.

25      Q.   I'm not asking --                                 13:27

CONFIDENTIAL

Page 304

1      A.   There was one -- there was one with Lend

2   Lease.  There was an email about -- about billing and it

3   listed some jobs.  There was -- I mean, I just don't

4   really remember in detail.  I'm sorry.  It's been years.

5      Q.   Ms. Haight, in conversations you've had that      13:28

6   have been recorded and in emails you have sent to people

7   and Facebook messages that you have posted, you have

8   routinely referred to reviewing thousands of documents

9   to discover what they did and to bring this suit.  I

10  want to know what those documents are.                    13:28

11             MR. NICHOLSON:  Object to the form.

12     A.   Just the emails.  Just different emails.

13     Q.   (By Ms. Anson)  What emails, Ms. Haight?

14     A.   I'm sorry.  I just -- the emails that were on

15  those CDs.                                                13:29

16     Q.   All of them?

17     A.   Not all of them.

18     Q.   Okay.  Which ones?

19     A.   There's just different ones.  I'm sorry.

20     Q.   No need to apologize, Ms. Haight.  I'm doing      13:29

21  discovery in this case.

22             You have now testified multiple times

23  that you reviewed emails in support of your allegations

24  in this litigation and I want to know what emails you're

25  talking about.                                            13:29

CONFIDENTIAL

Page 305

1      A.   Just any emails that referred to small

2  business, 8A companies, government commercial jobs.  I

3  don't remember specifically.

4      Q.   In those emails that you reviewed, were there

5  emails between Marty and his legal counsel or the              13:30

6  companies' legal counsel that Marty either was directly

7  a recipient of or was cc'd on?

8              MR. NICHOLSON:  Object to the form.

9      Q.   (By Ms. Anson)  Do you understand my question?

10     A.   What documents are you talking about?              13:30

11     Q.   The Office Depot documents that you've

12  reviewed, Ms. Haight -- can we talk about that universe

13  of documents?

14     A.   Yes.

15     Q.   Okay.  Were there emails in those documents?         13:30

16     A.   Yes.

17     Q.   Okay.  Were those the emails that you're

18  referring to as supporting your allegations in this

19  complaint?

20     A.   Some of them are, yes.                              13:30

21     Q.   Where are the other ones?

22     A.   They are on the CD.

23     Q.   Ms. Haight, isn't everything that was on the

24  CDs in the printed out documents from Office Depot?

25     A.   Yes.                                                13:31

CONFIDENTIAL

Page 306

1      Q.   Okay.  You just said that some of the emails

2   you reviewed to support your claims in this case were in

3   those documents.

4              Where are the other ones?

5      A.   Everything was given to the attorneys.        13:31

6      Q.   Okay.  Where did they come from?

7              MR. NICHOLSON:  Object to the form.

8      A.   The CDs.

9      Q.   (By Ms. Anson)  So the entire universe of

10   emails that we're talking about came from the CDs?      13:31

11      A.   Are you asking me if I had other emails?

12      Q.   Ms. Haight, you have made allegations in this

13   litigation.  Correct?

14      A.   Yes.

15      Q.   Okay.  You indicated that you reviewed certain   13:31

16   emails in support of your allegations in this

17   litigation.  Correct?

18      A.   Yes.

19      Q.   Are all of those emails that you reviewed in

20   support of your allegations in this complaint on the     13:32

21   CDs?

22      A.   I believe so.

23      Q.   Okay.  Now that we've established that, are

24   any of the emails on the CDs emails between Marty Haight

25   and his legal counsel, the companies -- are any of the   13:32

CONFIDENTIAL

Page 307

1    emails on the CDs -- let's ask it this way.

2              Are any of the emails on the CDs with

3    attorneys?

4         A.   Is Koley "Jensen" on any emails?  Yes.

5         Q.   And I wasn't limiting to it Koley Jessen.        13:32

6              Are any of the emails on the CDs with

7    attorneys?

8         A.   Yes.

9         Q.   Okay.  What attorneys?

10        A.   Well, Koley "Jensen".  I don't know what       13:33

11   other -- I don't know.  I would be guessing.  I don't

12   remember.

13        Q.   Are any of those emails that were with Koley

14   Jessen related to small business?

15        A.   Not that I know of.                            13:33

16        Q.   So it's your testimony here today that none of

17   the emails that are contained on the CDs are emails

18   where a Koley Jessen attorney is discussing small

19   business?

20        A.   I don't recall.                                13:33

21        Q.   You don't recall?

22        A.   No.

23        Q.   What small business emails do you recall

24   reviewing amongst anyone in that -- that came from those

25   CDs?                                                     13:33

CONFIDENTIAL

Page 308

1          A.   That I recall right now -- I don't recall any

2     right now.

3          Q.   Ms. Haight, you just testified a few moments

4     ago that you reviewed emails that related to small

5     businesses -- business that came from the CDs.          13:34

6               What emails were you referring to?

7          A.   There's emails, I just don't recall specifics.

8          Q.   Okay.  So if you don't recall the specifics,

9     how are you able to testify that they weren't with the

10    attorneys?                                               13:34

11         A.   I don't recall there being a specific email

12    with the attorneys.

13         Q.   Okay.  Do you recall there being any general

14    email with attorneys related to small business?

15         A.   I don't recall any.                            13:34

16         Q.   Don't recall any.  How would there be emails

17    from Marty's email account with the Koley Jessen

18    attorneys if there were no small business emails?

19              MR. NICHOLSON:  Object to the form.

20         A.   I don't know.  Because he e-mailed you.        13:34

21         Q.   (By Ms. Anson)  I'm Sorry.  What?

22         A.   Because he e-mailed you or you e-mailed him?

23         Q.   Are you talking about me?

24         A.   I'm talking about the Koley "Jensen"

25    attorneys.                                               13:35

CONFIDENTIAL

Page 309

1       Q.   Okay.  Well, I was a Koley "Jessen" attorney;

2   and, yes, there are emails that you have now put on a

3   log that were between me and Mr. Haight.

4              What I want to know, is there also emails

5   on those CDs that discuss with any attorney at Koley        13:35

6   Jessen or any attorney in the world small business?

7       A.   I don't know.

8       Q.   Who would know, Ms. Haight?

9       A.   The CDs.

10      Q.   Ms. Haight, you understand that there has been     13:35

11  significant debate in this case about certain

12  memorandums relating to small business.  Are you aware

13  of that?

14      A.   No.

15      Q.   You have no --                                      13:36

16      A.   What are you talking about?

17      Q.   Are you --

18      A.   I don't know what you're talking about.

19      Q.   Are you aware there has been disputes about

20  emails that contained memorandums from lawyers that         13:36

21  relate to small business?

22      A.   What is a memorandum?

23      Q.   You don't know what a memorandum is?

24      A.   I'm sorry.  I don't.

25      Q.   Okay.  Have you ever seen a memo written to        13:36



FILED FOR RECORD

2017 JAN 10 PM 2: 40

MELANIE REED
DISTRICT CLERK
ELLIS COUNTY, TX

CAUSE NO. 91058

| | | |
|---|---|---|
| TINA LEA HAIGHT, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF GRADY MARTIN HAIGHT, DECEASED | § § § § | IN THE DISTRICT COURT |
| | § | |
| VS. | § § | |
| | § | |
| JOHN PALTER, PALTER STOKLEY SIMS PLLC, AUBREY M. CONNATSER, AUBREY M. CONNATSER PLLC D/B/A CONNATSER FAMILY LAW, KOLEY JESSEN P.C., L.L.O., DAVID DVORAK, DAVID MAYER and MATTHEW MASER | § § § § § § § § § | ELLIS COUNTY, TEXAS |
| | § | 40TH JUDICIAL DISTRICT |

## ORDER ON MOTION FOR SANCTIONS

On August 29, 2016, the Court heard Defendants John Palter and Palter Stokley Sims

PLLC's Motion for Sanctions (the "Motion"). Thereafter, at the direction of the Court, the

record on the Motion was supplemented with additional evidence. The Court, having considered

the Motion, response, letter briefs, evidence, and oral argument of counsel offered in support of

and in opposition to the Motion, is of the opinion that the Motion should be granted in part and

denied in part.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that, in addition to

any other exhibits previously admitted, the following items are admitted into evidence as exhibits

relating to the Motion:

1.    The Affidavit of John T. Palter signed and sworn to on November 22, 2016 (the "Palter Affidavit").

2.    The certified audio transcription of the recording attached to the Palter Affidavit as Exhibit "A".

3.    The Amended Affidavit of John T. Palter signed and sworn to on January 5, 2017, including all exhibits to the Amended Affidavit.

App.00038

4.      The CD containing the audio recording of the "Meeting after Marty Haight's death," identified as #28 on plaintiff's log of recordings produced in this action (the "Meeting CD").

5.      All exhibits attached to the Motion ("Motion Exhibits"), including Exhibit 17A filed as a supplement to the Motion Exhibits.

6.      All exhibits attached to the plaintiff's response to the Motion ("Response Exhibits").

The plaintiffs' objections to the admissibility of the Meeting CD are **OVERRULED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the following instruction will be given to the jury at the trial of this action:

> Tina Lea Haight destroyed or failed to preserve audio recordings of conversations, meetings, and other communications between her and the Palter Defendants. You must consider that this evidence would have been unfavorable to Ms. Haight on the issues of whether the Palter Defendants adequately advised or informed her regarding: the sale of the Haight Companies; the release of certain parties as part of the sale transaction; her fiduciary responsibilities as executrix; and other matters as to which she complains that she was not adequately advised or informed by the Palter Defendants.

The Court makes the following findings of fact and conclusions of law in support of its decision to submit the foregoing instruction:

1.      Plaintiff Tina Haight claims in this action that defendants John Palter ("Palter") and Palter Stokley Sims PLLC (collectively "the Palter Defendants") failed to properly advise her in various respects and disobeyed her instructions in certain respects. (Plaintiff's Fifth Amended Original Petition at 8-10 (¶¶ 23-38), 11 (¶ 47); *see also* Response Exhibit 3). These allegations render the scope and content of communications between Haight and the Palter Defendants a highly material issue in this action.

2.      It is likely that as of March 29, 2014, and certain that as of December 1, 2014, Haight knew or reasonably should have known that there was a substantial chance that a claim against the Palter Defendants would be filed.

3.      Beginning on March 29, 2014, and continuing through at least February 9, 2016, Haight recorded numerous in-person conversations, telephone conversations, voice mail messages, and meetings involving the parties to this action and/or the issues involved in this action. These include, but are

App.00039

not limited to, conversations and/or meetings involving defendants John Palter, Aubrey Connatser, David Dvorak, David Mayer, and Matthew Maser, and Haight's sister Tracy Nussbeck and Gene Kroh. (Motion Exhibits 3, 6). Among these is the June 6, 2014, closing of the sale transaction that forms the basis of many of Haight's claims in this action (the "Sale Transaction"). (Motion Exhibit 4).

4.      Haight claims that on one of the recordings, Palter misinformed her that the Sale Transaction did not involve a release of certain parties and their attorneys. (Motion Exhibit 5).

5.      On March 21, 2015, Haight sent an e-mail to Cory Sanchez that stated that she was in possession of recordings of all of their meetings and implied that the recordings contained evidence of "federal fraud." (Motion Exhibit 16).

6.      Haight claims that she made the recordings because she "didn't trust everybody." (Motion Exhibits 4, 15).

7.      At the time she made the recordings, and continuing to the present, Haight knew or reasonably should have known that the recordings would be material and relevant to her claims in this action. Indeed, she testified that she made the recordings in the anticipation that they would constitute relevant evidence.

8.      Production of the recordings was requested by the Palter Defendants (Motion Exhibit 2 at 3-4, 6 (¶¶ 1-3, 5, 7-10, 26), as well as by other defendants (Motion Exhibits 2a, 2b, & 8).

9.      Haight has produced a limited number of recordings in this action. (Motion Exhibit 13 at 3-4 (¶ 1)). With the exception of the Meeting CD, which contains relevant information concerning this action, none of the produced recordings is particularly substantive. The recordings of the closing of the Sale Transaction, and of conversations and/or meetings involving Connatser, Dvorak, Mayer, Maser, and Sanchez have not been produced. Although a few recordings involving Palter have been produced, other recordings involving Palter (including the recording in which Palter allegedly misinformed Haight concerning the release) have not been produced.

10.     Haight has repeatedly claimed under oath that she had all of the recordings in her possession. (Motion Exhibits 3-7). She now claims, however, that all recordings in her possession have been produced, and that the recording devices on which she recorded the remaining conversations and/or meetings have now been located and are blank. (Response Exhibit 3 at 4-5 (¶ 32)). The circumstances, including Haight's unequivocal initial statements that she had the recordings in her possession, her threat to

Sanchez based on the existence of the recordings, her production of numerous relatively non-substantive recordings and non-production of numerous relatively substantive recordings, her change of testimony only when it became apparent that production could no longer be delayed, and the improbability of malfunction of each of several separate recording devices, convince this Court that Haight's current testimony that no further recordings ever existed is not credible. The Court therefore finds that Haight at one time had possession of each recording that she testified to having made.

11.   Haight testified unequivocally that the recordings were present in boxes of material removed from her ranch house and stored in a barn. (Motion Exhibit 3; Response Exhibit 3 at 4 (¶ 32)). She now claims to have gone through "literally well over a thousand boxes in the barn" without finding the recordings, although she claims to have retrieved all of the recording devices. (Response Exhibit at 4 (¶ 32)). From the continued existence of the boxes retrieved from the ranch house and the recording devices, the fact that the recordings were made on multiple devices, the Court infers that the recordings were not destroyed or lost through accident or inadvertence. Haight's false testimony concerning the non-existence of the recordings further supports the inference that they were deliberately destroyed or suppressed by her. The Court therefore finds that Haight either intentionally destroyed the recordings, or that she has them in her possession and is willfully refusing to produce them.

12.   In the alternative, the Court finds that Haight failed to exercise reasonable care to preserve the recordings. By her own testimony, the recordings concerned critical conversations, meetings, and other communications bearing on the truth or falsity of her allegations in this action. A reasonable person of ordinary prudence in Haight's situation would have taken steps to prevent loss or destruction of the recordings.

13.   Under the facts of this case, the recordings were of unique importance to the Palter Defendants' defense of the case. The gravamen of most of Haight's allegations is that the Palter Defendants failed to inform her, or affirmatively misinformed her, concerning critical elements of the Sale Transaction and of her duties and responsibilities as executrix of her husband's estate. Communications between Haight and Palter are therefore critically relevant to the allegations. Many of those communications were private attorney-client communications as to which there were no third-party witnesses. The content of the recordings would thus have been crucial objective corroborative evidence tending to support one party's version of the communications or the other party's version. This is confirmed by Haight's recognition at the time the recordings were made that they would constitute important evidence bearing on her claims.

14.     The centrality of the recordings to this case, and Haight's foreknowledge of that centrality, convinces the Court that, had the recordings been supportive of Haight's claims against the Palter Defendants, Haight would have taken significant steps to preserve the recordings and to produce them for eventual use against the defendants at the trial of the case.  The Court accordingly infers that the content of the recordings would have contradicted or significantly undercut Haight's testimony regarding the content of the recorded conversations.

15.     Pursuant to *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 21-22 (Tex. 2014), the Court has considered three factors in determining the sanction to be awarded for Haight's spoliation of the recordings.  These are (1) the degree of fault on Haight's part, (2) the degree of prejudice suffered by the Palter Defendants, and (3) whether there is a lesser sanction that will avoid substantial unfairness to the Palter Defendants.

16.     As to the first factor, the Court has concluded that Haight has intentionally destroyed or suppressed the recordings, or in the alternative that she negligently permitted them to be lost or destroyed notwithstanding knowledge of their critical importance.

17.     As to the second factor, the Court concludes that the prejudice to the Palter Defendants from the destruction or suppression of the recordings is extreme.  As noted above, the recordings are the only objective means by which the "he-said-she-said" dispute over the content of the parties' communications could be resolved.  *See Cire v. Cummings*, 134 S.W.3d 835, 841 (Tex. 2004) (citing trial court finding that destruction of evidence in legal malpractice case "take[s] away from these Defendants the ability to show by recorded conversations and/or documents objective proof that these Defendants are not liable").  Thus, as noted in *Brookshire Bros.*, 438 S.W.3d at 22, the spoliated evidence would have been significantly superior in kind and quality to the available evidence, and hence would not have been merely cumulative.

18.     As to the third factor, the Court has taken into account the fact that the spoliated evidence cannot be replaced or recreated from other sources. Monetary sanctions would not in any way cure the prejudice to the Palter Defendants.  Other than the spoliation instruction set forth in this order, the only other potential sanctions that would cure the prejudice to the Palter Defendants would be an order precluding Haight from offering evidence concerning the communications in question, or outright dismissal of Haight's claims.  In light of Haight's burden of proof, however, the Court concludes that a preclusion order would be a more severe sanction than a spoliation instruction, perhaps leading to the eventual direction of a verdict against her, and would be excessive.  The Court further concludes that the Palter Defendants' requested sanction of dismissal of Haight's claims would be excessive.

<u>**ORDER ON MOTION FOR SANCTIONS**</u>                                                            – Page 5
8592923.1/SP/24100/0149/010617

19.   Although the Court has found that Haight's spoliation was intentional, it
further finds in the alternative that if the spoliation was merely negligent,
it had the effect of prejudicing the Palter Defendants to the extent that they
have been irreparably deprived of having any meaningful ability to present
their defense.  The spoliation instruction set forth in this order therefore
falls within the exception outlined in *Brookshire Bros.*, 438 S.W.3d at 25-
26.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, insofar as the

Motion seeks relief other than that granted in this order, it is **DENIED**.

**SIGNED** this _____ day of January, 2017.

JAN 1 0 2017

_____

BOB CARROLL
JUDGE PRESIDING

App.00043